**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
:
MILBERG LLP,                                                     :
                                                                :
                          Petitioner,                           :
                                                                :
                  v.                                            :        Case No.:
                                                                :
HWB ALEXANDRA STRATEGIES PORTFOLIO;                             :
HWB DACHFONDS – VENIVIDIVICI;                                    :
HWB GOLD & SILBER PLUS;                                          :
HWB PORTFOLIO PLUS;                                              :
HWB RENTEN PORTFOLIO PLUS;                                       :
HWB VICTORIA STRATEGIES PORTFOLIO;                             :
DRAWRAH LIMITED;                                                :
NW GLOBAL STRATEGY;                                             :
U.V.A. VADUZ;                                                   :
VICTORIA STRATEGIES PORTFOLIO LTD.,                            :
KLAUS BOHRER; and                                              :
UTE KANTNER;                                                    :
                                                                :
                          Respondents.                          :
                                                                :
------------------------------------------------------------------------X

## PETITION TO VACATE ARBITRATION AWARD

Petitioner Milberg LLP ("Petitioner" or "Milberg") hereby petitions this Court pursuant
to 9 U.S.C. § 10 to vacate the portion of the Final Award ("Award") entered February 4, 2019 in
the arbitration between Petitioner and Respondents listed above in which the arbitration panel
declined to order payment of any attorneys' fees to Petitioner by Respondents in connection with
Petitioner's successful representation of Respondents in actions in this Court to recover on
Respondents' defaulted Argentine government bonds. Petitioner states as follows:

### Parties

1.      Petitioner is a limited liability partnership organized under the laws of New York,
and specifically is a New York law firm. It represented numerous individual and small-fund

bondholders in the Argentine bond litigation. Estudio Rosito Vago ("Rosito Vago"), a law firm with its principal place of business in Buenos Aires, was the originating counsel for many of the bondholder clients in these cases, including Respondents, and provided client legal services and assisted in prosecuting the cases from Buenos Aires throughout the cases' duration. Dreier LLP ("Dreier"), a New York law firm, was originally counsel of record for many bondholders, including some of the Respondents; when Dreier failed in 2009, most clients, including Respondents, retained Milberg as substitute counsel of record. Milberg and Rosito Vago also were retained by many other bondholders, including certain Respondents, post-Dreier.

2.      By written agreements, Milberg represents the residual fee interests of the Dreier bankruptcy trustee and the fee interests of Rosito Vago with respect to all of Respondents' cases, including in these proceedings. The co-counsel and fee-sharing agreements among Milberg, the Dreier trustee, and Rosito Vago were approved by the Dreier bankruptcy court. Allocation of fees among Milberg, the Dreier trustee, and Rosito Vago is not disputed and was not an issue in the arbitration. References to the interests of "Milberg" and "Petitioner" herein include the interests of Rosito Vago and the Dreier trustee.

3.      Respondents are ten investment funds,[1] organized in Luxembourg and Germany and two individuals (Klaus Bohrer and Ute Kantner) from Germany. Respondents retained Petitioner to enforce some $90 million in face value of defaulted bonds. Respondents became, by far, Petitioner's largest client group in the epic Argentine bond litigation.

## Jurisdiction and Venue

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a) because the amount in controversy exceeds $75,000 and the action is between diverse citizens. Subject

---

[1] A few of the original fund plaintiffs were combined while the litigation was ongoing, Respondents are the successor funds.

matter jurisdiction also exists pursuant to 28 U.S.C. §§ 1331 and 1367 because the underlying Argentina bond litigation arose under federal law and was conducted under federal jurisdiction, and because the arbitration award was made and is subject to vacatur based on federal law.

5.     Venue is proper under 9 U.S.C. § 10 because the Award was made in this district, and under 28 U.S.C. § 1391(a) because the parties agreed to arbitration in this district.

