# EXHIBIT 1

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
<u>**International Arbitration Tribunal**</u>

---

| | |
|---|---|
| In the Matter of the Arbitration Between: | ) |
| | ) |
| MILBERG LLP, | ) |
| | ) |
|         Claimant and Counterclaim Respondent, | ) |
| | ) |
|         v. | )   Case No. 01-17-0004-6221 |
| | ) |
| HWB ALEXANDRA STRATEGIES PORTFOLIO, | ) |
| HWB DACHFONDS – VENIVIDIVICI, | ) |
| HWB GOLD & SILBER PLUS, | ) |
| HWB PORTFOLIO PLUS, | ) |
| HWB RENTEN PORTFOLIO PLUS, | ) |
| HWB VICTORIA STRATEGIES PORTFOLIO, | ) |
| DRAWRAH LIMITED, NW GLOBAL STRATEGY, | ) |
| U.V.A. VADUZ, VICTORIA STRATEGIES | ) |
| PORTFOLIO LTD., KLAUS BOHRER, and | ) |
| UTE KANTNER, | ) |
| | ) |
|         Respondents and Counterclaimants, | ) |
| | ) |
|         v. | ) |
| | ) |
| ESTUDIO ROSITO VAGO, | ) |
| | ) |
|         Counterclaim Respondent. | ) |

---

## FINAL AWARD

      WE, THE UNDERSIGNED ARBITRATORS (the "Tribunal"), having been designated and duly appointed by the International Centre for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"), in accordance with the arbitration agreements set forth in attorney engagement agreements executed by and between MILBERG LLP

("Milberg" or "Claimant") and ESTUDIO ROSITO VAGO ("RV" or "Counterclaim-Respondent"), or Milberg's predecessor counsel Dreier LLP ("Dreier"), a non-party herein, on the one hand, and HWB ALEXANDRA STRATEGIES PORTFOLIO, HWB DACHFONDS – VENIVIDIVICI, HWB GOLD & SILBER PLUS, HWB PORTFOLIO PLUS, HWB RENTEN PORTFOLIO PLUS, HWB VICTORIA STRATEGIES PORTFOLIO, DRAWRAH LIMITED, NW GLOBAL STRATEGY, U.V.A. VADUZ, VICTORIA STRATEGIES PORTFOLIO LTD., KLAUS BOHRER, and UTE KANTNER (collectively, "HWB" or "Respondents"); and having been duly sworn; and

(a)    Milberg having filed its Demand for Arbitration and Statement of Claim with the American Arbitration Association ("AAA") on August 3, 2017;

(b)    HWB having filed its Answer to Claimant's Statement of Claim and a proposed Motion to Dismiss Claimant's Statement of Claim (the "MTD"), on or about September 6, 2017;

(c)    The Tribunal having been constituted on December 4, 2017;

(d)    The Tribunal having entered Procedural Order No. 1 on December 21, 2017, setting a schedule for supplemental submissions in connection with the MTD and other scheduling and procedural matters;

(e)    The Tribunal having considered and deliberated upon the submissions of Milberg and HWB and having entered Procedural Order No. 2 on January 11, 2018, determining that the Claimant had raised factual issues that could not be decided by dispositive motion and that proceeding by dispositive motion would not serve the interests of fairness and efficiency in this case;

(f)     HWB having filed a Counterclaim on March 7, 2018 against Milberg and against RV;

(g)     Milberg having filed a Reply to Counterclaim and Request for Sanctions on March 21, 2018, and RV having joined in the Reply without assertion of any jurisdictional objection;

(h)     The Tribunal, in its Procedural Order No. 6, having reserved decision on the aforesaid Request for Sanctions and having ruled that any evidence or legal argument related thereto would be subject to the same schedule set by the Tribunal with respect to submissions regarding all other issues;

(i)     HWB having submitted, as proposed expert testimony, a report of Richard M. Maltz, Esq, a New York-admitted attorney, dated June 15, 2018, addressing New York ethical standards for attorneys (the "Maltz Report"); and the Tribunal, in its Procedural Order No. 7, having accepted the Maltz Report as legal briefing but not as expert testimony, and having scheduled and received a separate pre-hearing brief by Milberg in response to the Maltz Report;

(j)     The Tribunal having entered nine procedural orders on questions of pleading, scheduling, confidentiality, privilege, third-party subpoena practice, sanctions, supplemental post-hearing briefing and other issues;

(k)     The Parties having exchanged and filed their respective witness statements, pre-marked exhibits, and pre-hearing briefs in compliance with the Tribunal's procedural orders;

(l)     The evidentiary hearing having taken place in New York, New York, on August 13, 14, 15, and 16, 2018;

(m)     Claimant having submitted into evidence at the evidentiary hearing nearly 400 documentary exhibits and the witness statements and oral direct testimony of 1) Michael C.

Spencer. Esq. ("Spencer"), principal Milberg attorney to handle the Argentine bond default cases for HWB and for other Milberg clients; 2) Patricia Rosito Vago, a practicing Argentine attorney based in Buenos Aires and the sole partner in RV; 3) Robert A. Cohen, Esq., a New York-admitted attorney, a partner in Dechert LLP ("Dechert") until September 2016, and lead counsel to NML Capital Ltd., the holder of billions of dollars (at face value, plus accrued interest) of defaulted Argentina bonds, in litigation related to the Argentina bond default; 4) Angela Matiz, the Buenos Aires-based financial and administrative advisor to RV who, acting for RV, calculated settlement values for RV's clients under a public settlement offer made by Argentina in February 2016 to all similarly situated bondholders (the "*Propuesta*"), obtained client authorizations to settle, and communicated with Argentina's Ministry of Finance with respect to such settlements; and 5) the witness statement of Gary S. Snitow, a former Milberg associate who worked with Spencer in the representation of HWB and other holders of defaulted Argentina bonds, as direct testimony with a waiver of cross-examination by HWB and RV (Tr. 258); and counsel for HWB and RV having cross-examined the foregoing witnesses, except for Mr. Snitow, at the evidentiary hearing;

(n)     HWB and RV having submitted into evidence at the evidentiary hearing, over 150 documentary exhibits and the witness statement and oral direct testimony of Hans Wilhelm (Willi) Brand ("Brand"), the principal of a Luxembourg joint stock company, fund manager HWB Capital Management S.A. and manager of the HWB funds; and counsel for Milberg having cross-examined Brand at the evidentiary hearing; and

(o)     Counsel for Milberg, HWB and RV (collectively, the "Parties") having presented closing arguments and related demonstrative exhibits on August 16, 2018; and

Final Award
ICDR Case No. 01-17-0004-6221

(p)     The Tribunal having requested, in its Procedural Order No. 9 dated October 3, 2019, and having thereafter received, sequential post-hearing briefing related to a counterclaim for disgorgement of a portion of fees paid to the Dreier, RV and Milberg law firms; and

(q)     The Parties having agreed to an extension of time for issuance of this Award until February 5, 2019;

The Tribunal having examined all the aforementioned factual and legal submissions of the Parties, and having deliberated upon the submissions and arguments of the Parties, does hereby enter this FINAL AWARD.

## I.     The Parties

1.      Claimant-Counterclaim Respondent Milberg is a New York law firm. Milberg succeeded Derier LLP as counsel to certain HWB parties in bondholder litigation with the Republic of Argentina ("Argentina") in the United States District Court for the Southern District of New York ("SDNY").