## Factual Background

### Summary

6.     This petition involves an award in an AAA/ICDR arbitration in which Petitioner sought to recover fees for legal work done for Respondents. The engagement agreements had hybrid fee provisions, including fixed-fee installments linked to case milestones (retention, filing complaint, and obtaining money judgment) and percentage-based contingency fees if any recoveries or settlements were obtained. Respondents paid $513,245 in the milestone fixed fees between 2007-2012. Petitioner obtained money judgments for Respondents over several years, which Argentina ignored; and then obtained *pari passu* injunctions for Respondents in October 2015. In February 2016, Argentina made its public settlement offers ("Propuesta") on the bonds, including enhanced settlement amounts for holders of *pari passu* injunctions. The total Propuesta settlement amount on Respondents' bonds calculated to some $162.5 million. In April 2016, Respondents inquired what their contingency fee would be if they accepted Propuesta settlements ($11.91 million), and two weeks later discharged Petitioner. A year later, using another lawyer, Respondents settled with Argentina for $162.3 million—some $150,000 less than the settlement available prior to discharge of Petitioner. Petitioner sought fees in *quantum meruit* in the underlying arbitration. Respondents asked for a reasoned decision, which the arbitration panel provided. The panel declined to award any fees, despite acknowledging that

3

Petitioner's extensive litigation efforts resulted in the settlement offers to Respondents; the panel did not articulate any reason other than stating, without any explanation, that the previously paid $513,245 in milestone payments (made years earlier and unrelated to Petitioner's crucial *pari passu* injunction work) "represent a reasonable total fee recovery." This petition seeks vacatur of the zero fee award, and remand with instructions to the panel to compute a fee consistent with the principles of *quantum meruit*

7.     This factual background section is based on many of the findings in the Final Award issued by the arbitrators.[2] It also refers to the arbitration record, including summary and source materials in the Statement of Claim,[3] and the written direct testimony of the senior lawyer from Milberg, Michael Spencer.[4]

<u>The Bond Litigation for Respondents</u>

8.     "Starting in 2002, holders of bonds in which Argentina had defaulted began to sue in the SDNY to enforce payment on their bonds."[5] The defaults on "external indebtedness" totaled about $90 billion, primarily including holders of some 20 series of "global" bonds.[6]

9.     Rosito Vago began to represent holders of defaulted Argentine bonds in 2001 and arranged for Dreier to represent those clients as counsel of record in SDNY cases.[7]

10.    Respondents retained Dreier and then Milberg to prosecute claims for recovery on some $90 million in face value[8] of defaulted Argentine bonds held by Respondents. Over the

---

[2] The Final Award ("Award") is attached as Ex. 1 to the Declaration of William F. Dahill in Support of Milberg's Petition and Motion to Vacate the Final Arbitration Award (the "Dahill Declaration"), submitted herewith.
[3] The full Statement of Claim ("Claim") is attached to the Dahill Declaration as Exhibit 2.
[4] Direct testimony at the arbitration hearing was submitted in writing. The direct Testimony of Michael C. Spencer ("Spencer Test.") is attached to the Dahill Declaration as Exhibit 3.
[5] *See* Award ¶ 24.
[6] *See* Spencer Test. ¶¶ 5-7.
[7] Award ¶ 25.
[8] Award ¶ 35. About ten percent of Respondents' bonds were euro-denominated; unless otherwise noted, amounts in this petition are converted to dollars at prevailing exchange rates.

years the various Respondent funds acquired bonds, usually at steep discounts from face value, and decided to sue on them. Respondents entered into 28 written engagement agreements with Dreier and then Milberg for investigation, commencement, prosecution, and resolution of recovery actions in this district. The engagement agreements also covered services by Rosito Vago as Argentine co-counsel. A total of seven SDNY actions covering scores of bond holdings of the 12 Respondents were filed in 2007-2013.[9]