2.      Respondents-Counterclaimants HWB Alexandra Strategies Portofolio, HWB Dachfonds–Veni Vidi Vici, HWB Gold & Silber Plus, HWB Portfolio Plus, HWB Renten Portfolio Plus, HWB Victoria Strategies Portfolio, and NW Global Strategy are sub-funds of non-party HWB Capital Management S.A., a Luxembourg joint stock company that operates under the supervision of non-party LRI Invest, S.A., a Luxembourg joint stock company.  Mr. Brand is the principal of HWB Capital Management S.A. Mr. Brand, through HWB Capital Management S.A., also manages investments, without LRI supervision, for Respondents-Counterclaimants Drawrah

Final Award
ICDR Case No. 01-17-0004-6221

Limited; U.V.A. Vaduz; Victoria Strategies Portfolio Ltd., Klaus Bohrer and Ute Kanter. Brand ¶¶ 1–4.[1]

      3.     Counterclaim Respondent RV is an Argentine law firm. Patricia Rosito Vago ("Vago"), an Argentine lawyer not admitted to practice in New York, is the sole partner in RV. Her spouse, non-party Alfredo (Freddy) Langesfeld ("Langesfeld"), is a non-lawyer who, during periods relevant to this controversy, performed financial, administrative, management and government relations services for RV.  Vago ¶ 5.

      4.     Dreier LLP, Milberg's predecessor counsel, is not a party to this arbitration. The Dreier bankruptcy estate, however, appears to have retained an interest in any award of attorneys' fees in this arbitration pursuant to an agreement entered into as of June 24, 2009, by Dreier LLP, through the bankruptcy trustee, with RV and Milberg.  Pursuant to that agreement, Dreier stands to receive twenty percent (20%) of any fees awarded after deduction of expenses incurred by Dreier, Milberg and RV, with expenses as of December 16, 2008, agreed as being $944,000 to RV and $21,000 to Dreier. CX 368.  The three-way agreement was approved by the U.S. Bankruptcy Court for the Southern District of New York and continues to govern RV, Milberg, and Dreier estate interests in any fee recovery obtained as a result of this arbitration. Spencer ¶ 18.

## II.    Principal Claims, Defenses and Positions of the Parties

### Milberg's Claims and Principal Arguments

      5.     Claimant commenced this arbitration to recover $11,906,767.00 in contingency fees for legal services provided to HWB pursuant to attorney engagement agreements

---

[1] Witness statements are referred to herein as "[Witness Name] ¶ ___."  Exhibits submitted by Milberg on behalf of itself or RV are referred to herein as "CX ___." Exhibits submitted by HWB are referred to herein as "RX ___."  The transcript of the evidentiary hearing is referred to herein as "Tr. ___."

that Milberg executed with each of the HWB parties herein (the "Milberg Agreements").  CX 1.

The Milberg Agreements differ from one another in some particulars; however, each agreement

includes an arbitration clause that provides as follows:

> Any dispute relating to this engagement shall be governed by New York
> law and shall be resolved through binding arbitration before the
> American Arbitration Association in New York City.

CX 6. The Milberg Agreements followed in time, and incorporated some of the terms set forth in

engagement agreements that certain HWB parties had executed with their prior counsel, Dreier

LLP (the "Dreier Agreements").  CX 5.  HWB engaged Milberg following the bankruptcy and

dissolution of the Dreier firm.

6.      Claimant asserts claims against HWB under New York substantive law for

(a) breach of contract for failure to pay contingency fees under the Milberg Agreements (and for

wrongful reliance on the termination provisions of the Milberg Agreements as a basis for not

paying the agreed contingency fees; (b) breach of the implied covenant of good faith and fair

dealing by failing to pay contingency fees; (c) unjust enrichment on account of HWB's recovery

of payments from Argentina based on legal work performed without paying Milberg the contingent

fees provided in the Milberg Agreements; and (d) *quantum meruit.*

7.      In support of its breach of contract claim, Milberg claims that it performed

substantial services and obtained results for HWB in the bondholder litigation.  Milberg asserts

that its legal services were "not performed on a basis that can be neatly allocated case-by-case or

client-by-client." Spencer ¶ 93. Milberg asserts that its efforts for other bondholder clients should

be considered in any *quantum meruit* analysis because they also benefitted HWB.  Milberg points,

in particular, to injunctions obtained by a bondholder counsel group in which Milberg participated

on behalf of HWB and Milberg's other bondholder clients, based on equal treatment or "*pari*

*passu*" provisions in the governing bond indentures. Id. The bondholder group, in pursuing *pari passu* injunctions that would bind depositories, clearing agents and banks, sought to apply pressure on Argentina to settle on favorable terms by foreclosing Argentina from international credit market transactions and from paying other creditors unless it also paid the bondholder group ratably. Id. at ¶ 25.

8.      Milberg claims that its efforts materially contributed to obtaining the *Propuesta*, a public offer made by Argentina to bondholders including HWB while Milberg was still representing HWB. Milberg concludes that, on its breach of contract claim, the Tribunal should award Milberg fees based on application of the contingency fee formulas in the Milberg Agreements to the amount HWB could have obtained at the time Milberg was HWB's counsel under the *Propuesta's* two-step formula. On this basis, Milberg calculates the contractually owed fee as $11,906,767. See CX 1 at 247–249.

9.      Milberg further contends that HWB cannot rely on HWB's termination of the Milberg Agreements to avoid paying contractually agreed contingency fees because HWB invoked the early termination provision of the Milberg Agreements in an untimely manner and in bad faith. Milberg cites evidence of HWB's continued request for legal services after the window for early termination had opened, as evidence of a bad faith effort to "stiff Milberg on its fees and pay their new counsel far less." CX 1 at 6.

10.      In support of its claim for breach of the covenant of good faith and fair dealing implied in New York contract law, Milberg argues that the HWB bondholders have enjoyed substantial benefits from Milberg's services in the form of settlement payments from Argentina, and that the Tribunal should infer from these benefits a right to recover the agreed contingency fees.

Final Award
ICDR Case No. 01-17-0004-6221

11.     In connection with its unjust enrichment theory of recovery, Milberg at times has suggested that the Tribunal should look not to the contractually agreed contingency fee rate (approximately eight percent [8%] or twelve percent [12%], depending on the engagement agreement) but to a federal district court determination in class action litigation related to defaulted Argentina bonds that a thirty percent (30%) contingent fee, combined with reimbursement of expenses, would be reasonable compensation for the class action lawyers. CX 1 at 23-24.

12.     In its pre-hearing brief, Milberg argues that, based on *quantum meruit*, Milberg should recover "at least $11,906,767." Responding in part to HWB's argument that Milberg failed to maintain time records sufficient to satisfy a loadstar analysis that looks to recorded time as the most important factor in quantifying recovery in *quantum meruit*, Milberg argued that, under New York law, a court must look beyond the lodestar approach in determining the reasonable value of the services performed, "particularly in a contingency case where the attorneys agree to take the risk of not getting paid if there is no recovery." Claimant's Pre-Hearing Brief at pp. 11-12.

### HWB's Counterclaim, Defenses, and Principal Arguments

13.     HWB asserts a Counterclaim against Milberg and RV for damages "in an amount not less than $2,800,000." HWB argues that Milberg and RV failed to exercise the ordinary, reasonable skill and knowledge commonly possessed by a member of the legal profession when they (a) advised HWB to reject the *Propuesta*, (b) assured HWB that they were "confident" they could obtain better terms, and (c) represented that the remaining bondholders "are united in seeking to negotiate a better settlement...." Although HWB allege that they were able to obtain a settlement that was $4 million higher than the *Propuesta*, they claim to have incurred

9

Final Award
ICDR Case No. 01-17-0004-6221

interest damages and additional legal fees and expenses proximately caused by Milberg's and RV's wrongful conduct.