11.     Both the Dreier and the Milberg engagement letters provided for New York law to govern and for arbitration of any disputes in New York. All but one of the letters contained "early termination" provisions, which permitted the client to terminate, usually if there had not been a judgment, settlement, or recovery within an interval of one or two or three or five years after execution of the letter, "without any further compensation or obligation" to the law firm.[10]

12.     The engagement letters provided for hybrid fees. First there were fixed "flat" fee amounts (sometimes referred to as "start-up" or "retainer" fees) to be paid by the clients "upon the achievement of defined tasks or results obtained" ("milestones")—usually retention, complaint filing, money judgment obtained.[11] Then there were percentage contingency fees "on amounts, if any, recovered from Argentina on the bonds."[12] Case expenses were not charged to Respondents and would not be subtracted from any contingency fees—expenses were borne by the lawyers.[13]

---

[9] A list of the actions, the Respondent plaintiffs in each, and the face amounts of bonds at issue is Ex. A to the Claim. The engagement agreements are collected at Claim Exs. B and C.
[10] The "early termination" provisions are fully described at Award ¶¶ 27-33. Respondents attempted to exercise early termination rights when they discharged Milberg in May 2016, after Argentina announced its settlement offer. Respondents made this one of their central defenses in the arbitration. As described below, the panel rejected that defense.
[11] Award ¶ 31.
[12] Award ¶ 27.
[13] Award ¶ 27; *see also* Claim Exs. B and C.

13.     By amount, the retainer/start-up fees ranged from a few hundred dollars to a high of $84,000 per plaintiff, usually payable in equal installments at each milestone.[14] The total amount of these retainer/start-up fees paid by Respondents (based on all milestones reached) was $513,245.[15] Overall, that amount calculates to a bit over one-half-percent (0.0056) of the face value of the bonds.[16]

14.     The contingency fees were defined on the basis of a percentage of the client's recovery—the specified percentages were 8% or 12%, but in almost all cases, no fee percentage was taken on a floor amount of the first 20 or 35 cents per dollar of face value, as negotiated at various times.[17] The floor amounts make it impossible to calculate a meaningful overall contingency fee percentage, except in the context of any particular recovery or settlement.[18]

15.     Petitioner zealously prosecuted Respondents' claims, along with similar claims by other bondholder clients. Over the years, Dreier and then Milberg obtained money judgments on virtually all client-plaintiffs' bonds, including Respondents'. Petitioner submitted evidence in the arbitration of the SDNY dockets for Respondents' cases demonstrating the extensive work it did, including filing complaints, opposing Argentina's motions to dismiss, filing summary judgment motions on bond enforcement and Argentina's defenses, obtaining the entry of money judgments and engaging in discovery disputes, and samples of some of the same.[19] Since Dreier had been involved in some of the earliest bond cases, evidence of their precedent-setting motion practice, which benefited clients in all later actions (including Respondents'), was also produced.[20]

---

[14] *See* Claim Exs. B and C.
[15] Award ¶ 82.
[16] Spencer Test. ¶ 15.
[17] *See* Claim Exs. B and C.
[18] On Respondents' eventual overall settlement amount of $162.3 million, the fee percentage would be about 7.34%. Spencer Test. ¶ 92.
[19] *See* Claim Ex. D; Dahill Declaration Exs. 4-9.
[20] *See* Dahill Decl. Ex. 10; Spencer Test. ¶ 10.

16.     Argentina refused to pay any money judgments and was able to shield its assets from collection efforts. That stalemate was broken when several test cases brought by a core group of large hedge funds, joined by Milberg in a test case for a small group of modest Argentine bondholders, obtained "equal treatment" injunctions under the *pari passu* clauses of the bonds.

17.     The panel found:

> Spencer [lead Milberg partner] participated in strategic discussions with a group of leading plaintiffs' counsel led by Dechert partner Robert A. Cohen. Spencer assisted in coordinating the strategy of counsel representing smaller plaintiffs in order to obtain *pari passu* injunctions, also known as equal treatment injunctions (requiring equal treatment of bondholders in accordance with the terms of the governing indentures) that contributed to resolution of the Argentina bond default cases.