14.    HWB sharply contests, as a factual matter, (a) the amount of work that Milberg claims to have performed, and (b) the degree of contribution that Milberg claims to have made to the recovery obtained by HWB from Argentina.  HWB contends that the settlement obtained by successor counsel was at least $925,000 more than that offered in the *Propuesta*.  CX 2 at 11-12.

15.    HWB has asserted defenses based upon the language of the Milberg Agreements and based upon New York law and ethical rules governing the attorney-client relationship. In particular, Respondents argue that HWB paid non-contingent legal fees to Milberg and "related entities,"[2] that corresponded to recorded hours reasonably valued at a much lower amount[3], and that the Milberg Agreements expressly gave HWB the right to terminate legal representation at any time without further compensation. CX 2.

---

[2] "Related entities" appears to be a reference to payments made to Dreier under the Dreier Agreements. The fees as to which HWB seeks disgorgement were flat fees based on milestones, paid, in the aggregate, as follows: $110,000.00 to Dreier; $57,404.00 plus 66,025.98 in Euros to RV; and $86,770.00 to Milberg. RX 3. The total US dollar value of these payments, using the Euro conversion rate used by HWB, is $332,744.92. In arguing for disgorgement, HWB lists the total of fees paid to Dreier, RV and Milberg as $513,244.92 ("$513,245"). This total includes $180,500.00 paid to a Swiss account of Gamatown Corp. Brand understood the beneficial owner of Gamatown Corp. to be Langesfeld. Tr. 550-551. Langesfeld then paid Brand a referral fee of $30,000 from the Gamatown account. By including the amount HWB paid to Gamatown, in effect HWB asks for some sort of credit for the referral fee paid to Brand. Brand understood the referral fee to be 25 percent of client payments originated by him. He testified that he received only the one $30,000.00 payment and he was not interested in referral fees. Tr. 549-553; RX 13. However, on July 6, 2012, Brand wrote to Langesfeld: "Freddy … 3) we are waiting already months now for our payment…. Regards Willi." RX 149. See also RX 150.

[3] The proposed lodestar calculation based on Milberg timesheets was a moving target. In HWB's pre-hearing brief on disgorgement, HWB argued that a lodestar analysis results in a total of $183,400. HWB Pre-Hearing Brief at 25. In HWB's Post-Hearing Brief on Disgorgement, HWB calculated the lodestar amount as $94,100.

16.    HWB also has asserted violations by Milberg of New York's rules for attorney conduct. In particular, based on the Maltz Report, HWB has argued that:

a.    The Milberg Agreements  impose non-refundable fees in violation of New York Rules of Professional Conduct, 22 NYCRR §§ 1200 *et seq*. (the "Rules").[4] Although only one Milberg Agreement used the term "nonrefundable," the agreements generally provided that the client could terminate the agreement if no judgment or settlement was obtained within a year without any obligation to pay Milberg "except for completing payment of the retainer fee set forth above."

b.    Milberg's demand for payment of an excessive contingent fee violates Rule 1.5(a) ("[a]lawyer shall not make an agreement, or charge, or collect an excessive … fee or expense."). HWB contends that a  contingency fee of $11,906,767, in addition to paid fees of $513,245, would result in an excessive fee at a billing rate of over $45,445 per hour."

c.    Provisions in the Milberg Agreements that restrict the ability of HWB to assign or transfer bonds (the "No Assignment Provisions") and that require Milberg's consent to release bonds from trust (the "Trust Provisions"), respectively, give Milberg a proprietary interest in the litigation and restrict HWB's ability to act, in violation of Rule 1.8(i) (a lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client) and Rule 1.7(a)(2) (a lawyer shall not represent a client if a reasonable lawyer would conclude that there is significant risk that the lawyer's

---

[4] New York Rules of Professional Conduct are referred to herein as "Rule ___".

professional judgment on behalf of the client will be adversely affected by the lawyer's own financial, business, property or other personal interests).

d. The aforementioned No Assignment Provisions and Trust Provisions in the Milberg Agreement both impermissibly restrict HWB's ability to act and threaten to affect Milberg's judgment in rendering advice to its client.[5]

17.     HWB further argues the broader propositions that, under New York ethical standards:

a. A client has the absolute right at any time to discharge an attorney with or without cause, and that, when an attorney is discharged, the attorney's remedy is to seek compensation, or return unused funds as the case may be, in accordance with the principles of *quantum meruit*.[6]

b. An engagement agreement must be clear so that a client can understand its terms. The Milberg Agreements state clearly that, if a client has not recovered within five years (and in some cases three years) after judgment is obtained, the client can terminate the engagement "without any further compensation or obligation to Milberg." There is no mention of a time, after expiration of the

---

[5] Respondents also argued in the Maltz Report that the evidence seemed to suggest that Milberg paid a non-lawyer to solicit clients in violation of Rule 7.2(a). See Maltz Report at 21. At the evidentiary hearing, it became apparent that Langesfeld paid Brand a referral fee and Milberg was unaware of any such payment having been made. Spencer ¶116; Tr. 551-52. It should be noted that Langesfeld, who was outside the Tribunal's subpoena power, chose not to testify. Vago admitted she was aware of her husband's payment of a referral fee to Brand, but did not indicate when she became aware of it and denied being "involved with discussions with Mr. Brand about these fees" or being "involved with the arranging or making of payments of these fees to Mr. Brand." Vago ¶ 17. In any event RV, as an Argentine law firm, is not subject to New York ethical rules. The parties did not inform the Tribunal as to potentially relevant Argentine rules of attorney conduct.

[6] HWB contends, however, at pages 21-22 of Respondents' Prehearing Brief, that the "clear contractual terms" of the Milberg Agreements "preclude any questions of *quantum meruit*."

Final Award
ICDR Case No. 01-17-0004-6221

> five-year or three-year period, within which a client must exercise its right to
> terminate or lose that right, and none should be implied because the engagement
> agreement was not clear on this point.[7]

## Milberg/RV Reply to Counterclaim

18.　In response to the Counterclaim, Milberg and RV have sought the imposition of sanctions on HWB for filing a frivolous claim.  Milberg and RV argue that (a) as a matter of law, a lawyer's judgment as to which course to pursue, among reasonable alternatives, cannot form the basis of a malpractice claim, and (b) as a factual matter, Milberg and RV advised continued litigation to maintain the *pari passu* injunctions until the Second Circuit vacated them, at which time they advised HWB and their other similarly situated clients to settle on the *Propuesta* terms but HWB rejected that advice and fired Milberg and RV in favor of continuing the litigation until, about a year later, HWB settled on the terms of the *Propuesta*.

## Milberg Reply to Maltz Report

19.　In response to the argument that the Milberg Agreements impose an improper, non-refundable fee, Milberg calls the Tribunal's attention to language in Rule 1.5(d)(4) that was omitted from the Maltz Report, namely "… provided that a lawyer may enter into a retainer agreement with a client containing a reasonable minimum fee clause if it defines in plain language and sets forth the circumstances under which such fee may be incurred and how it will be calculated."  Milberg argues that the start-up fee provisions comply with Rule 1.5(d)(4) because they specify amounts to be paid upon the occurrence of specific milestones in plain and detailed

---

[7] The Tribunal notes the argument in the Maltz Report regarding a possible failure of Milberg to meet its reporting obligations. Mr. Maltz appears not to have been made aware of documentary evidence that makes clear that Milberg and RV promptly and thoroughly reported material developments in litigation and in settlement negotiations. See paragraph 46, infra.