> Milberg filed its first *pari passu* motion, for a Milberg client named Varela, in coordination with similar motions filed by hedge fund plaintiffs, and participated actively in *pari passu*-related litigation.[21]

18.     Thereafter, the hedge fund counsel and Milberg successfully defended the injunctions in this Court, the Second Circuit and the Supreme Court, which had the effect of preventing Argentina and its banks from paying on other obligations that it wished to honor. After the success in the test cases, Milberg obtained injunctions in October 2015 for its other clients, including with respect to all qualifying bonds held by Respondents.[22]

19.     With the *pari passu* injunctions in place, the incoming administration of Mauricio Macri made the Propuesta bond settlement offers in February 2016. On that basis, Argentina moved for vacatur of the *pari passu* injunctions, which was vigorously opposed by Milberg; but the district court granted vacatur and the Second Circuit affirmed in mid-April 2016, making the

---

[21] Award ¶¶ 36-37.
[22] Award ¶¶ 36-38; Spencer Test. ¶¶ 23-36.

Propuesta the maximum definitive offer available from Argentina.[23] Milberg then advised its clients, including Respondents, to accept Propuesta settlements, which most clients other than Respondents did.[24]

20.      During this period, Respondents, acting through their manager and several directors, were constantly in touch with Milberg to assess whether Argentina would sweeten its Propuesta offers. Milberg and Rosito Vago exchanged dozens of emails with Respondents' manager.[25] A Luxembourg manager for many of the Respondent funds, however, began asking questions about the early termination provisions, even though the termination dates had passed months or years earlier, after which time Petitioner provided substantial services to Respondents, and also asked about "the current status of your prospective fees," which Petitioner answered.[26] On April 28, 2016, Brand [Respondents' manager]:

> sent an e-mail to Spencer in which he advised that he was in negotiations with the Special Master [to try to make a deal with Argentina] and that Spencer "should not worry much about performance fees. After all these years I promise to you, that I will include something reasonable for you in my final negotiations, when settling with the Gauchos, in the very near future." Brandt did not do so.[27]

21.      "In April and May 2016, HWB [Respondents] terminated the Milberg Agreements citing, as a basis for the terminations, the early termination provisions in the Milberg Agreements."[28]

Post-Discharge Events

22.      The Propuesta offers amounted to $162,504,207 with respect to Respondents' bonds. For almost all of Respondents' bonds, that amount reflected the augmented "Injunction"

---

[23] Award ¶¶ 42-45.
[24] Award ¶ 47.
[25] Award ¶ 46.
[26] Spencer Test. ¶ 55.
[27] Dahill Declaration, Ex. 15; *see* Award ¶ 49 (internal citations omitted).
[28] Award ¶ 50.

settlement amount based on the *pari passu* injunctions obtained by Milberg.[29] Without the injunctions, Respondents' Propuesta settlement entitlement would have been over $24 million less.[30]

23.     After the April-May 2016 discharges of Milberg by Respondents, no other law firm appeared for Respondents (*viz.* Local Civil Rule 1.4: an attorney of record "may be relieved or displaced only by order of the Court"). In November 2016, Respondents' manager told Milberg he had retained new counsel, Wilk Auslander LLP, but that he was coming to New York and wanted to "include" Milberg in their negotiations with Argentina. Thereafter, he directed all communications be held through his new law firm. Wilk Auslander informed Milberg that Respondents would not pay any fees.