Final Award
ICDR Case No. 01-17-0004-6221

language. Milberg further argues that HWB's argument regarding the fees being due even if the work was not done based on termination at the one-year mark is without basis because there is no contention that HWB ever paid any milestone fee for work that was not done.

20.     Milberg argues that the contingency fee sought by Milberg is reasonable and not excessive taking into account all of the eight factors that are relevant to a *quantum meruit* analysis as set forth in Rule 1.5(a). Milberg argues that the fee sought is reasonable considering the complexity of the Argentina bond default litigation, the efforts expended, and the result achieved, taking into account that (a) an analysis based on Milberg's time records is flawed because it does not capture all of the Milberg work that "benefited respondents as part of Claimant's overall client base;" (b) the Argentina bondholder cases largely overlapped, and so work done in one action benefited and advanced the other actions; (c) RV worked exclusively on the Argentina bond default cases; (d) a settlement for $162.5 million was available to HWB as of mid-April 2016 before HWB terminated the Milberg Agreements; (e) the fee sought in this case is approximately seven percent (7%) of the $162.5 million settlement amount that was available to HWB at the time of termination; and (f) that percentage is reasonable in light of the district court's determination that a thirty percent (30%) contingent fee was reasonable for class action counsel in Argentina bond default cases.

21.     Milberg further contends that the terms of the Milberg Agreements did not give it a proprietary interest in the bondholder litigation in that the prohibition against assignments provides reasonable security as to collectability of fees and corresponds to a restriction imposed by the district court in the Argentina bondholder litigation.

Final Award
ICDR Case No. 01-17-0004-6221

HWB Counterclaim for Disgorgement of Fees Paid

22.    In its post-hearing submission filed in response to a request from the Tribunal, HWB asserted the right to disgorgement of $419,145 of the $513,245 in fees paid to the Dreier, RV and Milberg firms, based on the contention that inclusion in the engagement letters of the Trust Provision and No Assignment Provisions constituted attorney misconduct under New York law and ethical standards in violation of Rule 1.8(i) and Rule 1.16. HWB relies on New York law to the effect that an attorney that engages in misconduct may be required to disgorge fees. HWB concedes that it has not found any precedent applying this principle to violations of Rule 1.8(i) or Rule 1.16. HWB does not explain how this New York principle can apply to fees paid to the Dreier bankruptcy estate, a non-party herein, or to RV, an Argentine law firm not subject to the ethical standards applicable to New York-admitted lawyers.

23.    Milberg argues that the Trust Provision and No Assignment Provisions do not violate any New York ethical standards and that, in any event, the disgorgement remedy is not available where the allegedly improper retainer provisions had no impact on client rights under the facts of the case. Milberg distinguishes conflict-of-interest precedents on which HWB relies by analogy.

## FACTS[8]

24.    Starting in 2002, holders of bonds in which Argentina had defaulted began to sue in the SDNY to enforce payment on their bonds. Early plaintiffs included sovereign debt funds, represented by major New York law firms including Debevoise & Plimpton LLP ("Debevoise") and Dechert. Spencer ¶ 7.

---

[8] In the interests of efficiency and cost-effectiveness, the factual discussion set forth in this Award is limited to facts that are material to the decision of issues raised in this arbitration. The Tribunal has reviewed and deliberated with respect to all of the evidence in the record.

15

Final Award
ICDR Case No. 01-17-0004-6221

25.    RV began to represent holders of defaulted Argentina bonds in late 2001.

Vago ¶ 4. Ms. Vago, sole partner in RV, arranged for Dreier to represent RV's clients in the SDNY

litigation pursuant to a written 50-50 fee-sharing agreement[9] providing that RV was responsible

for originating clients, communicating with them, and maintaining their records and case files in

Buenos Aires, and Dreier was responsible for representing the clients in the SDNY litigation.

Spencer ¶ 8. RV accumulated clients from nineteen countries, including the HWB entities. Vago

¶¶ 4, 9–15. In an affidavit filed in the Dreier bankruptcy, Vago testified that RV had incurred

$944,000 in unreimbursed expenses and dedicated $2,155,000 in lawyer time working with Dreier.

Vago ¶ 19.[10]

26.    Brand asked Langesfeld for referral fees in connection with RV obtaining

the HWB representation, and Langesfeld paid such fees. Vago ¶ 17. Vago testified that she was

not involved in those discussions or in arranging or making payments of referral fees to Mr. Brand.

Id. The payments were made before Milberg became involved with RV and HWB. Milberg did

not, directly or indirectly, make any payments to Mr. Brand (or any non-lawyer) in connection

with these cases or retainers. Spencer ¶ 116. Milberg was on notice, after the fact, that such

payments had been made. RX 141 ("7/20/2012. Dear Mike: attached referral fees paid by us to

---

[9] The fee-sharing terms evolved, beginning with a 65% Dreier / 35% Vago split in the original RV
agreement with Dreier, and ending with a 50-50 split in the final iteration of the agreement with Dreier,
and in the agreement with Milberg. CX 7, CX 8, CX 9, CX 10. See also RX 5.

[10] Milberg did not submit in this arbitration the Vago affidavit filed in bankruptcy court in support of any
application  for an award of expenses in this arbitration. In order to support its *quantum meruit* claim
more generally by showing the scale of RV's undertaking to represent bondholders including but not
limited to HWB, Milberg did submit the Client Representation, Transfer and Assignment Agreement
executed by the Dreier bankruptcy trustee, RV and Milberg, pursuant to which the bankruptcy trustee
agrees that RV will be reimbursed $944,000 in expenses through December 16, 2008, before the Dreier
bankruptcy estate is paid its share of any recovery. CX 368 and RX 19 at Milberg-000006; Tr. 233–242.

Willi Brand and the moneys received by Milberg LLP in relation to them.  By mistake it was paid totally by us.  Best, Freddy.")

       27.    During the period November–December 2007, Dreier entered into attorney engagement agreements styled "retainer agreements" with HWB parties (the "Dreier Agreements").[11]  CX 5; RX 8, RX 10.  Pursuant to the Dreier Agreements, clients paid flat fees on reaching specified milestones, and then a contingent fee on amounts, if any, recovered from Argentina on the bonds.  The Dreier Agreements did not provide for law firm recovery of out-of-pocket expenses.  The Dreier Agreements provided for New York law to govern, for arbitration of disputes in New York, and for early termination under specified circumstances at two intervals (at a one year interval, and at a five or three year interval, depending on the engagement agreement).

       28.    Vago sought substitute New York counsel for HWB in 2009 owing to a criminal prosecution of its principal, Mark Dreier, on charges unrelated to the representation of HWB, and the resulting bankruptcy of Dreier LLP.  Ms. Vago recommended to HWB that Milberg be retained as successor counsel to Dreier, in part because of Milberg's experience in representing large groups of plaintiffs on a contingent basis in complex financial matters involving transnational transactions.  Vago ¶¶ 22 –23.

       29.    During the period July–August 2009, Milberg entered into engagement agreements with the HWB entities that Dreier had represented in the SDNY Argentina bond default cases and with other HWB entities.  CX 5; RX 20, 22.  Milberg incorporated into its engagement agreements many of the substantive terms from, but also made some changes to the

---

[11] The HWB parties who entered into Dreier Agreements with regard to specific SDNY complaints filed by Dreier on their behalf were HWB Renten Portfolio Plus, HWB Quo Vadis (merged into HWB Alexandra Strategies Portfolio), HWB Alexandra Strategies Portfolio, NW Global Strategy, Victoria Strategies Portfolio Ltd., HWB Victoria Strategies Portfolio, HWB Portfolio Plus, U.V.A. Vaduz, and Klaus Bohrer.  CX 1.

language of the Dreier Agreements. Tr. 68. In May 2010, Milberg entered into attorney engagement agreements with HWB Gold and Silber Plus and NW Global Strategy. CX 6, RX 25, 26. In May 2012, Milberg entered into a second engagement agreement with NW Global Strategy. CX 6, RX 43.