24.     On May 31, 2017, Special Master Pollack announced that Respondents had settled with Argentina for $162,750,000.[31] However, documents later produced by Respondents in the arbitration disclosed that the real settlement amount was recalculated in October 2017 to be $162,349,235,[32] which Argentina paid and Respondents accepted. Petitioner, based on its extensive experience with hundreds of other Propuesta settlements, calculated the correct Propuesta settlement value for Respondents' bonds at $162,504,207, which would have yielded a contingency fee of $11,906,767.[33] The fee amount was escrowed pending final resolution of the present dispute.[34]

---

[29] Claim Ex. G; Spencer Test. ¶¶ 90, 104.
[30] Spencer Test. ¶ 62.
[31] Award ¶ 55.
[32] Award ¶ 57; Spencer Test. ¶ 64.
[33] Award ¶ 56; Claim Exs. G, H.
[34] Award ¶ 58.

The Arbitration

25.      In August 2017, Petitioner commenced an AAA/ICDR arbitration as provided in

the engagement agreements. The arbitration claims included a request for *quantum meruit* in the

amount called for by the engagement agreements had they remained operative. Three arbitrators

were selected. Respondents requested a reasoned decision and the panel agreed to provide one.

26.      The panel allowed the parties to request documents from the other side.

Respondents' request to Petitioner regarding time records was:

> Time records of the Law Firms relating to services performed solely on behalf of
> Respondents (as distinct from services performed by the Law Firms on behalf of
> their other clients).[35]

To respond to this request, Milberg performed word searches and produced timesheets

that made reference to any Respondents or Respondents' personnel. Rosito Vago did not

have timesheets for these cases because Argentine firms do not keep time records for

contingency fee cases. Dreier's timesheets were no longer available.

27.      Two months after Petitioner's initial production, one of Respondents' counsel

wrote to inquire whether certain documents "are the only time records you have produced and

plan to produce."[36] Since Respondents previously had asked only for time records for services

"performed solely on behalf of Respondents," but counsels' discussions now indicated

Respondents were making a much broader request, Petitioner produced all time records from the

bond cases, since the time spent on all of the bond clients benefitted each client, including

Respondents, and thus were relevant to the *quantum meruit* claim. Petitioner produced about 300

pages of computer line entries, reflecting 7,719.25 hours. Respondents protested to the panel that

they previously had asked for "[t]ime records of the Law Firms"—leaving off the "related to

---

[35] Dahill Declaration, Ex. 11 at Req. No. 2.
[36] Dahill Declaration, Ex. 12.

services performed solely on behalf of Respondents" qualifier.[37] Despite the fact that more than

six weeks remained before the hearing, the panel nevertheless excluded the records, finding that

the documents were not timely produced because they were (inexplicably) deemed responsive to

Respondents' earlier request for time records for "services performed solely on behalf of

Respondents."[38]

      28.     Respondents also made the following document request:

> Documents that support Claimant's position that quantum meruit value of services
> is equal to "30% contingency fee plus expense reimbursement." [Statement of
> Claim] at p.21).[39]

In response, Petitioner produced documents showing that Judge Griesa had approved an

award of a 30% contingency fee, plus reimbursement of substantial litigation expenses, to

plaintiffs' counsel in the class actions brought on behalf of certain bondholders—even

though plaintiffs' counsel had not been able to get *pari passu* injunctions entered in those

cases.[40] This was one of the pieces of evidence Petitioner submitted to support its

*quantum meruit* claim.

      29.     The arbitration was heard over a week in August 2018. Petitioner provided

testimony from Mr. Spencer, a Milberg associate lawyer, Ms. Rosito Vago, a Rosito Vago

administrator, and Robert Cohen, a Dechert partner who represented the largest hedge fund

bondholder, who testified about Milberg's contributions to the *pari passu* injunction efforts.

Respondents provided testimony from Mr. Brand, Respondents' manager.

---

[37] Dahill Declaration, Ex. 13, p. 2.
[38] Dahill Declaration, Ex. 14, p. 6.
[39] Dahill Declaration, Ex. 11 at Req. No. 13.
[40] Dahill Declaration, Ex. 16.