30.     The Milberg Agreements provide for New York law to govern, for arbitration of disputes in New York, and for early termination under specified circumstances. The Milberg Agreements entered in 2009 carried forward the early termination provisions of the Dreier Agreements at the one-year and five-year intervals and, like the Dreier Agreements, did not set any express time limits for the exercise of those termination rights. The early termination provisions in the 2010 agreements provide for early termination at the one-year and three-year intervals under specified circumstances. The early termination provision in the 2012 agreement is limited to the one-year interval.

31.     The Milberg Agreements contained provisions for cash payments styled as "retainer fees" to Milberg upon signing each agreement and then upon the achievement of defined tasks or results obtained. The cash payments differed in the various agreements, but generally a portion of the total was payable upon entry into the engagement agreement, filing of the complaint, and obtaining of a judgment.

32.     The Milberg Agreements further provided that, in the event there was no judgment or settlement within one year, the client shall be entitled to terminate the agreement "without any further compensation or obligation" to Milberg, except for completing payment of the retainer fee even though no judgment was obtained at that time. HWB never invoked or tried to invoke this provision to terminate the Milberg Agreements.

Final Award
ICDR Case No. 01-17-0004-6221

33.     All but one of the Milberg Agreements further provided that, in the event there was no partial payment from Argentina of principal and interest within five or three years (depending on the agreement) after the Client's judgment is obtained, the Client would be entitled to terminate this agreement "without any further compensation or obligation" to Milberg.[12]

34.     Milberg continued the work commenced by Dreier to obtain money judgments for its HWB clients, as it was doing for its other Argentina bondholder clients. Collection efforts, however, were not generally producing results for bondholders. Following Argentina's second exchange offer in 2010, less than ten percent of defaulted holders remained as holdouts. Spencer ¶ 21.

35.     Milberg commenced seven actions for various combinations of HWB parties. The total face value of the HWB bonds at issue exceeded $90 million. CX 15. Spencer ¶ 22.

36.     Spencer participated in strategic discussions with a group of leading plaintiffs' counsel led by Dechert partner Robert A. Cohen. Spencer assisted in coordinating the strategy of counsel representing smaller plaintiffs in order to obtain *pari passu* injunctions, also known as equal treatment injunctions (requiring equal treatment of bondholders in accordance with the terms of the governing indentures) that contributed to resolution of the Argentina bond default cases. Cohen ¶¶ 5, 8-11.

---

[12] The NML engagement agreement, executed at a much later phase of the bondholder litigation (May 2012), does not contain this provision. RX-43.

37.     Milberg filed its first *pari passu* motion, for a Milberg client named Varela, in coordination with similar motions filed by hedge fund plaintiffs, and participated actively in *pari passu*-related litigation.  Spencer ¶ 28.

38.     The focus of Milberg's specific litigation efforts was on test cases in the name of clients other than HWB.  Spencer ¶¶ 29–32. Milberg then worked to extend the benefits of test litigation to its other clients, including HWB.  Spencer ¶¶ 33–35.

39.     The election of Mauricio Macri as president of Argentina in October 2015 resulted in high-level settlement negotiations under the auspices of the SDNY Special Master. Argentina refused to include Milberg in settlement meetings.  Spencer ¶¶ 37–40.

40.     Argentina prioritized settlement negotiations with the NML hedge fund group whose claims collectively totaled about $5.9 billion. At the start of these negotiations, in February 2016, Argentina publicly announced the *Propuesta*, a settlement proposal that was subject to legislative approval in Argentina and the SDNY's lifting of its *pari passu* injunctions. Argentina moved to vacate the *pari passu* injunctions based on the new government's willingness to negotiate. RX 75. Spencer ¶¶ 40-42.

41.     On February 29, 2016, Argentina entered into a settlement agreement in principle with NML Capital, Ltd., and other major bondholders. CX 200.

42.     On March 1, 2016, the district court vacated the *pari passu* injunctions over vigorous objections of counsel for the remaining bondholders, including Milberg.  CX 201, 202.

43.     Argentina continued to refuse to meet with representatives of the remaining bondholders as a group or to make any offer other than the *Propuesta*.  CX 240A, Spencer ¶ 47.

44.     Spencer joined other bondholder counsel in arguing, in the Second Circuit, for reversal of the vacatur of the *pari passu* injunctions.  CX 227, CX 255.

Final Award
ICDR Case No. 01-17-0004-6221

45.     On April 13, 2016, at oral argument the Second Circuit affirmed from the bench the district court's vacatur order and issued a summary affirmance and order in the following days. CX 284.

46.     Milberg and RV sent e-mail status reports to HWB to keep HWB currently informed of developments. See CX 167–169, CX 171, CX 177, CX 179, CX 182–183, CX 190, CX 195, CX 197, CX 203–204, CX 212, CX 214, CX 217, CX 222, CX 224, CX 228-230, CX 235–238, CX 241, CX 244–245, CX 247–250, CX 253, CX 258, CX 260–262, CX 267, CX 269, CX 273, CX 277, CX 279–281, CX 284, CX 286, CX 291–298, CX 300, CX 304–306, CX 312.

47.     Prior to the Second Circuit decision on April 13, 2016, Milberg recommended that clients not accept the *Propuesta*. Following the April 13, 2016 affirmance of vacatur, however, Milberg recommended acceptance of the *Propuesta* as the best alternative at that point. CX 177, CX 171, CX 190, CX 195, CX 197, CX 241,  CX 292A.  Most remaining holdout litigants, including Milberg clients other than HWB, accepted the *Propuesta* over the remaining months of 2016. Spencer ¶ 52.

48.     Meanwhile, in the months following the various three-year and five-year anniversaries of obtaining judgments, HWB continued to request legal services and advice without making any reference to any early termination provision in the Milberg  Agreements. Spencer ¶¶ 34, 65–77; Brand Tr. 348–354, 356–374, 418–420, 425–427.

49.     On April 28, 2016, Brandt sent an e-mail to Spencer in which he advised that he was in negotiations with the Special Master and that Spencer "should not worry much about performance fees.  After all these years I promise to you, that I will include something reasonable for you in my final negotiations, when settling with the Gauchos, in the very near future." CX 312. Brandt did not do so.

21

50.     In April and May 2016, HWB terminated the Milberg Agreements citing, as a basis for the terminations, the early termination provisions in the Milberg Agreements.  CX 307, CX 308, CX 319.  Spencer responded, on behalf of Milberg, that the purported termination letters were ineffective.  CX 314, CX 320.

51.     On or about May 10-13, 2016, HWB engaged Wilk Auslander to represent HWB against Argentina. CX 317.  Wilk Auslander did not file a notice of appearance or other substitution-related papers in the SDNY litigation at that time, and HWB did not inform Milberg of the engagement of Wilk Auslander until November 2016. Spencer ¶ 59; CX 330, CX 331.

52.     HWB, through Wilk Auslander, informed Spencer that HWB would not pay Milberg any contingent fee on any recoveries from Argentina.  Spencer ¶ 62.