<u>The Arbitrators' Final Award</u>

30.     The panel issued its Award on February 4, 2019. It rejected the defenses asserted

by Respondents against any fee liability. In particular, it found:

    (a)     The engagement letters' provisions giving clients the right to terminate

"without any further compensation or obligation" following the specified milestone dates

were "of no avail" to Respondents: first, because Respondents "did not exercise that right

within a reasonable time"; and second, even if the exercise had been timely, Respondents

"waived the right by continuing to request and accept the benefit of Milberg's services."[41]

    (b)     The fixed start-up fees were not "improper non-refundable advances" and

did not raise any ethical concerns.[42]

    (c)     The contingency fee and bond transfer restrictions in the engagement

letters did not give the lawyers an improper proprietary interest in the bonds or unduly

restrict the client's property interests, and, in any event, the clients' situations never

implicated these ethical issues and the clients' rights were never prejudiced.[43]

    (d)     Respondents' claim that it was malpractice for Milberg to advise clients to

reject the Propuesta prior to mid-April 2016 was "without basis." Milberg's advice was

reasonable, and a lawyer's judgment as to which course to pursue among reasonable

alternatives cannot form the basis of a malpractice claim.[44]

---

[41] Award ¶ 68-70.
[42] Award ¶ 71.
[43] Award ¶ 72.
[44] Award ¶ 87.

31.     The panel then turned to determination of the reasonable value of legal services performed by Petitioner for Respondents as of the time Respondents terminated the attorney-client relationship.[45]

32.     The panel observed that "A *quantum meruit* analysis under New York law involves determining the reasonable value of legal services, taking into consideration the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended in rendering the services, the quality of performance of counsel, counsel's qualifications, the amount at issue, and the results obtained."

33.     With respect to the difficulty, nature and extent of the legal work performed by Milberg, Rosito Vago, and Dreier, the panel found:

> The difficulty of the representation was considerable, as reflected in the fact that litigation arising from the sovereign bond defaults in question began in 2002, involved legions of plaintiffs and many plaintiffs' lawyers, and did not result in the *Propuesta* until 2016. The representation of individual clients required strategic coordination with larger groups of plaintiffs and their counsel and, at the same time, specific attention to the facts, circumstances and priorities of each client or set of clients. Moreover, Milberg made a valuable contribution to the coordinated bondholder efforts (Cohen ¶¶ 8-11) and, at the same time, paid close attention to the priorities and instructions of HWB [Respondents].

> The nature and extent of the services rendered to [Respondents] over an extended period of time included rendering sophisticated legal advice; engaging in strategic coordination with other plaintiffs' counsel; preparing and filing pleadings; engaging in *pari passu* motions practice; obtaining judgments against Argentina; actively participating in appellate practice in the Second Circuit; providing input in settlement discussions; and reporting to the client on a timely basis as to all material developments in the case and related settlement negotiations.[46]

34.     The panel had more trouble in determining the amount of time reasonably expended in rendering services. The panel noted that time records for Rosito Vago and Dreier were not available, and that Milberg's time records showed 172 attorney hours and 90 paralegal

---

[45] Award ¶ 73.
[46] Award ¶¶ 75-76.

hours in the representation of Respondents, yielding a lodestar of $142,900—which was

considerably more than the $86,700 portion of the start-up fees received by Milberg.[47]

35.    The panel continued:

[A] comparison of the time records maintained by Milberg specifically for
[Respondents], on the one hand, with the description of services provided in the
Spencer and Vago witness statements and the legal filings and docket entries
included in the record of this hearing, establishes that Milberg did expend more
time on the representation of [Respondents] than is reflected in its [Respondent]-
specific time records. The 70-page Spencer witness statement, in particular,
provides a comprehensive overview of the effort undertaken and in effect, serves
as the equivalent of an affidavit of services in New York State practice. The Vago
witness statement also reflects time-intensive, though not particularly substantive
legal work done for [Respondents]. The Spencer and Vago witness statements,
combined with the docket sheets, clearly establish that much more legal effort was
expended on behalf of [Respondents] than is reflected in Milberg's time records. .
. .