53.     For the period May 2016 through January or February 15, 2018, Wilk Auslander billed HWB $2,305,131.91, and was paid $1,571,581.82.  CX 28; RX 148.

54.     In 2017 HWB sought to attach Argentina assets consisting of two military helicopter engines in Ohio for repair.  The attachment was unsuccessful due to an exception in the Foreign Sovereign Immunities Act for military property.  CX 390, CX 391

55.     On May 31, 2017, it was announced that Argentina had settled with HWB in the amount of $162,750.000.  CX 348.

56.     Milberg and RV asserted claims to payment of contingent fees, based on a recovery of $162,504,207, in the amount of $11,906,767. RX 147, CX 11, CX 13.  See also RX 11, RX 12, RX 13, RX 14, RX 15, RX 16.  This calculation was based on an application of the *Propuesta* two-step formula to the HWB bonds covered by the Milberg Agreements.  Spencer ¶¶ 99–106.

57.     The actual amount paid by Argentina for bonds covered by the Milberg Agreements was $162,349,235.48.  CX 364 at HWB0000036.

58.     The amount claimed by Milberg as contingent fees was placed in an escrow account pending the outcome of this arbitration.  CX 364 at HWB0000036; CX 365.

59.     Milberg has produced time records reflecting that its timekeepers dedicated 172 hours of attorney time and 90 hours of paralegal time up to the point of termination of the attorney-client relationship.  CX 27; RX 1.

60.     No time or expense records were introduced into the record of these proceedings regarding the RV or Dreier representation of HWB in the Argentina bond default cases.

61.     RV, Milberg, Dreier and other counsel have been paid a total in excess of $20 million for services rendered in connection with the representation of bondholders other than HWB.  Milberg received between $5 million and $5.5 million and RV received between $10 million and $12 million, the balance having been paid to other counsel.  Tr. 82-86.

## ANALYSIS

### Quantum Meruit

62.     Under well-settled New York law, a client has an absolute right, at any time, with or without cause, to terminate the attorney-client relationship by discharging the attorney. Where the discharge is without cause, the attorney is limited to recovering in *quantum meruit* the reasonable value of the services rendered.  Campagnola v. Mulholland, Minion & Roe, 76 N.Y.2d 38, 43 (1990) (internal citations omitted).  This rule is calculated to promote public confidence in the profession.  Demov, Morris. Levin & Shein v. Glantz, 53 N.Y.2d 553, 556-58 (1981) (internal citations omitted).  Contractual provisions that purport to limit the client's right to discharge a

Final Award
ICDR Case No. 01-17-0004-6221

client are not enforced. Jacobson v. Sassower, 122 Misc.2d 863, 866 (App. Term 1st Dep't 1983),

*aff'd*, 107 A.D.2 603 (1st Dep't 1985), *aff'd.* 66 N.Y.2d 991 (1985).

63.     A necessary corollary of the rule that a client has an unfettered right to

discharge an attorney at any time and for any reason is that the client cannot be held liable in

damages for breach of contract on account of termination of the attorney-client relationship.

Fariello v. Checkmate Holdings LLC, 82 A.D.3d 437 (1st Dep't 2011) (internal citations omitted);

Jacobson at 864; Demov at 556-57.

64.     When a client elects to terminate an attorney-client relationship without

cause, therefore, the lawyer's exclusive remedy under New York law is to recover compensation

in *quantum meruit* for services rendered. Fariello at 437; Dweck Law Firm, L.L.P. v. Mann, 2004

WL 1794486 (S.D.N.Y. Aug. 11, 2004). This is a logical extension of the "at will" nature of the

relationship. Moreover, the specific terms of a terminated engagement agreement do not determine

the *quantum meruit* recovery even when the representation results in a settlement offer. See Dweck

(prior to termination of engagement attorney obtained a settlement offer that would have produced

a $332,500 contingent fee; because the counsel engagement had been terminated, *quantum meruit*

awarded in the amount of $153,562.)

65.     Thus, theories of recovery urged by Milberg other than *quantum meruit* and

countered in HWB's pre-hearing brief – breach of contract, breach of the implied covenant of good

faith and fair dealing, and unjust enrichment – may be applicable in commercial relationships, but

they have no place in an attorney fee claim governed by New York law.[13] As such, these theories

will not be independently addressed in this Award and are deemed unsuccessful. For the avoidance

---

[13] The inapplicability of these doctrines is reflected in the fact that none of the cases cited in support or
opposition of theories other than *quantum meruit* involved attorney-client relationships. See Milberg Pre-
Hearing Brief at 6–10, 23–25; HWB Pre-Hearing Brief at 11-13, 16-17.

Final Award
ICDR Case No. 01-17-0004-6221

of doubt, Milberg's allegations that HWB terminated for an improper motive similarly do not create a basis for recovery other than in *quantum meruit*.

66.   In order to recover an attorney's fee in *quantum meruit*, an attorney must prove: (a) performance of services in good faith; (b) acceptance of the services by the client; (c) an expectation of compensation; and (d) the reasonable value of the services performed. Fulbright & Jaworski, LLP v. Carucci, 63 A.D.3d 487, 488-89 (1st Dep't 2009) (internal citations omitted). Only one of these criteria is at issue in this case: the reasonable value of the services performed.

67.   The Milberg Agreements, like the Dreier Agreements before them, are partial contingency fees in the sense that they provide for the payment of flat fees at specified milestones in the litigation and a contingent fee in the event of a recovery at the conclusion of litigation. Despite this distinction, Milberg relies heavily on case law related to agreements in which attorneys were at risk of receiving zero recovery. See Milberg Pre-Hearing Brief at 11-12.

68.   The provisions on which HWB relied to terminate following the three-year and five-year milestones, "without any further compensation or obligation," are of no avail to HWB in the circumstances of this case, for two reasons: (a) HWB did not exercise that right within a reasonable time, and (b) even if HWB had exercised the right in a timely manner, HWB waived the right by continuing to request and accept the benefit of Milberg's services.

69.   It is axiomatic that an agreement should be read as a whole and in a manner that gives meaning to all its provisions. The only way to give meaning to later milestones in the Milberg Agreements is to construe each milestone as a window of opportunity open for a limited time, a window that closes if HWB continues to request or knowingly receive services from Milberg.

70.     HWB did not just let months go by before terminating "without further compensation." HWB continued to call upon Milberg to provide services and to receive reports from Milberg reflecting the continued provision of services. Brand asked for extensive legal services and knew those services were being performed by Milberg for HWB in the months following the three-year and five-year milestone. See Spencer ¶¶ 34, 65–77 and exhibits referenced therein. By continuing to knowingly take advantage of Milberg's services for months after the early termination milestone, HWB waived any right to terminate "without further compensation."

71.     HWB's challenges to *quantum meruit* based on ethical considerations also ring hollow. The Milberg Agreements do not establish any improper non-refundable advances of fees. The flat fees paid were not advances but, rather, initial fees for the lawyer's general availability and clearly explained fees payable upon the achievement of milestones. The payments are subject to the general consideration regarding excessive fees, of course, but they do not implicate any concern about non-refundable advances. Compare Matter of Cooperman, 83 N.Y.2d 465 (1994).