Milberg's argument that its activities for other clients should be considered in
*quantum meruit* nonetheless has merit, however, in the sense that Milberg's closely
related and coordinate work for other clients affects at least two qualitative criteria
in *quantum meruit* analysis: the quality of performance of counsel and counsel's
qualifications.

The final factors in *quantum meruit* analysis, namely the amount at issue and the
result obtained, tend to justify a substantial fee recovery in this case. Milberg
represented [Respondents] in connection with Argentina's default in payment of
[Respondent]-held bonds and Milberg's efforts contributed to obtaining the
*Propuesta,* a settlement worth in excess of $16 million to [Respondents]. Milberg
prosecuted [Respondents'] claims in the context of complex and wide-ranging
litigation against a sovereign that had defaulted on bonds with a face value in excess
of $20 billion.[48]

36.    Despite the foregoing conclusions based on the extensive factual record presented

at arbitration, the panel concluded that no fee should be awarded::

Under the facts of this case, qualitative factors properly considered in *quantum
meruit* analysis justify fees to Milberg in excess of the amount that simple lodestar
arithmetic might otherwise indicate on this record. See <u>Balestriere</u> at 3 (lodestar

---

[47] Award ¶ 77.
[48] Award ¶¶ 78-81. The dollar figures in ¶ 81 are mistaken. The value of the *Propuesta* settlement to Respondents
was undisputedly over $162 million, not over $16 million. The sovereign debt default involved over $90 billion in
face value of bonds, not over $20 billion.

approach may be useful but must be modified to a substantial degree in unusual circumstances; under New York law, *quantum meruit* is left to the sound discretion of the trial court). Milberg's deep involvement in the prosecution of bondholder claims, and in the bondholder counsel group efforts including the successful pursuit of a *pari passu* injunction in the Varela case, materially enhanced the value of the time Milberg dedicated to representing [Respondents], and renders the $86,700 in milestone payments made to Milberg clearly reasonable compensation for Milberg's services. The evidence presented also establishes that the $513,245 in aggregate [Respondent] milestone payments represent a reasonable total fee recovery.

Qualitative considerations have their limitations; they do not justify an award of fees beyond the aggregate fees already paid to Milberg, RV and Dreier.[49]

37.     Thus, without explanation or rationale, the panel declined to award any *quantum meruit* fees, finding that the $513,245 total flat fees paid by Respondents early in the lawsuits "represented a reasonable total fee recovery"—such that zero fees were awarded for Petitioner's crucial work on the *pari passu* injunctions and in answering Respondents' frequent and urgent requests for advice in the litigation endgame.[50]

## Basis for Petition

38.     The arbitration panel manifestly disregarded the law in denying any award of fees to Petitioner. Petitioner presented the law on *quantum meruit*, but the panel ignored it when denying any *quantum meruit* fee, despite finding facts that required an award of *quantum meruit* fees under any reasonable legal analysis.

16.     The arbitration panel manifestly disregarded the law by excluding consideration of Milberg's total time and lodestar amounts for this litigation.

---

[49] Award ¶¶ 82-83.
[50] Award ¶ 82.

## **Relief Requested**

17.     The Award should be vacated with respect to its denial of *quantum meruit* fees,

and remanded with instructions for the panel to compute a fee consistent with the law on

*quantum meruit*.

Dated: New York, New York
          May 6, 2019

                                        Respectfully submitted,

                                        WOLLMUTH MAHER & DEUTSCH LLP

                                        By:   /s/William F. Dahill
                                                William F. Dahill
                                                Mara R. Lieber

                                        500 Fifth Avenue
                                        New York, New York 10110
                                        Telephone: (212) 382-3300

                                        *Attorneys for Petitioner*