72.     Finally, the Trust Provisions and No Assignment Provisions do not raise a bar to *quantum meruit* recovery or provide a basis for disgorgement of fees paid by HWB. These provisions did not result in the transfer of an improper proprietary interest in the bonds held by Argentina. Rather, they are consistent with the March 11, 2011 order from the SDNY that, "until further notice from the court, plaintiffs must refrain from selling or otherwise transferring their beneficial interests in the bonds in this action without advising the court in advance and obtaining the permission of the court." CX 49. Moreover, no evidence was presented to suggest that HWB ever requested, or that Milberg ever unreasonably withheld its consent to the release from trust, or

Final Award
ICDR Case No. 01-17-0004-6221

that HWB sought to sell any bonds, or that the mere existence of such provisions affected

Milberg's legal advice or inhibited HWB in any way from selling bonds, settling with Argentina

or changing counsel whenever it chose to do so.[14]

       73.    Squarely presented to this Tribunal, therefore, is the determination of the

reasonable value of legal services performed for HWB as of the time of HWB's termination of the

attorney-client relationship with Milberg and RV.

       74.    A *quantum meruit* analysis under New York law involves determining the

reasonable value of legal services, taking into consideration the difficulty of the matter, the nature

and extent of the services rendered, the time reasonably expended in rendering the services, the

quality of performance of counsel, counsel's qualifications, the amount at issue, and the results

obtained. Courts typically use a "lodestar" analysis in which the court estimates fees by

multiplying the number of hours reasonably expended by a reasonable hourly rate. Balestriere

PLLC v. CMA Trading, Inc., 2014 WL 7404068 at *5 (S.D.N.Y. Dec. 31, 2014); Dweck at 3.

       75.    The difficulty of the representation was considerable, as reflected in the fact

that litigation arising from the sovereign bond defaults in question began in 2002, involved legions

of plaintiffs and many plaintiffs' lawyers, and did not result in the *Propuesta* until 2016. The

representation of individual clients required strategic coordination with larger groups of plaintiffs

---

[14] By contrast, the cases on which HWB relies in its post-hearing brief on disgorgement involve attorneys discharged for cause or other instances of misconduct actually prejudicing a client's rights or compromising a client's representation. Cf. Quinn v. Walsh, 18 A.D.3D 638 (2d Dep't 2005) (attorney representation of driver and passenger in violation of DR 5-1-5(a); Pessoni v. Rabkin, 220 A.D.2d 732 (2d Dep't 1995) (same); Chen v. Chen Qualified Settlement Fund, 552 F.3d 218 (2d Cir. 2009) (fee charged in excess of New York statutory maximum in medical malpractice case); Yannitelli v. D. Yannitelli & Sons Constr. Corp., 247 A.D.2d 271 (1st Dep't 1998) (attorney admitted numerous violations of Code of Professional Responsibility over a period of years; no specifics provided), Balestriere PLLC v. CMA Trading, Inc, 2014 WL 7404068, at *5 (S.D.N.Y. Dec. 31, 2014) (dictum, citing In re Goldstein involving mismanagement of client funds); U.S. Ice Cream Corp, et al. v. Bizar, 240 A.D.2d 654 (2d Dep't 1997) (improper excessive billing and coercing client to settle); In re Sacco & Fillas LLP v. David J. Broderick, P.C., 133 A.D.3d 862 (2d Dep't 2015) (attorney discharge for cause).

Final Award
ICDR Case No. 01-17-0004-6221

and their counsel and, at the same time, specific attention to the facts, circumstances and priorities of each client or set of clients. Moreover, Milberg made a valuable contribution to the coordinated bondholder efforts (Cohen ¶¶ 8–11) and, at the same time, paid close attention to the priorities and instructions of HWB.

76.     The nature and extent of the services rendered to HWB over an extended period of time included rendering sophisticated legal advice; engaging in strategic coordination with other plaintiffs' counsel; preparing and filing pleadings; engaging in *pari passu* motions practice; obtaining judgments against Argentina; actively participating in appellate practice in the Second Circuit; providing input in settlement discussions; and reporting to the client on a timely basis as to all material developments in the case and related settlement negotiations.

77.     More challenging than the difficulty, nature and extent of the services rendered, is a determination of the amount of time reasonably expended in rendering services. No time records were provided to the Tribunal for Dreier or RV time dedicated to the representation of HWB. The time records maintained by Milberg indicate an expenditure in the range of 172 attorney hours and 90 paralegal hours in the representation of HWB. Assuming an attorney rate of $700 per hour and a paralegal rate of $250 per hour, the Milberg time records suggest, based on a lodestar analysis, a total fee to Milberg in the neighborhood of $142,900, considerably more than the $86,700 that Milberg received in milestone payments from HWB. Viewed strictly in terms of fees paid to Milberg, under a lodestar analysis the fees HWB paid to Milberg clearly were reasonable.

78.     Assuming that HWB's challenge to the reasonableness of all milestone fees paid to all entities is properly to be decided by this Tribunal, a law firm seeking payment of fees or to justify fees already paid generally has the burden of presenting records from which a finder

of fact may determine the time reasonably required to perform the services at issue. Popal v. Slovis, 646 Fed Appx. 35, 36 (2d Cir. 2016) (attorney also failed to provide any estimate of time spent). Here, the Milberg time records say nothing about the RV and Dreier efforts on behalf of HWB. However, a comparison of the time records maintained by Milberg specifically for HWB, on the one hand, with the description of services provided in the Spencer and Vago witness statements and the legal filings and docket entries included in the record of this hearing, establishes that Milberg did expend more time on the representation of HWB than is reflected in its HWB-specific time records. The 70-page Spencer witness statement, in particular, provides a comprehensive overview of the effort undertaken and, in effect, serves as the equivalent of an affidavit of services in New York State practice. The Vago witness statement also reflects time-intensive, though not particularly substantive legal work done for HWB. The Spencer and Vago witness statements, combined with the docket sheets, clearly establish that much more legal effort was expended on behalf of HWB than is reflected in Milberg's time records.

79.     Milberg belatedly sought to have the Tribunal also consider the time records maintained for its other clients in connection with the Argentina bond litigation. In view of the undisputed fact that Milberg was compensated for that time in the form of fees paid by those other clients, considering such records in any quantitative analysis of hours dedicated to HWB would risk double-counting Milberg time.

80.     Milberg's argument that its activities for other clients should be considered in *quantum meruit* nonetheless has merit, however, in the sense that Milberg's closely related and coordinated work for other clients affects at least two qualitative criteria in *quantum meruit* analysis: the quality of performance of counsel and counsel's qualifications.

Final Award
ICDR Case No. 01-17-0004-6221

81.    The final factors in *quantum meruit* analysis, namely the amount at issue and the result obtained, tend to justify a substantial fee recovery in this case. Milberg represented HWB in connection with Argentina's default in payment of HWB-held bonds and Milberg's efforts contributed to obtaining the *Propuesta*, a settlement offer worth in excess of $16 million to HWB. Milberg prosecuted HWB's claims in the context of complex and wide-ranging litigation against a sovereign that had defaulted on bonds with a face value in excess of $20 billion. Spencer ¶¶ 5 – 10.

82.    Under the facts of this case, qualitative factors properly considered in *quantum meruit* analysis justify fees to Milberg in excess of the amount that simple lodestar arithmetic might otherwise indicate on this record. See <u>Balestriere</u> at 3 (lodestar approach may be useful but must be modified to a substantial degree in unusual circumstances; under New York law, *quantum meruit* is left to the sound discretion of the trial court). Milberg's deep involvement in the prosecution of bondholder claims, and in the bondholder counsel group efforts including the successful pursuit of a *pari passu* injunction in the Varela case, materially enhanced the value of the time Milberg dedicated to representing HWB, and renders the $86,700 in milestone payments made to Milberg clearly reasonable compensation for Milberg's services. The evidence presented also establishes that the $513,245 in aggregate HWB milestone payments represent a reasonable total fee recovery.

83.    Qualitative considerations have their limitations; they do not justify an award of fees beyond the aggregate fees already paid to Milberg, RV and Drier.

84.    Moreover, assuming *arguendo* that the Tribunal had jurisdiction to do so, the Tribunal lacks a sufficient factual basis on which to re-allocate the total $513,245 in fees paid to all entities. The Tribunal has no alternative but to leave the milestone payments as it finds them.

Final Award
ICDR Case No. 01-17-0004-6221

Counterclaim for Malpractice

85.    HWB's counterclaims fall into three categories: (a) disgorgement of that portion of the $513,245 in milestone payments that constitutes an excessive fee; (b) disgorgement on grounds of ethical misconduct; and (c) damages for malpractice consisting of Milberg's advice to HWB to reject the *Propuesta* when that offer was first made.

86.    As set forth above, the Tribunal finds that the $513,245 in fees paid by HWB was not excessive and Milberg engaged in no ethical misconduct.

87.    Moreover, the Tribunal finds that the claim of malpractice in providing advice to reject the *Propuesta* to be without basis.  A lawyer's judgment as to which course to pursue, among reasonable alternatives, cannot form the basis of a malpractice claim.  Rosner v. Paley, 65 N.Y.2d 737, 738 (1985); Orchard Motorcycle Distrib. Inc. v. Morrison Cohen Singer & Weinstein, LLP, 49 A.D.3d 292, 293 (1st Dep't 2008).  Milberg reasonably advised HWB to continue litigation to maintain the *pari passu* injunctions until the Second Circuit affirmed vacatur of those injunctions, at which time Milberg advised HWB to settle on the *Propuesta* terms. Spencer ¶¶ 111–115.  HWB rejected Milberg's recommendation in favor of pursuing enforcement of judgments. Tr. 157–58, 170.  HWB bears full responsibility for the consequences of its fully informed decision, including the additional legal fees HWB paid to Milberg's successor counsel before reaching a settlement with Argentina on terms that were no better, or in ny event not materially better than the terms made available to HWB under the *Propuesta*.

Conclusion

88.    The milestone fees paid by HWB constitute reasonable compensation for all legal services at issue in this arbitration.  Milberg's claim for the payment of additional fees, under any theory including *quantum meruit*, is denied.

Final Award
ICDR Case No. 01-17-0004-6221

89.   HWB's counterclaim is denied in its entirety.

## AWARD

I.   For the foregoing reasons, the Tribunal hereby awards, as its FINAL AWARD, as follows:

(a) The breach of contract claim of MILBERG LLP ("Milberg") against HWB ALEXANDRA STRATEGIES PORTFOLIO, HWB DACHFONDS–VENIVIDIVICI, HWB GOLD & SILBER PLUS, HWB PORTFOLIO PLUS, HWB RENTEN PORTFOLIO PLUS, HWB VICTORIA STRATEGIES PORTFOLIO, DRAWRAH LIMITED, NW GLOBAL STRATEGY, U.V.A. VADUZ, VICTORIA STRATEGIES PORTFOLIO LTD., KLAUS BOHRER, and UTE KANTNER (collectively, "HWB") for alleged failure to pay contingent legal fees in accordance with attorney engagement agreements, is denied in its entirety and dismissed with prejudice on the merits;

(b) Milberg's claim against HWB for alleged breach of implied covenants of good faith and fair dealing arising from an alleged failure to pay contingent legal fees, is denied in its entirety and dismissed with prejudice on the merits;

(c) Milberg's claim against HWB for alleged unjust enrichment arising from the recovery of settlement funds from Argentina based on legal work performed, is denied in its entirety and dismissed with prejudice on the merits;

(d) Milberg's *quantum meruit* claim is granted only to the extent that fee payments made pursuant to attorney engagement agreements prior to the commencement of this arbitration need not be refunded to HWB either in whole or in part;

32

Final Award
ICDR Case No. 01-17-0004-6221

      (e) HWB's Counterclaim for legal malpractice against Milberg and against ESTUDIO ROSITO VAGO ("RV"), for $2.8 million in damages or for disgorgement and for other relief, is denied in its entirety and dismissed with prejudice on the merits;

      (f) The administrative fees of the International Centre for Dispute Resolution totaling $53,011.02 and the compensation of the arbitrators totaling $246,289.27 shall be borne equally by Milberg and HWB. Therefore, HWB shall reimburse Milberg the sum of $5,030.52, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Milberg.

      II.     This Final Award is in full settlement of all remaining claims and counterclaims submitted to the Tribunal in this arbitration. All claims not expressly granted herein are hereby denied.

      III.     This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute the Final Award of this Tribunal.

      We hereby certify that, for the purposes of Section I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in

Final Award
ICDR Case No. 01-17-0004-6221

New York City, New York, U.S.A.

Dated: February 4, 2019

_Billie Colombaro_
Hon. Billie Colombaro

_____
James Hosking

_____
Richard L. Mattiaccio, Chair

33

Final Award
ICDR Case No. 01-17-0004-6221


New York City, New York, U.S.A.

Dated:  February 4, 2019


_____
Hon. Billie Colombaro


_____
James Hosking


_____
Richard L. Mattiaccio, Chair

Final Award
ICDR Case No. 01-17-0004-6221

New York City, New York, U.S.A.

Dated:  February 4, 2019

_____

Hon. Billie Colombaro

_____

James Hosking

Richard L. Mattiaccio, Chair

34

Final Award
ICDR Case No. 01-17-0004-6221

State of New York
      SS:
County of New York

   I, Billie Colombaro, do hereby affirm upon my oath as Arbitrator that I am the

individual described in and who executed this instrument, which is my Final Award.

Dated: _2|4|19_         _Billie Colombaro_
                Billie Colombaro

State of New York
      SS:
County of New York

   On this 4th day of February 2019, before me personally came and appeared
Hon. Billie Colombaro, to me known and known to me to be the individual described in and who
executed the foregoing instrument and acknowledged to me that she executed the same.

_02|04|2019_         _Felisha A. Garcia_
Dated              Notary Public

FELISHA ANNIE GARCIA
Notary Public – State of New York
NO. 01GA6368321
Qualified in New York County
My Commission Expires Dec 11, 2021

State of New York

34

Final Award
ICDR Case No. 01-17-0004-6221

State of New York

        SS:

County of New York

      I, James Hosking , do hereby affirm upon my oath as Arbitrator that I am the

individual described in and who executed this instrument, which is my Final Award.

Dated: _FEBRUARY 4, 2009_                      
                                             James Hosking

State of New York

        SS:

County of New York

      On this 4th day of February 2019, before me personally came and appeared
James Hosking, to me known and known to me to be the individual described in and who
executed the foregoing instrument and acknowledged to me that he executed the same.

_02/04/2019_
Dated

                              Notary Public

OSLEN A GRANT
NOTARY PUBLIC-STATE OF NEW YORK
No. 01GR6345355
Qualified in Kings County
My Commission Expires 07-25-2020

37

Final Award
ICDR Case No. 01-17-0004-6221

State of New York

SS:

County of New York

I, Richard L. Mattiaccio, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Dated: February 4, 2019

Richard L. Mattiaccio, Chair

State of *New York*

SS:

County of *New York*

On this 4th day of February 2019, before me personally came and appeared Richard L. Mattiaccio, to me known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged to me that he executed the same.

February 4, 2019

Dated

Notary Public

DIANE RAINERI
Notary Public, State of New York
No. 01RA4915265
Qualified in Nassau County
Commission Expires 12/21

37