# EXHIBIT 3

**AMERICAN ARBITRATION ASSOCIATION**
**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
--------------------------------------------------------------------X
                                                                    :
In the Matter of the Arbitration Between:                           :
                                                                    :
MILBERG, LLP,                                                        :
                                                                    :
                                    Claimant and                    :
                                    Counterclaim-Respondent,         :    Case No. 01-17-0004-6221
                                                                    :
                        -v-                                          :
                                                                    :
HWB ALEXANDRA STRATEGIES PORTFOLIO *et al.*,                        :
                                                                    :
                        Respondents and Counterclaimants,           :
                                                                    :
                        -v-                                          :
                                                                    :
ESTUDIO ROSITO VAGO,                                                :
                                                                    :
                            Counterclaim-Respondent.                :
                                                                    :
--------------------------------------------------------------------X


STATE OF   NEW YORK          )
                             )
COUNTY OF NEW YORK           )


## TESTIMONY OF MICHAEL C. SPENCER

      Michael C. Spencer, being duly sworn, deposes and says:

**Introduction**

I.     CHRONOLOGY

      A.     Background on the 2001 bond default and initiation of lawsuits

      B.     Respondents retain Rosito Vago and Dreier starting in November 2007; Milberg takes over for Dreier in July 2009

      C.     The Equal Treatment injunction strategy and test cases

  D.  Milberg obtained Equal Treatment injunctions for Respondents in 2015; Respondents were included in Milberg's negotiations with the new Macri administration and the Special Master starting in early 2016; Judge Griesa indicated he would vacate the Equal Treatment injunctions in March 2016; vacatur was affirmed on appeal in mid-April 2016

  E.  Many other bondholders then settle; Respondents terminate Milberg in April-May 2016; Respondents' judgment enforcement efforts fail; the Special Master announces Respondents' settlement with Argentina "within the parameters of the Propuesta" on May 31, 2017; the settlement amount is amended downward in October 2017; Respondents refuse to pay any legal fees to Claimant; the present arbitration

## II. MY TESTIMONY RELATING TO CERTAIN ISSUES

  A.  Respondents continued to request and receive legal services from Milberg and Rosito Vago long after the Early Termination Dates specified in most of Respondents' retainer letters

  B.  Additional facts that may be relevant to quantum meruit

  C.  Respondents settled with Argentina in October 2017 for $154,972 less than Milberg had obtained for them under the Propuesta before they discharged Milberg in April-May 2016

  D.  Regarding the malpractice counterclaim (Feb. 5-19, 2016): Mr. Brand was fully informed about the pros and cons of settling, and was always adamant that he would not settle for less than 100% recovery; he rejected any advice that he should consider compromise

  E.  Factual materials concerning Respondents' arguments on legal ethics issues

**INTRODUCTION**

1.      I am the principal lawyer at Milberg LLP who has handled the Argentine bond cases for our many clients, including Respondents.  I have led Milberg's engagements in these matters since we were approached by Patricia Rosito Vago in 2009 to take over for Dreier LLP ("Dreier"), which was no longer able to continue its work on these cases.

2.      My background is summarized at https://milberg.com/bio/?smid=397, attached hereto as Ex. A.  I graduated from Harvard Law School in 1976 and clerked for a federal district judge in Los Angeles for a year, then joined Cravath, Swaine & Moore in New York as a litigation associate.  In 1986, I moved to the plaintiff side by joining Milberg, and became a partner a few months later.  I have been at Milberg since then.[1]

3.      I will present this testimony by first generally describing the Argentina bond cases and Claimant's activities chronologically, and then providing testimony focused on particular matters about Respondents.  In the material below, references to "Claimant" indicate Milberg LLP (active in these cases since 2009), Dreier (active prior thereto) (now represented by its trustee), and Estudio Rosito Vago (which originated these cases and has been active in all aspects of our retentions throughout the time period).  As described more fully below, the three law firms have co-counsel agreements covering the work in these cases and the fees at issue.  CX 7 – CX 10; CX 368.

---

[1] At the start of 2018, Milberg was reorganized as Milberg Tadler Phillips Grossman LLP.  Milberg LLP remains as a subsidiary law firm and as the Claimant in this arbitration.

4.      I was largely responsible for working with our outside counsel to prepare Claimant's Statement of Claim (CX 1) and I incorporate it and its exhibits as part of my testimony here.[2]

## I.      CHRONOLOGY

### A.      Background on the 2001 bond default and initiation of lawsuits

5.      My involvement in the underlying litigation starting in 2009 required me to learn the history and details of the bond defaults.  The Argentine government announced it was suspending payments on its external indebtedness at the very end of 2001.  The indebtedness on its approximately 20 series of "global" bonds and other external indebtedness reportedly totaled about $90 billion for all creditors.  Most series of the bonds were denominated in US dollars, but a few were in Deutsche Marks or Euros. The indenture-type documents used for each series of bonds ("fiscal agency agreements" or FAAs) contained sovereign immunity waivers and allowed enforcement jurisdiction in New York under New York law.  These bonds were issued at various times from 1993 to 2001, with maturities from 2003 to 2031, and coupon interest rates from 6.0% to 12.375%.

6.      The bonds had been marketed primarily at retail to individuals and smaller investment funds in Italy, Argentina, and other European and South American countries. The bonds were and are held and traded in electronic book entry form using the main three clearing systems (DTC, Euroclear, Clearstream).  There has consistently been a

---

[2] I would amend the Statement of Claim in one respect:  I understood, and we alleged, that Respondents were settling their claims on "the same" terms that were available under the Propuesta, based on the announcement by the Special Master stating the same.  CX 348.  Subsequently we learned (from documents produced by Respondents in this arbitration) that Respondents' actual settlement in October 2017 ($162,349,235 – CX 364 at  HWB0000036) was less (by $400,765) than their settlement as announced in May 2017 ($162,750,000, CX 18 at HWB0001008).  The actual settlement amount Respondents received was also $154,972 less than the consideration they could have claimed under the Propuesta ($162,504,207 – CX 11), as explained in my testimony below.

secondary market with some liquidity.  Post-default, the bonds traded down to levels of $0.10 to $0.30 per $1 of face value.  Many original holders, for reasons of financial necessity, sold their bonds into the secondary market after the default, which is how the large sovereign default hedge funds accumulated much of their holdings at low cost.

7.     After the default, bondholders began to sue to enforce payment of their bonds in the Southern District of New York ("SDNY"), starting in 2002.  Early plaintiffs included sovereign debt funds (represented by Debevoise, Dechert, and other large New York law firms) and numerous individuals represented by Dreier LLP.  The Dreier bondholder clients were generally smaller investors who had retained the Rosito Vago law firm in Buenos Aires.  Patricia Rosito Vago, the sole member of the Rosito Vago law firm, had a background in tobacco and consumer litigation on the plaintiff side in Argentina.  After the default, she began meeting with bondholders from Argentina and Europe to discuss the situation and possible options for recovery.  Many bondholders started retaining Rosito Vago in 2002 for enforcement litigation.  She arranged for Dreier to serve as co-counsel for her firm's clients to handle enforcement litigation in the SDNY, as provided in a written agreement between the two firms.  I will defer to her testimony for further details.

8.     As explained to me by Ms. Rosito Vago, her firm and Dreier had a simple agreement: Rosito Vago was responsible for originating and communicating with clients and maintaining all client records and case files in Buenos Aires; and Dreier was responsible for the litigation in New York.  Fees were to be shared 50-50.  CX 9.

9.     Judge Thomas P. Griesa was assigned to the defaulted bond cases and new cases were assigned to him.  He handled the cases from inception until he retired and

handed them over to Judge Loretta A. Preska in June 2017.  Judge Griesa died in December 2017.  The Republic of Argentina retained the Cleary Gottlieb Steen & Hamilton LLP ("Cleary") law firm at inception; Cleary has remained principal counsel for the Republic since then.

10.     As I learned from my review of the case files in 2009, threshold issues were litigated in a handful of the early cases principally by lawyers from Debevoise and Dechert (representing hedge fund bondholders); Dreier (representing individual and small fund bondholders); and later several firms representing plaintiffs in proposed bondholder class actions as well.  The issues arose in motions to dismiss filed by the Republic and in summary judgment motions filed by bondholder plaintiffs seeking entry of money judgments.  Claimant has produced in this arbitration extensive pleadings and motion papers from *Mazzini v. Republic of Argentina*, 03 cv 8120, as examples to show the early work by the Dreier firm.  *See* CX 375 (docket in 03 cv 8120).  As examples of this work: CX 376 is the amended complaint in *Mazzini*; the Dreier firm's SDNY reply brief from July 2004 in further support of partial summary judgment and in support of its motion to strike defendant's discovery requests, opposing numerous early defenses raised by Argentina in an attempt to create a material issue of genuine fact, for example: alleged ambiguities in plaintiffs' account statements, sufficient pleading of alleged defaults in paying interest or principal, jurisdictional sovereign immunity and waivers, hearsay objections to plaintiffs' provision of depository account statements to show bond ownership, and resolution of joint holder issues.  *See* CX 375 at MILBERG-000990 (Dkts. 20-22).  CX 378 is the Dreier firm's brief to the Second Circuit opposing Argentina's appeal from the entry of a money judgment in *Mazzini,* on grounds that

plaintiffs allegedly had not shown they owned their bonds, and also mentioning Argentina's prior litigation of defenses of lack of good faith, unclean hands, champerty, international comity, public policy, abuse of rights, and lack of standing (on the ground that allegedly only the fiscal agent "owned" the bonds). *See* CX 378. Plaintiffs were successful in defeating the appeal. *See* CX 380 (2d. Cir. affirmance). The parties also litigated the applicable New York law on bond accelerations and calculating amounts of principal, interest, and interest-on-interest owing on the bonds. By 2005 or 2006, most of the threshold defenses being raised by the Republic had been rejected by Judge Griesa and those decisions were on their way to affirmance on appeal. Based on the work in the early cases, entry of money judgments in later cases (including Respondents') became easier.

11.     Despite the money judgments entered against Argentina in many defaulted bond cases, the government refused voluntarily to pay the judgments, and it took steps to insulate itself from judgment holders' attempts to execute on or otherwise enforce the judgments, using the protections afforded sovereigns in the Foreign Sovereign Immunities Act. Continuing with the examples cited above from the *Mazzini* case, plaintiffs made extensive efforts to attach and execute on government assets in 2008-2010. One notable effort (undertaken with many other plaintiffs) was attachment efforts with respect to Argentine private pension fund assets, including those located in the United States, that Argentina was nationalizing into the Argentine social security system (ANSES). That process occasioned extensive litigation by many bondholders. *See* CX 381. Judge Griesa allowed the ANSES attachments in November 2008, but the Second Circuit reversed the following year. Plaintiffs also sought a holding that Argentina's

central bank, BCRA, was an alter ego of the government for purposes of attachments; that effort also was ultimately rejected by Judge Griesa.  CX 375 at MILBERG-001007 (Dkt. 128).  Shortly after Milberg substituted in for Dreier, we had firm investigators conduct a search for Argentine government assets in the U.S., but that effort also was not availing.  It became apparent that the Republic was extremely well-versed in avoiding judgment executions by protecting assets and asserting sovereign immunity.

12.     Argentina made public "swap" offers in 2005 and 2010 to exchange outstanding bonds for newly issued "Exchange Bonds" whose payment was (somehow) deemed assured.  The two swap offers reportedly retired about 92% of the value of outstanding bonds at an average cost to the government of about $0.30 per $1 of face value.  The remaining bondholders became known as "holdouts."

**B.      Respondents retain Rosito Vago and Dreier starting in November 2007; Milberg takes over for Dreier in July 2009**

13.     I leave it to Ms. Rosito Vago to address her initial contacts with Willi Brand, a manager of retirement funds in Germany and Luxembourg that held a lot of defaulted bonds.  From the retainer agreements and case files, I know that Respondents began retaining Dreier and Rosito Vago in November 2007 (for what became 07 cv 10657), covering about $50 million face amount of bonds.  CX 5 at HWB0000070-90.  Further retentions followed, covering more bonds that Respondents owned or acquired.  *See* CX 5.

14.     The 28 retainer letters between Respondents and Dreier (and later Milberg) are identified as CX 5 – CX 6.  The retainers are contingency fee retainers with what I learned to be negotiated percentage contingency fees based on amounts recovered by the clients, plus initial amounts of "startup" fees described below.  The retainers did

not provide for reimbursement out of any recoveries for expenses the lawyers had incurred in prosecuting the cases.  Respondents' retainers reflected a contingency fee structure whereby the fees were to be based on any amounts recovered in excess of negotiated floor amounts.  As specified in the retainers, the floor amounts were $0.35 or $0.65 per $1 face amount or €0.20 per €1 face amount; and the contingency fees were 8-12% of recoveries over the floor amounts, as negotiated by the parties.  *See, e.g.*, CX 5 at HWB0000070; CX 6 at HWB0000122-23.

15.    The provision that the lawyers' out-of-pocket expenses incurred in prosecuting the cases (everything from filing fees to costs for transcripts, copying and research expenses, dedicated personnel, etc.) would *not* be reimbursed to counsel "off the top" of recoveries (before the percentage contingency fees were calculated) was, in my experience, unusual.  *See, e.g.*, CX 5 at HWB0000070-71; CX 6 at HWB00000122-23.  This meant that counsel bore those expenses.  On the other hand, the provision that the clients were to pay "start-up" fees keyed to milestones in the litigations (such as retention, filing the complaint, and obtaining a money judgment) was also unusual.  *See id.*  Respondents assert that they paid a total of "over $513,000" in start-up fees, which Claimant does not dispute.  That amounts to about 0.56% of the total *face amount* of Respondents' bonds at issue in this arbitration (somewhat over $90 million[3]).

16.    The retainers also contained an "Early Termination" clause, which usually provided: "In the event there is no partial payment on principal or interest within five years[4] after the Client's judgment is obtained, the Client shall be entitled to terminate this

---

[3] The settlement amounts are much higher due to interest accrued over many years.
[4] The retainers for NW Global Strategy and HWB Gold & Silber Plus for bonds in 10 cv 4656 specified three years (CX 6 at HWB0000154-155, HWB0000157-57); the May 3, 2012 retainer for NW Global

agreement without any further compensation or obligation to Milberg" (or Dreier in applicable instances).  CX 5 at HWB0000071; CX 6 at HWB00000123.

17.     In 2008 and 2009, in a shocking turn of events, Marc Dreier was criminally charged with fraud in connection with misappropriation of large amounts of clients' funds, and pled guilty.  This devastated Ms. Rosito Vago, for obvious reasons, and she came to New York to find replacement counsel.  She met with me, and retained Milberg for that role.

18.     Because the clients had already been traumatized once (by the bond default), we wanted to make the transition from Dreier to Milberg as seamless as possible.  Dreier and Rosito Vago had already invested large amounts of legal time and expense in prosecuting the cases to date.  Rosito Vago, Milberg, and the trustee for the Dreier bankruptcy estate reached an agreement for continued prosecution of the cases by Milberg in place of Dreier, for clients who consented to that arrangement.  CX 368.  Milberg would take over for Dreier on exactly the same terms for the clients.  As among the lawyers, for cases that had been started during Dreier's "era," the fees would be shared among Rosito Vago, Milberg, and the Dreier trustee[5] in a specified ratio; expense amounts incurred up to the changeover date (for purposes of allocating fees if and when recoveries were eventually obtained) were agreed upon.  That three-way agreement was approved by the Dreier bankruptcy court (CX 368 at MILBERG-000014-16), and continues to govern our dealings for those cases.

---

Strategy bonds in 13 cv 8887 provided an early termination date if "there is no judgment or settlement within one year."  *Id.* at HWB00000161-62.

[5] The Dreier trustee had an interest in future fees because Dreier had an attorney fee lien against future contingency fees based on the work it had performed.  This agreement also provided that the amount of expenses incurred by Rosito Vago was $944,000.00, subject to reimbursement if and when fee income was realized.  CX 368 at MILBERG-000006.

19.     All clients were given the opportunity to proceed with Milberg as substitute counsel or to look elsewhere.  A large majority, including Respondents, continued with Milberg and signed substitution-of-counsel stipulations and replacement retainers on the same terms as before.  *See, e.g.*, CX 6.

20.     Milberg's substitution for Dreier was essentially seamless for the ongoing clients.  In addition, Rosito Vago and Milberg continued to be retained by new bondholder clients (including Respondents, for their additional bondholdings), who entered into retainers with Milberg, with Rosito Vago identified as co-counsel.  *See* CX 6.  Respondents' cases with docket numbers starting 09 and later are post-Dreier cases. The arrangement between Milberg and Rosito Vago was memorialized in an agreement, which again included provisions for payment of expenses and sharing any eventual fees. CX 10.  At Milberg, the cases were handled by me, with the assistance of Gary Snitow, a very able associate; some other lawyers were also involved during the earlier years.  I met many of the European clients, including Willi Brand, when Ms. Rosito Vago, her husband Alfredo (Freddy) Langesfeld, and I visited Italy in 2009 to meet with clients and potential clients there.

21.     When the changeover occurred, our litigation efforts were focused on continuing to obtain money judgments for our bondholder clients (building on the experience in the early cases, as described above); seeking attachment opportunities for clients for whom we had obtained money judgments; and looking for other pressure points that might break the impasse between bondholder judgment creditors and this sovereign debtor committed to resisting all collection efforts.  The situation looked rather

bleak for bondholders, with less than 10% of defaulted holders remaining as holdouts after the government's 2010 exchange offer was completed.

22.     Ultimately, 13 Respondents entered into 28 retainer letters for these cases, but three funds were merged into one of the other funds in late 2013, meaning there are now ten Respondents. Milberg commenced seven actions for various combinations of Respondents. The total face value of their bonds was over $90 million (with the bonds denominated in Deutsche Marks or Euros converted at prevailing rates). *See* CX 15.

**C.     The Equal Treatment injunction strategy and test cases**

23.     The 1994 FAA, section 1(c), provides: "The Securities will constitute … direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank <u>pari</u> <u>passu</u> and without any preference among themselves. The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement)" ("Equal Treatment"). The 1993 FAA did not have a parallel provision but the bond prospectus did. This Equal Treatment provision had a history dating from the 19th century; more recently, holders of defaulted debt of Peru and the Congo had tried to use it as legal leverage, but its meaning and use had not been dispositively litigated. EM, one of the early bondholder plaintiff litigants on Argentina bonds, had raised the provision in 2002 and Argentina sought an injunction prohibiting EM from using the provision to try to interfere with the government's payments to other creditors. Judge Griesa held the issue was not ripe for adjudication in 2003, and both sides backed off from further motion practice. After the 2005 and 2010 exchange offers,

the holdouts were still seeking recoveries and needed a further strategy. The time had come to try to make further use of the Equal Treatment clause.

24.     I do not recall exactly when I was approached by Robert Cohen, NML's lead lawyer at the Dechert firm, about an Equal Treatment strategy. I see that he and I first had email contact about these cases in April 2010 (concerning attachments and stays (CX 46 at MILBERG-0002471), and I subsequently discussed many issues with him, including the hedge funds' prior experience with Equal Treatment clauses, prior to NML's filing of its first Equal Treatment motion in October 2010. Gary Snitow and I were discussing and researching Equal Treatment issues immediately after NML's motion was filed. In February 2011, I spoke with Mr. Cohen about joining a contingent of hedge fund representatives for a planned meeting with state legislators in Albany about "anti-merger legislation," a bill to clarify state law on the merger doctrine in order to foreclose one possible objection to Equal Treatment motions in post-money-judgment cases.[6]  *See* CX 50. Mr. Cohen and I began discussing the possible utility of having an Equal Treatment motion initiated by non-hedge-fund plaintiffs -- *i.e.*, small or individual investors, who had bought their bonds at or near full price before the default, who ideally were from Argentina, and whose claims had not yet gone to money judgments. *See id.* Unlike the hedge funds, those investors could not easily be attacked by Argentina as foreign bond speculators who had purchased at large discounts but were litigating for full recoveries of principal and accrued interest. I identified Milberg's recent *Varela* case, 10 cv 5338, whose 13 Argentine plaintiffs had purchased their bonds at full price pre-default

---

[6] "Merger" is a res judicata doctrine providing that claims in a litigated case merge into a resulting judgment. In these cases, we were concerned that Argentina would argue in post-money-judgment cases that our claims for Equal Treatment injunctive relief had merged into the money judgments and thus could not be further pursued. That concern did not apply for cases in which money judgments had not yet been entered.

(and thus were not "vultures," the name the press had given to the hedge funds), had accumulated total claims of only about $1 million, and included mostly quite elderly women who were very definitely up for the challenge.  Milberg began developing Equal Treatment motion papers for *Varela* in the spring of 2011.  I shared a draft of those papers with Mr. Cohen in early July 2011.  CX 51.

25.     On July 14, 2011, I attended a meeting called by Robert Cohen at the Dechert offices to discuss Equal Treatment.  *See* CX 50; CX 52.  It included lawyers from a handful of firms representing several prominent bondholders.  Mr. Cohen's invitation email noted that Judge Griesa's clerk predicted that the court would decide NML's pending Equal Treatment motion after his summer recess; that I would be filing an Equal Treatment motion in one of our pre-judgment cases shortly "and why it makes sense for [Milberg] to do so;" and that we hoped to pursue anti-merger legislation.  *Id.* The group recognized that Argentina had increasingly been testing the patience of Judge Griesa by refusing to honor the money judgments entered against it or to engage in settlement negotiations.  The consensus was that we should adopt a carefully coordinated Equal Treatment strategy, taking sequential and deliberate steps in a limited number of test cases, while other bondholder plaintiffs should stay on the sidelines while the strategy was executed (with assurances that everyone would be given the opportunity to join in when the time was right).  The legal key to the strategy was to persuade the court to interpret the Equal Treatment provision to prevent Argentina from paying its other external indebtedness obligations unless it also "ratably" paid its global bond creditors -- and then to issue an injunction enforcing that interpretation.  The crucial advantage of an injunction would be that -- unlike money judgments, which only bound the debtor -- an

14

injunction would, under FRCP Rule 65(d), also bind Argentina's agents and "other persons who are in active concert or participation" with it.  By binding depositories, clearing agents, and banks, an Equal Treatment injunction thus could potentially foreclose Argentina from international credit market transactions, and from paying other current creditors such as the exchange bond holders unless it also paid plaintiffs ratably, which Argentina would likely find intolerable.

26.     Milberg filed its first Equal Treatment motion in *Varela* in early August 2011 (discussed in more detail below).  *See* RX-033 – RX-035.  At that point, the Equal Treatment motions filed by NML and the three other hedge funds in its group and by Milberg in *Varela* became fully coordinated, and eventually we filed joint-caption papers for important motions.  *See, e.g.*, RX-046.  The hedge funds were: NML, which was part of Paul Singer's Elliott Management Corp. ("Elliott"), with the Argentina work led by Jay Newman; Aurelius Capital, led by Mark Brodsky, who was formerly at Elliott; Blue Angel and other funds related to Davidson Kempner Capital, represented by Avi Friedman and Ephraim Diamond; and funds related to Bracebridge Management, led by Nancy Zimmerman.

27.     Respondents have suggested in this arbitration that Milberg or I have claimed credit for originating the Equal Treatment strategy, but I have never done that.  I have always made it clear that Dechert (later joined by Gibson Dunn, largely for appellate work), representing NML, led the Equal Treatment strategy among its group of hedge funds (Ed Friedman of Friedman Kaplan and Robert Carroll of Goodwin Procter also played large roles); and Milberg also was invited to join, which we did.  The group developed and coordinated the ongoing strategy as described above.

28.     Respondents have also suggested that Milberg was just "riding the coat-tails" of Dechert and Gibson Dunn in these cases.  Those firms were definitely leaders of the group and did a large amount of work – and I am sure their clients, holding billions in defaulted debt, demanded no less.  Milberg provided some key benefits to the group that were not otherwise available: the *Varela* plaintiffs themselves; and I would also say that the hedge funds realized that Milberg was a resourceful and responsible plaintiffs' firm that could contribute credibly to the litigation effort itself and could also persuade other plaintiffs' firms not to interrupt that strategy with competing filings -- no mean feat in the plaintiffs' bar.  I also played a full role as a member of this group, attending most meetings, reviewing and commenting on joint briefs, participating in joint activities and press events featuring the *Varela* plaintiffs, and filing separate briefs in *Varela* when warranted.  Those activities included:

(a)     Milberg prepared the *Varela* bondholders to play the role of test case plaintiffs for the Equal Treatment injunction effort.  This was not just a passive engagement for them.  As the Equal Treatment injunction strategy began to succeed, it attracted lots of public attention, particularly in Argentina, and soon enough not only Judge Griesa but the *Varela* plaintiffs themselves were featured in news articles and subject to a lot of criticism for supposedly being anti-Argentina.  Eventually some of the plaintiffs were subject to harassment from the Argentine tax authorities as the Kirchner administration became more aggressive.   Ms. Rosito Vago in particular was instrumental in supporting this group of plaintiffs throughout the several years of this phase of the litigation.

(b)     Milberg prepared and filed the *Varela* case (filed July 13, 2010) and
shepherded it through its first phases. CX 40 at MILBERG-000030 (Dkts.
1-6).  After NML filed its initial Equal Treatment motion in October 2010,
Gary Snitow and I began researching and analyzing the Equal Treatment
issues with a view toward including them in *Varela* (as part of a summary
judgment motion that would also include money judgment demands). That
very intensive work, and the drafting of the motion papers, proceeded
throughout the rest of 2010 and well into 2011.

(c)     As noted above, I attended a meeting at Dechert in July 2011 where a
coordinated Equal Treatment strategy was developed and agreed upon by
many bondholder groups, including introducing the Equal Treatment issue
into the *Varela* case.

(d)     Milberg filed motions in *Varela* on August 3 and 4, 2011, to amend the
complaint to include Equal Treatment claims (CX 40 at MILBERG-
000031-32 (Dkts. 21-23)), and for summary judgment on those claims,
(*see id.* (Dkts. 12-20, 24-32); *see also* RX-033 – RX-035), as well as for
money judgments.  Those papers were extensive, and included
declarations from all the clients.  I attended the hearing on these "first
phase" Equal Treatment motions in the test cases (seeking a declaration
that Argentina's actions were violating the provision), and the motion was
granted on December 13, 2011.  *See* CX 40 at MILBERG-000033 (Dkt.
44); *see also* CX 50 – CX 53; CX 55 – CX 59 (emails between Mr. Cohen

and me, and others, during this period, coordinating and discussing several issues).

(e)     Once Judge Griesa ruled that payments to the Exchange Bondholders but not the holdouts would violate the Equal Treatment provisions, Milberg became involved in the "second phase" briefing of the joint motions (including in *Varela)* to Judge Griesa for entry of an injunction for specific performance of the Equal Treatment provision in January 2012.  *See* CX 40 at MILBERG-000033 (Dkts. 45 (motion) and 50 (joinder in reply)); CX 60 – CX 64; *see also* RX-041.  I attended the hearing.  The Court granted the motions on February 23, 2012.  *See* CX 40 at MILBERG-000033 (Dkt. 51).  Argentina appealed the Equal Treatment orders, and Milberg helped with the opposition to Argentina's motion to stay the injunction pending appeal.  *See* CX 40 at MILBERG-000033-34 (Dkt. 52, March 5, 2012 stay pending appeal); CX 61.

(f)     Milberg assisted in the joint opposition brief filed in April 2012 in the Second Circuit on Argentina's appeal.  *See* CX 65; CX 67.  I attended the hearing of the appeal in July 2012.  The appeal was largely denied, but the court remanded for clarification of the ratable payment formula, by order dated October 26, 2012.  *See* CX 41 at MILBERG-000086.  Argentina filed a Cert Petition to the Supreme Court from this decision.

(g)     During the pendency of the appeal, the NML group and Milberg sought support for our positions from legislative and executive officials and certain amicus groups.  Around the end of March 2012, I traveled to

Washington DC with other members of our group to meet with representatives of the Solicitor General's office, which intended to file an amicus brief in the Second Circuit in Argentina's favor.  On April 10, 2012, around the time our joint appeal brief was being finalized, my partner Sanford Dumain and I prepared and sent a letter to Harlan Levy of the New York Attorney General's office seeking to persuade his office to file an amicus brief supporting our positions, explaining the *Varela* and other Milberg clients, and hoping to counteract the Solicitor General's amicus filing.  CX 66.  Sandy knew Harlan Levy from prior cases.

(h)  In addition, following up on earlier preparation work, my partner Barry Weprin (whose family had many political connections) and I were part of a group of about 10 lawyers and investors who visited New York state legislators and officials in Albany on May 8, 2012, to describe and urge passage of a bill to ensure that the res judicata "merger doctrine" would not prevent claims for injunctive relief in aid of judgment enforcement from being asserted in cases in which a money judgment had already been entered.  *See* CX 50; CX 68.

(i)  On remand from the Second Circuit to Judge Griesa starting in October 2012, Milberg assisted in preparing the joint briefs concerning ratable payment and the scope of the injunction (*see, e.g.*, RX-047 (summary judgment brief after remand dated November 14, 2010); CX 79 (reply summary judgment brief after remand dated November 20, 2012, MILBERG-000495 contains my signature)), resulting in the Court's

"amended 2/23/12 order" filed November 26, 2012 (*see* CX 40 at

MILBERG-000035 (Dkt. 64)).

(j)    I happened to retain in an email my mark-up of the draft Gibson Dunn

brief on remand from November 11-12, 2012 (CX 77 –78) , and I recently

compared it to the final version as filed by the group (CX 79), to assess

how my comments were received.  Most of my suggested deletions

(offered for concision) were not accepted, but quite a few of my editorial

suggestions were taken, which at least tells me that the chief drafting

lawyers went through and considered my comments thoroughly.

(k)    After Judge Griesa confirmed and clarified the injunctions in late

November 2012, we again began preparing for a trip to the Second Circuit,

to try to avoid another stay pending appeal, or to obtain security from

Argentina in the event the stay was extended, and to seek "anti-evasion"

discovery from entities that it appeared Argentina was preparing to use to

evade the injunctions if and when they finally became effective.  This

work is reflected in emails involving me and lawyers for the NML group

(*see* CX 80 – CX 82; CX 84 – CX 87) and in filings in the *Varela* docket

in late 2012 (*see* CX 40 at MILBERG-000035 (Dkts. 66-71)).

(l)    We also began some public relations work to support bondholders'

positions in connection with the upcoming second Second Circuit appeal.

Planning started in December 2012, culminating with Milberg's hosting a

group of about a dozen bondholders from Argentina, including *Varela*

plaintiffs, to meet in New York and then Washington DC with press

representatives, legislators, and other influential persons, in late January 2013. The goal was to emphasize that Argentina's resistance to paying on the bonds was harming average people who had bought the bonds as retirement savings and for other normal investment purposes, and that not all bondholders were "vultures" and speculators as the press had been reporting.

(m)   The NML group and Milberg prepared two briefs to the Second Circuit on Argentina's appeal from the November 2012 injunction orders; I joined with Aurelius and Blue Angel in a brief filed on January 25, 2013, which dealt principally with the issues of the operation of bond payment systems and what persons were bound by the injunctions. The Second Circuit affirmed Judge Griesa in a decision issued on August 23, 2013. CX 41 at MILBERG-000101.

(n)   Starting well before the August 2013 decision from the Second Circuit (*see* CX 67), Milberg began working with the NML group bondholders, and later other groups as well, to develop and share information on the value of bond holdings in the various actions. This was initially relevant to the issue of seeking an appeal bond from Argentina, but we also realized that if we ever got to the point of negotiating a settlement, it would be useful to coordinate our exact approaches in calculating interest accrual amounts, interest-on-interest, post-judgment interest, and the like. Rosito Vago, which maintained all client records for our cases, began to further develop its spreadsheets to update that information so we could

share it with NML group members, which we did.  These calculations were important when settlement negotiations later became feasible.  *See e,g.*, CX131 – CX 133.

(o)   Argentina's Cert Petition from the first Equal Treatment appellate decision (October 2012) was maturing at this point, and we filed opposition briefs in August 2013.  I worked on these briefs extensively.  CX 93 – CX 99; CX 100 at MILBERG-0004378 (my comment: "Are we sure we want to call Eggers [Argentine official] a 'liar'?"]); CX 101 – CX 104.  I also wrote to Christine Lagarde, managing director of the IMF, in July 2013, seeking to dissuade the IMF from filing an amicus brief supporting Argentina (CX 92), which may have been successful.  Cert was denied in October 2013.

(p)   Anticipating the cert denial, the NML group and I were focused in September and early October 2013 on trying to persuade the Second Circuit to lift the district court's stay on effectiveness of the Equal Treatment injunctions that had been entered.  CX 106 – CX 111; CX 141. I provided comments on our motion to lift the stay and gave extensive comments on an updated version that prompted extended reconsideration by the drafters.

(q)   In March 2014, Argentina and other parties filed their Cert Petitions with respect to the Second Circuit's affirmance in August 2013 of the second Griesa injunction decision from November 2012.  In March-May 2014, I worked very intensively on the cert oppositions; we filed on May 7.  In

addition to providing comments on other group members' cert oppositions, I filed a cert opposition brief for the Varela plaintiffs only; I drafted this first portion to focus on our plaintiffs' status as "definitely non-vultures," and NML group appellate lawyers addressed the position by Argentina and amici that application by the courts below of the Equal Treatment provision would destroy sovereign debt markets.  I also recall that in early May, my partner Barry Weprin arranged a meeting with Congressman Jerrold Nadler for NML representatives to discuss the position of the government on cert.

(r)     The Supreme Court denied cert on June 16, 2014, which acted to terminate the stays that had been entered.  Judge Griesa appointed Daniel Pollack of McCarter & English in June 2014 as Special Master to handle possible settlement negotiations with Argentina, which the judge fervently wanted.  However, Argentina dismissively vowed immediately after cert was denied that it would evade the Equal Treatment injunctions, principally by devising ways to continue paying interest on the Exchange Bonds outside the reach of the injunctions.  Judge Griesa ruled that those avoidance efforts, including steps taken by financial entities in the chain of payment, would violate the injunctions, and the Exchange Bondholders (whose payments were being held because of the injunctions) themselves sought rulings that they should be paid.  After, Argentina and its allies sought to bring an expedited appeal to the Second Circuit, I worked on the group's

motions to dismiss the appeals in September and October 2014 and ultimately the appeals were dismissed.

(s)   At this point, the need of strictly coordinating Equal Treatment motion practice before Judge Griesa was waning, and of course virtually all plaintiffs with SDNY bond actions wanted to obtain injunctions. We at Milberg included Equal Treatment claims in some complaints we were filing for new clients, and we brought the claims into existing actions where money judgments had not yet been entered, such as *Pons*, 13 cv 8887, which included Respondent NW Global Strategy's claims on two bonds. *See* CX 35; CX 393. We also filed the complaint in *Perez* in October 2014, assembling all the Milberg clients (including most Respondents) and claims in post-money-judgment actions into one omnibus case seeking entry of Equal Treatment injunctions. CX 382.

29.   As shown by the details set forth above, overall, the Equal Treatment test case strategy worked essentially as planned. Over many months of hearings, Judge Griesa first declared that Argentina had violated the Equal Treatment provision when it paid Exchange Bond creditors without making ratable payments to us (the test case plaintiffs including Varela); and then he issued injunctions prohibiting Argentina and others acting in concert with it from making debt service payments on the Exchange Bonds unless ratable payments were also made to us. The Second Circuit twice affirmed those rulings, and finally the Supreme Court denied Argentina's Cert Petition on June 16, 2014.

30.     When the Equal Treatment injunctions in the test cases became effective in 2014 shortly after cert was denied, Argentina decided to suspend (and default on) its payments to holders of Exchange Bonds, because the Kirchner administration was not willing to make ratable payments to test case bondholders as required by the injunctions.

31.     The NML group and I also became a de facto negotiating committee when Judge Griesa appointed Mr. Pollack as Special Master to try to resolve the cases and forced the Kirchner administration to send a representative to New York for settlement negotiations.  *See* CX 129 (Pollack email setting up first meeting with Argentina negotiators); CX 128 ("Framework for Settlement" presented by us at first meeting). During numerous meetings in 2014 and 2015, the Kirchner government demonstrated no intent ever to settle, and Axel Kiciloff, the economy minister, was dismissive of all such efforts.  I was involved in those very lengthy and frustrating meetings in 2014 and 2015, and I believed this gave Milberg a primary place at any future meaningful settlement negotiations.

32.     After cert was denied and the Equal Treatment injunctions went into effect, several other fronts opened in the overall dispute.  The "Euro Bondholders," comprising part of the Exchange Bondholders whose payments were suspended as a result of the Equal Treatment injunctions, sought to continue the stay as to payments to them, and the NML group and Milberg opposed that effort (*see* CX 135 – CX 136, July-August 2014).  We also served subpoenas on Euro Bondholders and they returned the favor, which became a protracted dispute.  *See* CX 130; CX 142.  When it appeared that Argentina was blatantly planning to violate the injunctions by seeking to off-shore critical steps in the process by which it could pay Exchange Bondholders, the NML group and

Milberg started contempt proceedings against Argentina, which eventually resulted in a contempt citation issued by Judge Griesa. *See* CX 139 (preparing contempt papers in September 2014); CX 145 – CX 146 (papers in February and March 2015 on our motion to dismiss Argentina's appeals from contempt citation). Citibank, whose branch in Buenos Aires was part of the payment mechanism for interest on the Exchange Bonds, joined Argentina's effort to continue the stay, and Judge Griesa allowed Citibank an exception, which we appealed. *See* CX 137 (regarding briefing schedule, August 2014). These disputes continued for more than a year; in October and November 2015 we were involved in serving subpoenas on Euro Bondholders, who reportedly were seeking to replace BNY Mellon as the bond trustee in order to permit offshore interest payments; and on their banks about involvement in that process. *See* CX 151; CX 154.

> **D.    Milberg obtained Equal Treatment injunctions for Respondents in 2015; Respondents were included in Milberg's negotiations with the new Macri administration and the Special Master starting in early 2016; Judge Griesa indicated he would vacate the Equal Treatment injunctions in March 2016; vacatur was affirmed on appeal in mid-April 2016**

33.    Mr. Brand was closely following our strategy with the test cases and *Varela,* which I had carefully described to him at the outset and throughout its implementation. *See* CX 69; CX 71. He demonstrated that he was knowledgeable and reasonably sophisticated about the legal arguments and strategies we were employing, and he said he concurred with our judgment to proceed in that way. I kept him informed about court decisions when they were entered and important motions we were filing in *Varela*. *See* CX 73; CX 75 – CX 76; CX 83; CX 88 – CX 89; CX 148 – CX 150.

34.    After the Equal Treatment injunctions in the test cases were implemented, we took immediate steps to expand their benefits to our other clients, of course including

Respondents.  Mr. Brand was particularly eager to ensure that his funds join in obtaining

Equal Treatment injunctions, which he correctly understood provided bondholders' best

leverage for inducing Argentina to pay the global bondholders.  Mr. Brand requested us

to continue in this way well *after* the Early Termination dates had arrived for most of

Respondents' bondholdings in May and October 2013 and February-March 2014, as

described in more detail in Part II (A) below.

      35.    As noted above, Milberg filed the *Perez* omnibus action in October 2014

seeking entry of Equal Treatment injunctions for all its post-money-judgment clients (*see*

CX 143), and also brought injunction motions in February 2015 in a few other cases that

were still pre-money-judgment, including *Pons,* 13 cv 8887 (*see* CX 35 at MILBERG-

000927 (Dkts. 4-7).  All Respondents' bonds were covered by these Equal Treatment

motions except for the handful that did not qualify for Equal Treatment (those were a

2003 bond held by Respondent U.V.A. Vaduz in 07 cv 11497, and the eight non-USD-

denominated bonds held by Respondents U.V.A. Vaduz, Kantner, and Bohrer in 09 cv

7059 -- none of those bonds were issued under the 1994 FAA).

      36.    Most other bondholders who were SDNY plaintiffs with other counsel

also sought Equal Treatment injunctions.  This included the NML group members, which

held many bonds, both pre- and post-money-judgment, that had not been included in their

test cases.  The NML group members had only purchased 1994 FAA bonds, so their post-

test-case actions included their entire remaining holdings.  The motions had to address

the merger doctrine defenses that Argentina raised, as well as arguments raised not only

by Argentina but by its other creditors and allies.

37.     Judge Griesa granted these new Equal Treatment injunctions, including for Milberg clients, the NML group members, other bondholders, in his omnibus order issued on October 30, 2015.  CX 152.  This covered Respondents' bonds in the *Perez* and *Pons* cases.

38.     Maurizio Macri was elected president of Argentina in October 2015 and took office in December 2015, replacing Christina Kirchner.  *See* CX 151.  The new administration immediately signaled its intent to negotiate with bondholders, in order to facilitate Argentina's ability to re-enter international credit markets.  President Macri sent senior representatives to New York in December 2015 and January 2016 to set up negotiations.  Meetings were to be held under the auspices of the Special Master, and it became apparent that Mr. Pollack was very receptive to the new negotiators for Argentina (Finance Minister Prat Gay and Finance Secretary Caputo) -- presumably reflecting Judge Griesa's strong desire to foster negotiated settlements and end the bond litigations. *See* CX 157 (12/21/15 Pollack email to Cohen, Friedman, Carroll, Spencer, Rieman, Costantini regarding upcoming negotiations); CX 158 (1/11/16 Pollack email to Newman, Brodsky, Zimmerman, Rieman, Missing, Costantini, Spencer, Friedman re upcoming initial meeting).  Starting at the beginning of January 2016, I was spending virtually full time on these matters.

39.     The NML group and I continued to work together in strategizing how to negotiate with the government team.  We all felt that a united front would maximize our results.  The hedge fund lawyers and their clients were looking to settle for amounts not much discounted from their total claim values -- calculated as principal and all accrued interest.  We all spent time gathering and confirming those dollar values, so our

negotiating positions could be coordinated.  *See* CX 127, CX 131 – CX 133 (claim value charts, including Respondents' bonds).  Mr. Pollack convened an initial meeting in mid-January 2016 with Finance Secretary Caputo (CX 158), which the NML group and Milberg (and Duane Morris, another firm representing individual claimants) attended.  In early February there was another meeting and the group presented some initial numbers, including charts of claim values and possible recovery proposals.

40.     As described above, the initial planning sessions in December 2015 and January 2016 for discussions with Macri administration officials included bondholder representatives from the four NML group hedge funds and me.  However, when the time came for actual negotiations in early February, I was not invited to the initial meetings with the NML group members.  This elicited push-back from the NML group, who wanted me included.  *See* CX 159, CX 160 ("Mike is an important member of our committee, and we feel strongly that he should attend all our meetings with the Argentines and with you.").  The Argentines refused.  CX 163.  I did retain direct contact with the Special Master and eventually the negotiators.  *See* CX 164.

41.     The government then prioritized discussions with only the NML group, whose claims collectively totaled about $5.9 billion.  There were reportedly meetings with them on-and-off throughout February.  Simultaneous with the start of those negotiations, the Republic publicly issued a settlement Proposal (the "Propuesta")  on February 5, 2016 (CX 176), which "contemplate[d]" a two-part offer, "subject to the approval of the National Congress as well as to the judicial decision ordering the lifting of the Pari Passu Injunctions."  CX 176 at MILBERG-003453-54.  The offer provided that any holder of a global bond could settle for a payment of face value plus 50% (the

"Base" or "Standard" offer), and any holder who had obtained an Equal Treatment injunction could settle for 70% (or 72.5% for those who accepted on or before February 19) of the "accrued value of the claim," defined as the monetary judgment amount or the accrued claim value if no money judgment had been entered (the "Pari Passu" or "Injunction" offer). This "contemplated" offer was clarified and formalized in Law 27,249, enacted on March 31, 2016, which remains the definitive statement of the Propuesta offer (and which is still in effect). CX 22.

42.    At about the same time, Argentina moved by order to show cause before Judge Griesa for an "indicative ruling" to vacate the Equal Treatment injunctions on the ground that the Macri administration's willingness to negotiate settlements constituted "changed circumstances" sufficient to justify vacatur. Perhaps sensing that Cleary was too identified with the prior, intransigent Kirchner administration, Argentina retained Cravath to handle the vacatur motion. After some procedural adjustments, Argentina's vacatur motion was set for hearing on March 1, 2016.[7] *See* CX 39 at MILBERG-001834-36.

43.    Two settlements were actually made on February 3, one day before the Propuesta was released: by Montreux Partners LP for what was "presently understood" to be $298.6 million as payment for Montreux's judgments at the 72.5% Injunction level; and by EM Limited to "resolve all litigation" for payment of "between $842,000,000 and $848,000,00 as finally determined between them." CX 165 at MILBERG-004317-18. Argentina later described these settlements as "equal to or less than" what those bondholders would be entitled to receive under the then-forthcoming Propuesta. *Id.* at

---

[7] The docket sheets in *Perez* (CX 39 at MILBERG-001833-37 (Dkts. 24-56)), provide a complete record of the Equal Treatment proceedings before Judge Griesa in 2016.

MILBERG-004319-20.  Seven further settlements were announced by the Special Master and Argentina during the last three days of the "72.5%" period for Injunction settlements -- including the *Brecher* class action (covering an undetermined amount of bonds, at the Standard settlement level); and settlements at both Standard and Injunction levels (with some amounts indeterminate) by six other investment funds, the largest being an Injunction settlement by Capital Ventures International for $162.5 million.  *Id.* at MILBERG-004321-48.  The settlements during this period did *not* include NML, Aurelius, Blue Angel, or Bracebridge.

44.      On February 29, 2016 on the eve of the hearing with Judge Griesa on vacatur of the Equal Treatment injunctions, Mr. Pollack announced that NML, Aurelius, Blue Angel, and Bracebridge had reached an Agreement in Principle to settle with Argentina.  CX 200.  All their bonds had received Equal Treatment injunctions, and the settlement consideration was computed as 75% of "the amount of their claims of $5,891,000" asserted in the SDNY (which computes to $4,418,250,000), plus an additional amount of $235 million for settlement of claims outside the SDNY and for legal fees (which equates to another 4% of the claim amount).  CX 200 at MILBERG-003459.  This settlement thus was for almost exactly 79% of the claim amount on the subject bonds.  The claim amount was explicitly stated to be "inclusive of all legal and statutory interest applicable to each such claim through February 29, 2016."  *Id.*  If payment was not made by April 14, 2016, "interest will resume running … on the full claims at the legal and statutory interest rate applicable to each such claim."  *Id.*

45.      At the SDNY vacatur hearing on March 1, 2016, counsel for bondholder plaintiffs who had not yet settled, including me, beseeched Judge Griesa not to vacate the

injunctions, because the Macri administration had only indicated a willingness to settle the bond claims against Argentina, but had not cured the problem that led to entry of the injunctions -- *i.e.*, the government still was unwilling to satisfy holders' money judgments or honor the Equal Treatment provisions of the bonds.  Even the NML group opposed vacatur, because they were worried that Argentina would renege on their settlements and leave the funds without any remedy or leverage.  I provided input into the filings in opposition to Argentina's application to vacate the injunctions.  *See* CX 184 – 187; CX 40 at MILBERG-000046 (Dkt. 297).  In addition, I had filed a declaration and "Small Bondholder Plaintiffs' Memorandum" prior to the hearing, and at the hearing, I argued strenuously to Judge Griesa that he should keep the injunctions in force, at least for a few weeks, and allow us to negotiate under those conditions.  *See, e.g.*, CX 201; CX 202 at MILBERG-002074-78, MILBERG-002101.  Nevertheless, Judge Griesa promptly indicated he was vacating the injunctions.  The remaining unsettled bondholders (including all affected Milberg clients) appealed to the Second Circuit.

46.     Around this time, leading up to the Second Circuit argument in mid-April 2016, Respondents (represented by both Mr. Brand and LRI) became even more closely and directly involved with me in strategizing about the situation and ensuring that their views and interests were heard by the Argentina representatives.  Their status through the rest of 2016 is discussed in detail in a separate section in Point II below.

47.     At this point, the government was unwilling to negotiate settlements on terms other than the Propuesta, and also refused to meet with remaining bondholders as a group.  *See* CX 240A at MILBERG-004303.

48.     The Second Circuit scheduled argument on the appeals for April 13, 2016 – just before the first group of settlements that had been reached were scheduled for funding.  To me, it was clear that Judge Griesa had vacated the injunctions as a way to pressure bondholders into settling; but the case law firmly held that fostering settlement prospects was not a permissible basis for vacating injunctions of the type that had been issued.  I believed the Second Circuit should and would reverse the vacaturs and allow the remaining bondholders to negotiate settlements on a more equal footing (*i.e.*, with the prospect of continuing to enforce our injunctions).  I argued strenuously for reversal of the vacaturs, in our appellate briefs (CX 227; CX 255) and at the Second Circuit argument on April 13.  Needless to say, our briefs were considerably different from the NML group's briefs (*see* CX 386; CX 389).

49.     The Second Circuit panel hearing this appeal had different judges than those who had heard the several Equal Treatment injunction appeals in prior years (and who had ruled in favor of bondholders).  From the outset of the April 13 hearing, it was clear that the panel was disposed to affirm the injunction vacaturs and hasten all settlements.  That is what happened: the panel affirmed from the bench, and issued a summary affirmance and order in the following two days.  CX 284.  On April 22, Argentina's counsel gave notice that the conditions for vacatur had been satisfied, and Judge Griesa immediately vacated the injunctions.  *See, e.g.*, CX 39 at MILBERG-001837 (Dkt. 56.)

50.     The most effective way that Ms. Rosito Vago and I had for keeping our clients informed of developments in their cases was through email "status reports" -- which I typically wrote, and Ms. Rosito Vago sent out to our full client list.  We also met

33

with clients who visited us in Buenos Aires or New York.  After the Macri administration

changed approach and signaled willingness to negotiate with bondholders starting in

early 2016, we began sending out status reports much more frequently.  I provided my

candid assessment of our situation in my reports.  Mr. Brand was on the email list and

received the reports.

51.     On February 3, 2016, after the initial meeting with Finance Secretary

Caputo, I reported that "we have entered into negotiations with Argentina to resolve your

claims" and that "As has been true for our litigation efforts in recent years, we are joining

with the large 'hedge fund' bondholders in seeking the best possible settlement resolution

with Argentina."  CX 177 at MILBERG-004222.  On February 15, I reported on the

stalled settlement discussions so far and on Argentina's motion to vacate the injunctions.

I wrote that "Argentina is trying to coerce bondholders into accepting a proposed

settlement on terms it dictates," which we were resisting, "and we expect to prevail, at

least in the appellate court;" "We urge our clients not to accept Argentina's current

offers.  All remaining bondholders are united in seeking to negotiate a better settlement

with the government."  CX 171.  This accurately reflected what I had observed in court

and in meetings with other counsel: if the injunctions could be preserved, we would have

leverage to negotiate a better settlement.  Two days later, I sent a follow-up status report

specifically addressing the "72.5%" limited-time offer in the Propuesta, stating "WE

ARE CONFIDENT WE WILL BE ABLE TO NEGOTIATE BETTER TERMS" so "we

urge you to please be patient and strong, and do not accept this offer."  CX 190 at

MILBERG-002726.  I also opined that "we are confident the Second Circuit Court of

Appeals will override Judge Griesa and order that the injunctions remain in effect."  CX

190 at MILBERG-002726.  The latter point reflected my reading of the legal standards for modifying or dissolving injunctions, which I did not believe Argentina had come close to satisfying.  On February 22, I sent another follow-up report, noting that Judge Griesa had indicated his intention to vacate the injunctions, which all remaining holdout bondholders intended to oppose in the appellate court.  I reiterated my belief that "we will be able to negotiate significantly better terms."  CX 195 at HWB00000377.  On February 24, I wrote briefly about the announcement of the NML group settlement.  I stated we expected to meet soon with the Argentina representatives; "We believe we are in a good position to get terms that are similar or better than the Hedge Funds;" and "We still strongly recommend that our clients should NOT accept Argentina's public offer."  CX 197.  On March 19, I wrote to update our clients on the current status, concluding: "We understand that you are seeing media reports that the government is winning.  However, the government officials are not taking into account their political risk in the Congress and the legal risk that the Second Circuit will reverse Judge Griesa's vacatur of the injunctions.  We continue to believe that the government will offer us better terms than the 'public' terms described above."  CX 241.  On April 14, Ms. Rosito Vago and I wrote immediately after the Second Circuit affirmed Judge Griesa's vacatur of the Equal Treatment injunctions.  I stated there were "mainly two scenarios:" settle under Propuesta terms; "We think this will be your best alternative at this point;" or "Some of you may want to discuss other possible options with us to continue litigating.  We will be happy to explain those situations if you would like."  CX 292A.  I ended: "Thank you for your loyalty and support during this long and difficult process."  *Id.*

**E.     Many other bondholders then settle; Respondents terminate Milberg in April-May 2016; Respondents' judgment enforcement efforts fail; the Special Master announces Respondents' settlement with Argentina "within the parameters of the Propuesta" on May 31, 2017; the settlement amount is amended downward in October 2017; Respondents refuse to pay any legal fees to Claimant; the present arbitration**

52.     Almost all the Milberg-Rosito Vago clients, and in fact most remaining holdout litigants, decided to settle on Propuesta terms following the Second Circuit's affirmance of Judge Griesa's vacatur of the injunctions -- some sooner, some later.  Mr. Pollack announced additional settlements frequently over the rest of 2016.

53.     Milberg and Rosito Vago have now had over two years of close experience in administering the settlements.  The government interprets Law 27,249 (CX 22) to require all settlements to fall within the terms of the Propuesta, and in a lengthy call I had with new Finance Secretary Bausili in 2016, he told me it would be a criminal violation for any government official to approve a settlement at a higher amount.  We have discussed settlement amounts with the Ministry and reconciled figures when necessary, and we have addressed any legal issues with Cleary.  Rosito Vago and the Ministry shared detailed settlement calculations for all plaintiffs represented by Milberg in SDNY actions.  *See* CX 20 – CX 21.  As a result, the Ministry recognizes our counsel status and attorney fee liens in those cases, and we have been able to resolve any differences in applying Propuesta terms for each client and bond subject to settlement. All settlements (including those of Milberg clients) are formalized according to the published Propuesta terms and a standard agreement signed by the Ministry and the bondholder (or, in our cases, by me) ("Agreement Schedule"), which attaches an "Attachment" (settlement spreadsheet) showing the pertinent information on each bond

being settled, including the settlement consideration.  Plaintiffs in our cases (except

Respondents) who decide to settle convey their decisions to Rosito Vago or Milberg, and

we deal with the Ministry in carrying out the settlements (finalizing paperwork, arranging

bond transfers through our settlement account, and disbursing settlement consideration).

54.    A few of the small individual bondholders who came to us through Mr.

Brand (Messrs. Braun and Schmidt) decided to proceed with their settlements under our

auspices.  However, Respondents did not.

55.    In mid April 2016, after Mr. Brand mentioned the retainers' Early

Termination clauses in a phone conversation with me, he e-mailed me in the course of

discussing LRI's recent direct involvement in the situation on the eve of the Second

Circuit argument and stated:

> I just wanted to let you know that they [LRI] also came up
> with the idea of terminating your contract according to the
> contract clause.  Do not talk to them any further.  I am the
> owner of the hwb funds and the manager as well, I am
> doing my due diligence daily.  It is my decision and not
> theirs!  Will meet them today.  At what time can I call you?
> Best Willi.

CX 270 at MILBERG-0003848.  I responded (April 11, 7:17am NY time):

> Hi Willi, thank you, I understand of course.  Call me at any
> time, day or night, if it is urgent.  Today I will be in my
> office by ~8:30 NY time.  We have many clients who are
> considering whether finally to accept the 70% offer.  Your
> decision will be important for everyone, and will influence
> how we appear to the appeals court on Wednesday.  But of
> course you must make your own decision according to your
> own best judgment.  I will help you any way I can.  Best,
> Mike.

*Id*.  Soon thereafter, Mr. Berke of LRI made his request that I contact the government

representatives immediately "in order to express our will for a common solution" and

requesting "the current status of your prospective fees" so they could "update [their] internal pricing / valuation of the HWB bonds." CX 271 at MILBERG-0003850. (My contact with Mr. Pollack and Mr. Bausili in response to that request, and my further contacts with Mr. Brand and LRI and some further services we provided to Respondents, are discussed in more detail in Point II.A below.

56.     Some Respondents, however, acting through LRI sent letters and emails to us terminating the Milberg retainers in late April. *See* CX 307 – CX 308. Mr. Brand, however, continued on after those dates as though Respondents had not really terminated us: he continued to seek advice from and communicate with me, cordially. *See* CX 309 – CX 310; CX 312. I advised Mr. Brand that I viewed the LRI termination letters as being ineffective. CX 314. Mr. Brand then sent termination notices for the other Respondents (CX 319), to which I responded as I had concerning LRI's similar notices (CX 320).

57.     Because Mr. Brand continued his contacts with me, I did not really know Mr. Brand's or Respondents' intentions, and I did not push him for insight. Mr. Brand did not tell me or otherwise indicate that Respondents had retained new counsel. None of Respondents made a motion in court to replace Milberg with substitute new counsel, and they did not comply with Local Civil Rule 1.4, which provides that an attorney who has appeared as attorney of record for a party "may be relieved or displaced only by order of the Court," and that a party seeking to displace an attorney must show "whether or not the attorney is asserting a retaining or charging lien."

58.     On October 27, 2016, I sent a letter to Carmine Boccuzzi of Cleary stating it had come to our attention that certain plaintiffs "may be attempting to settle their claims without our participation using other counsel" and asking him and his client to

"please take notice of our liens and proceed accordingly," based on an attached chart listing Respondents' bonds covered by actions commenced by Dreier or Milberg. CX 328 at HWB0000269. I do not recall how I had become aware of impending settlement discussions involving Respondents.

59.    On November 2, 2016, I received a WhatsApp message from Mr. Brand: "Hi Mike, how are you? I am actually in NY. We will be meeting Argentina on Thursday for first negotiations. Would it be possible for you to meet me in order to discuss our fee situation? As I told you months ago, I want to include you in our negotiations with them. I could come to your office if you like? Best Willi." CX 330; CX 331. I responded that I was in Toronto but would return and meet him in the afternoon, which I did. CX 331 – CX 332. In our brief and cordial meeting, Mr. Brand informed me that he and his funds (Respondents) had retained the Wilk Auslander firm and were meeting with Mr. Pollack and representatives of Argentina the next morning. He asked if he could meet again at Milberg the next day following the meetings, and I of course agreed. However, I received a WhatsApp message from him on the afternoon of November 3: "Mike: Our attorney Jay Auslander of Wilk Auslander LLP is reviewing your claim for additional fees and the lien you say your firm has on any settlement proceeds. Please from now on, deal directly with Jay about this issue. Thank you Mike!" CX 334. Mr. Auslander confirmed that request by email the next day. CX 335 at MILBERG-004000. I have not had any contact with Mr. Brand since then. Mr. Pollack emailed me on November 4 to report on the meeting and to say that the claims remained unresolved; he did not want to become involved in any fee issues. Mr. Auslander

emailed me on November 5 asking a number of questions about the situation, and I responded on November 7.  CX 335.

60.     I learned from a docket notification service in April 2017 that Respondents (using Wilk Auslander) had sought to attach two Argentine military helicopter engines that were in the United States for repair, but the federal judge in Ohio rejected the attachment based on the exception in the FSIA for military property.  *See* CX 390.

61.     Mr. Pollack issued a press announcement on May 31, 2017, that a settlement between Respondents and the Republic had been reached in the amount of $162,750,000.  CX 348.  The announcement did not provide details about exactly which claims or bonds were being settled and on what basis, but Mr. Pollack described the settlement as being "within the parameters of the Propuesta."  *Id.*  The stated amount, however, was about $246,000 greater than what Rosito Vago and I had calculated as the Propuesta settlement amount for Respondents' bonds, which perplexed me due to the prohibition against settlements in excess of the Propuesta level referred to above.  I speculated that the overage was due to inclusion of bonds of some additional persons affiliated with Mr. Brand, or rounding errors, or some other extraneous factor.

62.     Since Mr. Auslander had made it clear that Respondents would not pay us any fees, Claimant started this AAA/ICDR arbitration in August 2017.  Claimant retained Wollmuth Maher & Deutsch LLP as our outside counsel.  In our arbitration statement of claim, we included a detailed calculation of Respondents' settlement entitlements under the Propuesta (totaling $162,504,207 (CX 11)), and of the fees provided for under the retainer agreements based on those recovery amounts (totaling $11,906,767) (CX 13).

Milberg alleged that Respondents could have obtained full Propuesta settlement amounts any time after Milberg recommended to its clients that they accept those terms following the Second Circuit's affirmance of Judge Griesa's vacatur of the Equal Treatment injunctions on April 13, 2016. We also calculated that the Equal Treatment injunctions we had obtained for Respondents increased the amounts available to Respondents under the Propuesta on most of their bonds, as compared to the settlement amounts that would have been available to them if they did not have injunctions. We recently detected a typographical error in the portion of our original Exhibit G (reproduced as CX 11) showing that information -- the correct amount of increase in Propuesta entitlement attributable to Respondents' Equal Treatment injunctions is in excess of $24 million.

63.     Respondents' answer in arbitration (September 2017) reaffirmed that Respondents were settling with Argentina for $162,750,000, and strongly disputed our calculation of the maximum amount of a Propuesta settlement on their bonds. *See, e.g.*, CX 2 at 11-12 & nn.11-12.

64.     We learned from documents produced by Respondents in this arbitration in March 2018 that Respondents' settlement with Argentina had been finalized in October 2017 in the total amount of $162,349,235.48 (CX 364 at HWB0000036) -- some $154,972 less than Claimant's calculation of Respondents' true Propuesta entitlement, and $400,765 less than the settlement amount announced in May 2017. The reasons for those discrepancies, according to our analysis, are described in the Point II.C below. We persuaded Argentina and/or Respondents to put our claimed fee amount in an escrow account pending the outcome of this arbitration. CX 365. The settlement amount, less the escrow, was reportedly paid by Argentina to Respondents in early 2018.

## II.     MY TESTIMONY RELATING TO CERTAIN ISSUES

### A.     Respondents continued to request and receive legal services from Milberg and Rosito Vago long after the Early Termination Dates specified in most of Respondents' retainer letters

#### i.     Services Provided Keyed to Early Termination Dates

65.     As previously noted, most of Respondents' retainer agreements contain a provision that states:  "In the event there is no partial payment on Capital or Interest after 5 (five) years since Client's judgment is obtained, the Client shall be entitled to terminate this agreement without any further compensation or obligation to Dreier."  *See, e.g.*, CX 5 at HWB0000071.  We continued those provisions when Milberg took over for Dreier, in the interest of preserving maximum continuity for the clients.  *See, e.g.*, CX 6 at HWB0000123

66.     The retainer agreements were entered into when a client decided it wished to include bonds it held in an upcoming enforcement lawsuit.  The cover pages for the collection of retainer agreements submitted with our arbitration statement of claim (and reproduced in the arbitration identifies which retainer agreements correspond to which actions and the Respondent client/plaintiffs in those actions.  *See* CX 5 at HWB0000068 (actions started by Dreier); CX 6 at HWB0000120 (actions started by Milberg).  The complaints in each action, as well as charts and spreadsheets prepared by Rosito Vago (*e.g.*, Statement of Claim Exhibit G, CX 11), identify which bonds were included for each plaintiff in each action.  An Early Termination clause in a retainer agreement covered the bonds and claims asserted in the action started at that time.  Exhibit I to the Statement of Claim (CX 14) sets forth, for each action, the Respondent, the amount of bonds involved (by judgment amount), the date on which a money judgment was

obtained, and the number of years after judgment when the Early Termination date arrives (which is further described below).

67.     I should say initially that Mr. Brand never said anything to me about the early termination provisions in the retainer letters, or intimated that he contemplated invoking the provisions, at any time until he in fact did so in May 2016.  Nor did anyone else affiliated with Respondents, including HWB or LRI persons, until, as noted above, Mr. Brand's email of April 11, 2016 (CX 270 at MILBERG-0003848) recounted that LRI had "came up with the idea" of terminations but that the matter was his to decide, not theirs.  So during the entire chronology set out below, I never once looked at termination dates and I never considered these provisions.

68.     The earliest early termination dates arose for one Respondent (NW Global Strategy) with respect to its two bonds in 13 cv 8887, which provided for a date one year after the retainer was signed (yielding an early termination date of May 3, 2013); and for two Respondents (U.V.A. Vaduz and Klaus Bohrer) with respect to their bonds in 07 cv 11497, which provided for a date five years after money judgments were entered (yielding an early termination date of October 17, 2013).  As described in Part I of my testimony above, 2013 was a central year for the Equal Treatment test case litigation -- the Second Circuit denied Argentina's appeal from Judge Griesa's second (post-remand) Equal Treatment decision in August 2013, and Argentina's Cert Petition from the first Equal Treatment decision of the Second Circuit was denied on October 7, 2013.  *See* CX 41 at MILBERG-000101.  Between May-October 2013 and the following June, Milberg and counsel for the NML group were seeking to lift the stay on the injunctions, and more importantly, were intensively opposing Argentina's second Cert Petition, which was its

last-ditch effort to overturn the Equal Treatment injunctions.  As stated above, cert was
denied on that petition on June 14, 2014, affirming the injunctions and effectively lifting
the stays and clearing the way for the injunctions' effectiveness and enforcement.  *See id.*
at MILBERG-000102.

69.     In a Milberg status report in August 2013, I had explained to all our
clients, including Mr. Brand, that we were making our Equal Treatment argument in only
one test case, and likewise that our hedge fund allies had included only some of their
bonds in their test cases.  "We believe it is important to get a final decision on the
existing test case before we seek to expand it to all our other clients."  CX 112 at 2, 6.
We had entered into the retainer for Mr. Brand's most recently acquired bonds in May
2012, but Mr. Brand had agreed to delay the filing of the complaint as part of our
strategy.  On December 11, 2013, I emailed Mr. Brand to discuss filing new complaints
with the Equal Treatment allegations for NW Global Strategy bonds.  CX 118A.  In
response, Mr. Brand asked me to proceed with commencing these actions.  *Id.*; CX 393.
Later, he provided declarations for our summary judgment motions in the case.  All the
foregoing occurred after the first Early Termination Dates on which Respondents now
rely for terminations by NW Global Strategy, U.V.A. Vaduz and Klaus Bohrer in 13 cv
8887 and 07 cv 11497.

70.     Also during 2013, Mr. Brand told us he needed to merge three of the
Respondent funds and asked us to obtain the necessary permission of Judge Griesa for
amendment of the affected funds' money judgments (which prohibited transfers of bond
ownership without court permission).  Mr. Brand had asked me in June 2013 about
applicable legal requirements for transfer of bonds on which judgments had been entered

and there ensued quite extensive correspondence about what he wanted and what was needed (we drafted declarations from fund officials and sought consent from Argentina), and ultimately we made an application to the court. *See* CX 90 – CX 91; CX 113 – CX 115; CX 117 – CX 118; CX 367; CX 369; CX 370 – CX 373. The merger issue was concluded after we persuaded Cleary not to oppose and Judge Griesa signed an order on December 11, 2013. *See* CX 374. We decided not to bill any of the funds for our time for that transactional work, even though it was outside the scope of our retainers. This work, too, was performed for Respondents after the first Early Termination dates.

71.     The second early termination date period was February-March 2014, applicable to the great majority of Respondents' claims and cases: the bonds in two actions (07 cv 10657 and 07 cv 11382) in which money judgments had been entered in February 2009 and a five-year period applied; and one action (10 cv 4656) in which a money judgment was entered in March 2011 and a three-year period applied. CX 14. Respondents did not terminate the retainers at that time either; rather, they requested and encouraged Milberg to continue to litigate hard on their behalf.

72.     This was the period when Milberg was focused on opposing Argentina's pending Cert Petition, which I sent to Mr. Brand when it was filed in February. I kept Mr. Brand informed of developments (*see, e.g.*, CX 118A; 119; CX 120), and we filed our opposition in May 7, 2014. Mr. Brand was very aware that the outcome of the test cases was crucial for the Equal Treatment strategy as applied to his bonds as well. We were still carrying out the strategy of waiting to file additional Equal Treatment motions in the district court until cert was decided. I emailed Mr. Brand on May 15, 2014 to ask him specifically about 13 cv 8887, which was still on hold:

> Hello Willi! …
>
> I'm writing to you now in particular because we are preparing to file summary judgment motions (seeking both payment and enforcement of the pari passu clause) for our few clients, including you (for some of your bonds), who have not yet obtained judgments. …
>
> My question: Do you want us to include your pre-judgment action as part of the small group for which we will seek summary judgment if and when cert is denied?  I don't really see any downside; it may attract a lot of attention but that really isn't a factor.  Please let me know what you think.                    Best              regards,              Mike.

CX 120A.  He responded:  "What would be your recommendation from the point of the lawyers view?"  CX 121.  I gave him a longer explanation, including consideration of whether his post-money-judgment funds would feel deprived if they had to wait longer than the pre-judgment funds to obtain injunctions.  *Id.*  Ultimately he asked us to make the filings: "Please include the pari passu injunction at the earliest possible time for the new claim.  Best regards, Willi."  *Id.*

73.     I emailed Mr. Brand immediately when cert was denied on June 16, 2014 (CX 122), and then on June 18 after we had seen Judge Griesa, who had informed us he would move expeditiously to enter Equal Treatment injunctions for all qualifying plaintiffs, so (as I put it) Respondents would "get to join an exclusive club."  CX 123.  Our efforts had put Respondents into a very strong position.  *See, e.g.*, CX 152 (order granting Equal Treatment injunctions).

74.     It was at this point that the two main post-cert-denial projects got underway which continued through at least May 2016: trying to negotiate settlements with Argentina (with the old, and eventually the new, administrations), and expanding the Equal Treatment injunctions to all qualifying bonds -- as described in Point I above.

Respondents were included in our injunction claims and motions in *Perez* (CX 138, CX 144) and *Pons*, and my attempts to negotiate with government representatives and through the Special Master were on behalf of all our clients, including Respondents. *See, e.g.*, CX 134. Respondents did not seek to invoke the Early Termination provisions during this period at all. All of Mr. Brand's communications to me expressed satisfaction with our efforts and the strategy that was unfolding. *See, e.g.*, CX 148 – CX 150.

75.     Only Respondents' claims in 09 cv 8299 were subject to an Early Termination Provision termination date (February 24, 2016) that was remotely proximate to the dates in April and May 2016 when Respondents sent their emails terminating the retainer agreements. The claims in 09 cv 8299 represent a relatively small portion of Respondents' overall claim amounts (around $35 million). Respondents did not exercise the Early Termination Provision when it arose in February 2016, and instead continued to affirmatively utilize Milberg's services (with respect to all of their bonds) during this critical time in the litigation -- February through April 2016, when Argentina successfully moved to vacate the injunctions, and the vacatur order was affirmed by the Second Circuit -- with Milberg taking a leading position in opposing vacatur. During this time, we sent numerous status reports to our clients, and I communicated with Mr. Brand very frequently about these strategies and developments. On February 3, I had a half-hour phone call with Mr. Brand, who told me he was "adamant at sticking to 100 cents on the dollar." CX 168 – CX 169. Mr. Brand also knew we were comparing notes with the NML group members about calculating claim values in preparation for negotiations, which Mr. Brand also wanted for discussions with LRI and his regulators. *See* CX 175, CX 177 – CX 178, CX 182 – CX 183; CX 264. As described above, in early and mid-

April, acting on the separate instructions of Mr. Brand and LRI officials, I engaged directly with officials of the Macri administration to test possible settlements (*see* CX 264 – CX 266; CX 271 – CX 273; CX 275 – CX 279), and advised Mr. Brand and LRI of the outcome (*see* CX 269; CX 279; CX 281).  On April 11, 2016, LRI sought and I gave them information about the contingency fee amounts owing on their bonds, and they stated in writing they were preparing to pay the fees.  CX 271; CX 281.

76.     There is a copious record of emails and other communications between Milberg, Rosito Vago, Mr. Brand, and LRI during February-April 2016.  These include the status reports identified above; discussions during the second week of March concerning Mr. Pollack's attempts to facilitate discussions between the government and Mr. Brand, which did not occur (CX 211); my advice to Mr. Brand about post-judgment interest rates and the possibility of "exporting" federal court judgments to higher-rate jurisdictions (CX 217); my inclusion of a specific description of Respondents in our Second Circuit brief in March (CX 227 at MILBERG-002128) based on Mr. Brand's feedback (CX 222, CX 224); my advice to Mr. Brand about the actual recovery values in the NML group and EM settlements (CX 225); my response to LRI's Messrs. Berke and Thiel about a typo in the retainer letter giving the contingency fee percentage for one bond (CX 231) and about the judgment status in 13 cv 8887 (CX 235 – CX 237; *see also* CX 234) and Mr. Brand's request that LRI be told that a successful attachment could lead to 100% recovery (*see* CX 237 at MILBERG-003782); my explanation to Mr. Berke and Mr. Thiel of LRI that we had agreed with Mr. Brand not to obtain a money judgment yet in 13 cv 8887 because an accruing bond coupon rate was much higher than the federal post-judgment interest rate (CX 234; CX 238); my arrangement in mid-March 2016 for

Mr. Brand, at his request, to give interview quotes to a Bloomberg reporter, and my review of his quotes (CX 244 – CX 245; CX 247 – CX 250); my analysis for Mr. Brand and LRI of probable scenarios for bondholders in view of the upcoming Second Circuit argument in mid-April 2016 (CX 260 – CX 261).  This also includes my communications with Mr. Pollack and Finance Minister Caputo concerning Respondents' positions and concerns.  *See, e.g.*, CX 273 – CX 278.  After the Second Circuit's affirmance of vacatur, Mr. Brand continued to ask about likely settlement scenarios and whether Argentina might terminate the Propuesta offer, which I answered.  CX 298.  In late April, I introduced Mr. Brand to another large holdout bondholder in New York since I thought they might have common interests.  CX 305.  I provided a response to Mr. Brand in late April about LRI's concern about payment assurances from Argentina for bonds submitted for settlement (delivery-vs-payment procedures provide security).  CX 306.

77.    Throughout that very intensive legal and practical interaction they had with me, Respondents did not seek to discharge Milberg until LRI did so at the end of April and after the foregoing activity.  CX 307 – CX 308.

78.    For Respondents' several bond claims in 09 cv 7059, the five year early termination date did not occur until September 2016 -- in other words, in that case, Respondents invoked the early termination provision five months before it even arose.

79.    In addition to the foregoing, there are two other subjects on which we provided services to Respondents after their early termination dates lapsed: "claim value" calculations and information about judgment enforcement.

ii.   Rosito Vago Provided Respondents with Spreadsheets Showing
"Claim Values" on Their Bonds in April 2016

80.   As mentioned in the chronology above, accurate calculations of amounts

owing on plaintiffs' bonds were important in several respects.  They were required for

entry of money judgments.  Also, Injunction settlements under the Propuesta were based

on 70% of the "claim value" of the bonds submitted for settlement on which Equal

Treatment injunctions had been entered.  The applicable law, Law 27,249, defined claim

value as follows: (a) for bonds on which money judgments had been entered before

February 1, 2016, claim value was "the legal claim (which includes the amount

acknowledged in said judgment and judicial interest accrued from the judgment date until

January 31, 2016);" and (b) for bonds "without a money judgment, claim value was "the

legal claim (which includes principal due plus accrued interests pursuant to the

contractual interest rate and the statutory interest rate over the contractual interest rate

until January 31, 2016, pursuant to the laws of the State of New York)."  CX 22 at

MILBERG-004426-27.  Pursuant to those definitions, bondholders seeking Injunction

settlements on bonds with money judgments were entitled to consideration based in part

on the post-judgment interest accrued on their bonds; and bondholders seeking Injunction

settlements on bonds without money judgments were entitled to consideration based on

principal plus coupon interest plus statutory (New York 9%) interest-on-interest over the

contractual interest rate, through January 31, 2016.  *See id.*

81.   Those calculations are arithmetically objective and should not present

particular difficulties once the rules are understood.  I mention the issue here because,

among other reasons, Respondents' submissions in this arbitration show they still are not

informed about these provisions (*i.e.*, as recently as their letter to the Panel dated June 1,

2018, they insisted that claim values on money-judgment bonds do not include post-judgment interest).[8]  In April 2016, Rosito Vago provided Respondents with spreadsheets meticulously calculating the claim values on each of their money-judgment bonds, including post-judgment interest.  CX 300.  Respondents *could have* used that valuable information when negotiating their own settlements with Argentina, and when dealing with the issue in this proceeding, but evidently they are resisting acknowledging the governing law and correct information.

### iii.    Respondents Declined to Follow Up on Milberg's Repeated Introductions of Kobre & Kim for Sovereign Judgment Executions

82.    As the events of 2016 unfolded, Mr. Brand made very clear to me and Ms. Rosito Vago that he was determined not to settle his claims on terms anywhere near what Argentina was offering, and instead intended to pursue "100%" recoveries by way of attachments and executions.  *See* CX 168 – CX 169.  This led to discussions of how those services would be provided.

83.    I told Mr. Brand that judgment enforcements were a standard part of legal practice in the United States and that Milberg could and would handle them.  In fact, Milberg had been extensively involved in numerous attachments and execution attempts. In 2010, when Milberg was just entering the cases in place of Dreier, my first contact with Dechert's Robert Cohen was in connection with joint efforts to establish government alter ego status for Banco Central de la Republica Argentina (BCRA) so that its assets could be reached (CX 47); those efforts were undertaken in part on behalf of Milberg clients who are now Respondents in this arbitration (or their predecessors), and a review

---

[8] Respondents stated (CX 366 at p. 8 n.26): "Without basis, Milberg argues that 'the Propuesta does include post-judgment interest in claim values.' … That's wrong.  … As such, the Propuesta calculations in Ex. 4 to HWB's Counterclaim do not include post-judgment interest."

of the docket sheets for Respondents' cases shows that we sought attachments on their behalf repeatedly through the years.  *See, e.g.*, CX 29 at MILBERG-000858-59 (Dkt. 20, order to show cause for attachment of "FJP funds" and Dkt. 23 (Argentina's appeal)), MILBERG000858-62 (Respondents are among parties seeking attachments); CX 30 at MILBERG-000874-75 (Dkts. 17, 25 similar attachments on behalf of Respondents, and Argentina's appeal); CX 31 at MILBERG-000896-98 (Dkts. 43, 46, 47 appointing Milberg for judgment executions and entering restraining orders); CX 33 at MILBERG-000914-15 (Dkts. 13-16 same as above).

84.    I was also generally aware that the NML group hedge funds had agents on the look-out for more specific assets or accounts that might be attachable; the prime example was NML's attachment of an Argentine Navy training frigate in Ghana in 2012, which was widely reported in the media.  When Milberg entered these cases, one of our in-house investigators prepared a memo on Argentine government assets in the United States.

85.    In 2016, Mr. Brand started to focus on possible judgment execution attempts as he realized that settlements with Argentina would not likely reach the levels he sought, and he raised the issue of judgment enforcement.  In addition to going over the information above, I wrote him in an email on April 9, 2016, as follows:

> If any bondholder client decides not to reach a settlement with Argentina, enforcement of the client's money judgment by attachment and execution will be the best remaining alternative.  This involves obtaining registration of the judgments from Judge Griesa's court and then filing them in jurisdictions where Argentina may have assets, for attachment and execution by the appropriate authorities. As Argentina re-enters world financial markets, it will likely expose more assets that will qualify for attachment. As you know, we have discussed retaining a specialist law

> firm in this area, Kobre & Kim of New York.  I have
> attached materials they prepared concerning their services,
> and some sample retainer proposals.  If we get to this point,
> I think they would be an excellent resource.
>
> The actual procedure for executing on a defendant's assets
> is not complex.  It should be noted that the value of the
> judgments on which executions are based is 100% -- that is,
> the full value of the judgment (in these cases, principal,
> interest, and interest-on-interest) plus post-judgment
> interest is collectible (minus official fees).  In addition,
> normally the executing jurisdiction applies its own post-
> judgment interest rate, which means that a judgment
> registered in the New York State courts (for example) will
> likely have the New York 9% rate applied for post-
> judgment interest.  This procedure thus has some real
> attractions.

CX 268 at HWB0000416-17.  I raised Kobre & Kim because I thought it was more likely that attachable assets would be found in foreign jurisdictions as "Argentina re-enters world financial markets," and I knew that Kobre & Kim had experience with judgment enforcement outside the U.S. that Milberg did not.  *See also* CX 253.

86.    A week later, one day after the Second Circuit affirmed vacatur of the Equal Treatment injunctions, I again emailed Mr. Brand quoting the FSIA provision on attachment and execution, 28 U.S.C. §1610(c) and urging him that it would be counter-productive to approach Judge Griesa prematurely to seek attachments when many bondholder settlements were still pending.  CX 286.  On April 18, I emailed my contacts at Kobre & Kim to report that Mr. Brand had asked me a lot of questions about them based on his review of their website (CX 293 – CX 294); I emailed Mr. Brand on the same day that Kobre & Kim was ready to have a call (CX 296), and on April 21 I again offered to arrange a call (CX 304).  I do not believe one ever occurred.  *See* CX 318.

87.     As it turned out, two individual holdout bondholders (Ladjevardian and Colella) did make a motion before Judge Griesa for FSIA permission to pursue attachments of government assets around this time.  On May 1 (*i.e.,* after LRI had sent its termination notices to us), Mr. Brand wrote to me and Rosito Vago: "Hi! Question to all of you: why are you not doing such motion for our clients.  Instead of talking about 'en banc hearing'?  Mike: I did not hear from Kobre & Kim LLP at all, why?"  CX 313 at MILBERG-0003933, attaching an email from a lawyer at King & Spalding about the Ladjevardian/Colella motion.  Mr. Langesfeld sent a message to Mr. Brand on May 27 attaching Judge Griesa's order denying the motion, to which Mr. Brand replied, "Thank you Freddy!"  CX 321 – CX 323.

### B.     Additional facts that may be relevant to quantum meruit

88.     Dreier, Rosito Vago, and Milberg performed substantial services under the retainer agreements, until Respondents terminated the retainers.[9]  Neither Mr. Brand nor any other representative of any Respondents ever said they were dissatisfied with the legal services we furnished.  On the contrary, Mr. Brand was always complimentary to me and Rosito Vago.  As noted above, just two weeks before terminating us, LRI asked for confirmatory information about the fees owed under the retainers -- confirming that they had not terminated the retainer relationship.  CX 271; *see also* CX 312 (e-mail from Willi Brand:  "You should then not worry to[sic] much about performance fees.  After all this[sic] years I promise to you, that I will include something reasonable for you in my final negotiations").

---

[9] The first terminations of Milberg and Rosito Vago came from LRI.  CX 307 – CX 308.  As noted above, Mr. Brand previously had told me that he, not LRI, was responsible for making decisions for Respondents. As a result, for a time we viewed the discharges as "purported."  It later became clear that Mr. Brand also was committed to the discharges.  CX 319.

89.     Mr. Brand conveyed that he strongly believed he should recover the full claim amount on his bonds.  He never said anything to me indicating that he would settle for less.  At times, I told him that it was unlikely that Argentina would settle for full value even if the Early Termination injunctions remained in effect, and that executing on his funds' money judgments was a very uncertain project in light of the failures by NML and related hedge funds, which had devoted huge resources to that effort without any real success.  Of course, as lawyers we did not guarantee success or any particular outcome for Respondents' claims and cases.  I did believe that the Second Circuit would not affirm Judge Griesa's vacatur of the Early Termination injunctions in March-April 2016, because the only thing that had changed was Argentina's rhetoric and the amount of its take-it-or-leave-it settlement offers.  It turned out that I was wrong.  However, the services we provided to our clients in these cases were valuable, and the Early Termination injunctions we obtained had very quantifiable value because Propuesta settlement offers for injunction holders were generally higher than for those who did not have injunctions.

90.     As noted above, we have calculated that the additional value to Respondents from having injunctions for their qualifying bonds, under a Propuesta settlement, would have been some $24.37 million, as part of the $162,504,207 for which they were eligible under the Propuesta.

91.     I also note the level of contingency fees awarded by Judge Griesa to counsel for plaintiffs in the Argentina bond class actions.  Like Claimant, class counsel took on their cases on a contingent basis, without assurance of obtaining any fees or reimbursement of their expenses.  Judge Griesa awarded class counsel (three co-lead

counsel law firms and one former class counsel in one group, and one law firm in a separate case) reimbursement of their expenses plus 30% of the recoveries (net of those expenses) obtained by class members, in nine class actions.  *See* CX 346 at HWB0000300, HWB0000302, HWB0000312.  The court assumed a total class settlement of around $26 million (*id.* at HWB0000280), and awarded reimbursement of expenses totaling about $924,000 (*id.* at HWB0000300), meaning the dollar amount of the fee would be about $7.5 million.  Those class actions, and the "individual" (non-class) cases litigated by Dreier, Rosito Vago, and Milberg (including Respondents' cases), proceeded during the same multi-year span of time and covered many of the same legal issues.  Class counsel reported about $13 million in lodestar in the cases.  *Id.* at HWB0000287.  Notably, Judge Griesa awarded the 30%-plus-expenses amounts to class counsel even though they had not succeeded in obtaining Early Termination injunctions for class members (most of their bonds would have qualified), and the class settlements were on Standard terms under the Propuesta.

92.     By comparison to the class fee awards of 30% (putting aside expenses for the moment), the contingency fees specified in the retainer agreements that Respondents entered into with Claimant arithmetically work out to an overall fee total of about 7.3% of Respondents' total settlement amount.  *See* Exhibit H to the Statement of Claim, CX 13.  Including the initial retainer "start-up" fees paid by Respondents (totaling about $513,000) would bring that figure up to about 7.6%.  If the fee amounts were reduced by out-of-pocket expenses (which were reimbursed in the class cases, but reimbursement is not provided for in Respondents' retainers), Claimant's fee percentages would of course

decline somewhat.  This demonstrates that the effective contingency fee percentages in Respondents' retainers are way below what Judge Griesa awarded to class counsel.

93.     Most of Claimant's legal work in these cases was not performed on a basis that can be neatly allocated case-by-case or client-by-client.  Many of the actions combined a number of diverse bondholder clients as plaintiffs, and many of the issues were litigated in early cases, where precedents were established that then applied to later cases.  Respondents were certainly beneficiaries of that early work, since they did not begin litigating until five years after the default, when much of the legal groundwork had already been laid, as described in Part I above.  In a similar vein, Milberg and the three firms representing the NML group of hedge funds cooperated extensively in litigating the Equal Treatment injunction issues in limited test cases (including *Varela*), and the results were then applied to all qualifying plaintiffs, well beyond the test cases.  Thus, I cannot separate out how the benefits of any particular legal work were distributed among cases and clients.  In the same vein, I rarely kept time identified as pertaining only to certain clients or cases, even if time was so spent, because it was not necessary.  In order to locate Milberg documents in response to Respondents' document request in this arbitration for time records "relating to services performed solely on behalf of Respondents (as distinct from services performed by the Law Firms on behalf of their other clients)," I had word searches performed on our time records to identify references to client names (Brand, HWB, NW Global, etc.) -- and entries that happened to have those names in them turned up.  *See* CX 27.  Identifying the amount of work spent "solely on behalf" of a particular client is essentially meaningless in this context, because almost all work was done for multiple bondholder clients or such clients generally.

94.     I expect it goes without saying that contingency fees can be very challenging for the lawyers, especially when the underlying litigation is very protracted, as this was, such that the law firms start incurring personnel, overhead, and out-of-pocket costs as soon as the case begins, but recovery of fees comes much later, and indeed may never come.

**C.      Respondents settled with Argentina in October 2017 for $154,972 less than Milberg had obtained for them under the Propuesta before they discharged Milberg in April-May 2016**

i.     <u>Settlement Amount Available Under the Propuesta on Respondents' Bonds</u>

95.     Putting aside whether Claimant's entitlement to fees should depend on Respondents' achievement of any particular settlement amount, I wish to address Respondents' claim that they ultimately settled for an amount in excess -- sometimes they say substantially in excess -- of the Propuesta amount Claimant could indubitably have obtained for them, thereby supposedly justifying their refusal to pay fees to us at all. Their claim is factually erroneous.  And their claim that we committed "sloppy mathematical errors" (CX 2 at 11) in calculating the correct Propuesta settlement amount for their bonds instead reflects their lack of understanding of the rules for Propuesta settlements.

96.     The Propuesta was first announced on February 5, 2016 (CX 176) "subject to the approval of the National Congress" (*id.* at MILBERG-0003454), and was enacted into law (Law 27,249) on March 31, 2016.  CX 22.  The Propuesta provides arithmetically precise instructions for calculating permissible settlement amounts for settling bondholders who have, or who do not have, Equal Treatment injunctions

(Injunction and Standard settlements, respectively).  For bonds for which an Equal Treatment injunction had not been obtained (because certain bonds did not qualify or because the holder did not obtain an injunction), the "Standard" settlement amount is 150% of the bond's face value (but for bonds with money judgments, not greater than the money judgment amount plus accrued interest as of January 31, 2016).  For bonds for which an Equal Treatment injunction had been obtained, the settling holder can elect the higher of the "Standard" settlement amount or an "Injunction" amount defined as 70% (or 72.5% for settlements committed to during the two weeks ending on February 19, 2016) of the "claim value" of the bond.  For Injunction bonds without money judgments, the claim value is principal plus accrued coupon interest plus interest on interest at the New York statutory rate, through January 31, 2016.  For Injunction bonds on which money judgments had been entered, the claim value is the amount of the money judgment plus federal post-judgment interest through January 31, 2016.  All of those factors and amounts are objectively ascertainable.

97.     Since the Propuesta was enacted, I know of no bondholder who has settled on better terms, which I understand would be prohibited.  The hedge funds in the NML group had injunction bonds and settled at 75% of claim value plus 4% for attorney fees (i.e., higher than Propuesta terms) in late February 2016 -- but those (and the few other settlements announced for that period) were exceptions specifically enumerated in the annex to Law 27,249.

98.     As noted previously, the true total Propuesta settlement value for Respondents' bonds is $162,504,207, as we set forth in Exhibit G to our arbitration statement of claim in August 2017.  CX 11.  Respondents could have settled and received

that amount as of mid-April 2016, after Milberg recommended to its clients that they

settle on Propuesta terms, following the Second Circuit's affirmance of Judge Griesa's

vacatur of the Equal Treatment injunctions.  CX 292A.  Rosito Vago also provided our

Propuesta settlement figures for all our clients to the Ministry in late April 2016, and

those figures were reconciled and approved thereafter.  *See* CX 20 – CX 21.  As

previously stated, Rosito Vago also provided claim and settlement value figures to

Respondents on their bonds in April 2016, which support the same conclusion.  CX 300.

> ii.   Respondents' Criticisms of Claimant's Propuesta Figures
>        Are Unfounded

99.    The Special Master's announcement of Respondents' settlement in May

2017 stated the amount as $162,750,000 (CX 348) -- somewhat higher than our

calculation of the maximum Propuesta value, as noted above (CX 11).  The following is a

recap of how the settlement figures presented by Respondents and their calculations of

Propuesta settlement values have unfolded thereafter.

> (a)   Respondents' arbitration answer (September 6, 2017) repeated that their
>
>        settlement amount was $162,750,000.  *See* CX 2 at 11-12.  It did not
>
>        attach any spreadsheet showing that amount or its derivation, however.
>
>        *See generally id*.
>
> (b)   Respondents' arbitration answer also asserted that Claimant's Exhibit G
>
>        calculation of Propuesta settlement values contained "sloppy mathematical
>
>        errors" by overstating claim values on many bonds, and also "overstate[d]
>
>        the payout for certain judgments held by Respondent HWB Gold & Silber
>
>        Plus."  *Id.* at 11 & nn.6 & 7.  Respondents asserted that Exhibit L attached
>
>        to their answer "explained and corrected" the errors.  *Id.*  Exhibit L

60

contained Respondents' first calculation of their purported total Propuesta

settlement value: "a maximum of $161,824,982," and they said their

actual settlement was "at least $925,000 higher."  *Id.* at 11-12.

(c)     In their malpractice counterclaims asserted against Milberg and Rosito

Vago on March 7, 2018, Respondents included an Exhibit A (also referred

to as "Exhibit 4") with Propuesta calculations, basing the claim values for

Injunction bonds purely on money judgment amounts, without including

any post-judgment interest.   CX 3 at 23.  Respondents now calculated the

Propuesta settlement value for their bonds at $158,327,539 (*id.* at 10) -- a

decline of some $3.5 million since their answer was filed.  Respondents

thus alleged they were receiving "approximately $4 million more" than the

70% Propuesta offer.  *Id.* at 5.

(d)     On March 9, 2018, Respondents' document production included their

"official" settlement spreadsheet (CX 364 at HWB0000036) showing their

settlement with Argentina was really for $162,349,235, and had been

signed in October 2017.  This was a decline in settlement amount of some

$400,765, as compared to the amount announced by Mr. Pollack on May

31, 2017.  This was the first time Claimant learned the true amount of

Respondents' settlement.

(e)     Respondents also produced their retainer letter with Wilk Auslander dated

May 10, 2016 (CX 317 at HWB0000004), which provided for a

contingency fee calculated based on any recovery "in excess of the

amount currently offered to you by the Republic," stated to be

61

$147,000,000.  That is much lower than any other calculation of the

Propuesta offer.

(f)     On May 16, 2018, Respondents produced a settlement spreadsheet (CX

18) for the first time showing (apparently) the derivation of the original

settlement amount of $162,750,000 announced by Mr. Pollack on May 31,

2017.  The differences are discussed below.

100.    Despite Respondents' changes in their Propuesta calculations and

settlement amount, Claimant stands by the correct Propuesta settlement value as set forth

in Exhibit G to its arbitration claim (CX 11).

101.    I prepared a spreadsheet for use in conjunction with my testimony here:

"Comparison of Settlement Amounts" with a page for Respondents' USD-denominated

bonds and a page for Respondents' DM and Euro bonds (which I will refer to as my

"Comparison Spreadsheet").  CX 394.

102.    Respondents' largest Propuesta error has been to ignore post-judgment

interest when calculating claim values for Injunction bonds with money judgments.  As

noted above, the Propuesta allows inclusion of post-judgment interest in those situations,

and Claimant's figures did not reflect "sloppy mathematical errors."  Respondents used

money judgment amounts without interest in their "USD Claim Value" amounts on their

October 2018 settlement spreadsheet, as shown in my Comparison Spreadsheet column D

(totaling $201.9 million claim value), which can be compared to column F (our claim

values, which include post-judgment interest, totaling $209.5 million).  This is a total

*understatement* by Respondents of Propuesta claim values of about $7.5 million, which

would translate into over $5 million in settlement value if all bonds were settled on

Injunction terms.  Their error is strange because the bond-by-bond claim value and settlement figures provided to Respondents by Rosito Vago in April 2016 included post-judgment interest.  CX 300.

103.    Respondents' assertion in their answer that Exhibit G overstated the settlement value for two bonds (maturing in 2017 and 2027) owned by HWB Gold and Silber Plus in 10 CV 4656 (see yellow highlighting on Respondents' answer Exhibit L (CX 2 at 114)) erroneously fails to recognize that the face + 50% settlement value amounts for those two bonds are higher than the 70%-of-claim-value amounts.  Milberg included the correct, higher Standard values in its Exhibit G (*see* column G of the Comparison Spreadsheet (CX 394 at 1)).  Respondents thus erroneously *understated* the Propuesta settlement value on these two bonds by $679,226.

104.    Respondents excluded two of their bonds with very high settlement value yields from their calculations.  These are the NW Global Strategy bonds, sued on in 13 CV 8887, with face values totaling $109,000.  Because we (deliberately) did not seek money judgments on them (as described above), interest continued to accrue at high coupon rates, and the Injunction claim value rose to $572,520, with a total 70% settlement value of $400,764.  These bonds were correctly listed in Exhibit L to Respondents' answer (CX 2 at 113) (middle of page) (September 2017) with their 70% settlement value of $400,764.  However, Respondents' May 2017 settlement spreadsheet listed the bonds at $0 settlement value, and their October settlement spreadsheet omitted any reference to these bonds.  *See* CX 364 at HWB0000036; CX 18.

105.    Respondents have asserted that the difference between their May 2017 and October 2017 settlements -- which totals $400,765 -- occurred "as a result of the removal

of those two bonds" (CX 3 at 11).  While the amounts match, the logic does not work, because these bonds were included at zero value in *both* the May and the October settlement spreadsheets, so removing them in the October settlement should not have caused any change in the bottom line.  Respondents' opposition to Milberg's motion to subpoena lawyers from Cleary, dated June 1, 2018 (CX 366 at 8 n.27) stated that the bonds were removed because "Milberg never obtained a [money] judgment" so "NW Global Strategy was free to transact in these bonds well before any settlement discussions."  This seems to imply that Respondents sold the bonds, but that is not logical, because their settlement value was far higher than anyone would pay for them in the market (and the injunction status is not transferable); plus Respondents never mentioned anything like this previously.  In any event, since these bonds were included by Respondents in Exhibit L to their arbitration answer (CX 2 at 113) (September 2017) at full settlement value, it seems the bonds were held by NW Global Strategy at that time, and thus also the previous year, when Propuesta settlements became available. Accordingly, these bonds should be counted when calculating the value of the Propuesta settlements that Milberg obtained for Respondents (as Exhibit G (CX 11) to Claimant's statement of claim correctly reflects).

106.    The above analysis confirms our original calculation that the Propuesta settlement value of Respondents' bonds was and is $162,504,207, and that Respondents' actual settlement amount was $154,972 below that.

107.    LRI managing director Frank Alexander de Boer and senior fund consultant Christian Lehnertz wrote to the Commission de Surveillance du Secteur Financier, the Luxembourg regulator for the Respondent funds managed by LRI

(constituting 64.5% of the total value of the settlement, according to the letter), in

summer 2016 based on the context (the auto-date in the hardcopy letter is not accurate),

stating that the settlement amount of $162,750,000 was "more than USD 6,000,000" over

what the Propuesta would have provided and was "within the scope of the conditions that

the biggest holdouts (Note: NML/Singer) were able to negotiate in February 2016."  CX

233 at 5.  The latter assertion (naming Reuters as the source and without mentioning

NML/Singer) was made in a HWB newsletter sent to investors around the same time.

CX 353 at 1, 3.  As can be seen from our information provided above, both assertions

were false.

> **D.     Regarding the malpractice counterclaim (Feb. 5-19, 2016):**
> **Mr. Brand was fully informed about the pros and cons**
> **of settling, and was always adamant that he would not settle**
> **for less than 100% recovery; he rejected any advice that he should**
> **consider compromise**

108.    Respondents' malpractice counterclaim against Milberg and Rosito Vago

contends that the law firms should have advised Respondents to accept the initial 72.5%

Propuesta offer for Injunction bonds that Argentina announced was available for the

period February 5-19, 2016.  This was a period of intense public attention on the status of

holdout bondholders' claims. Senior negotiators from the new Macri administration

arrived in New York for discussions with bondholders as mediated by the Special Master.

Two settlements were announced in New York almost immediately, on February 3

(Montreux and EM), as described above.  CX 165 at MILBERG-004317-18.  The

Propuesta was announced on February 5.  CX 176.  Argentina filed an order to show

cause application on February 11 seeking to vacate the Equal Treatment injunctions and

noting appearances by lawyers from Cravath (not its usual counsel, Cleary) to handle the

application.  On February 16, one of the class actions settled (on Standard terms).  CX
165 at MILBERG-004321.  On February 17-19, six more fund settlements were
announced, mostly on Standard terms except for Capital Ventures International, whose
Injunction settlement totaled $162.5 million.  CX 165 at MILBERG 4322-48.  All of
these events were covered extensively in the financial and popular press.  The fact that
some holdouts settled during this period did not mean that everyone should have -- as
attested by the long roster of non-settling holdouts who urged Judge Griesa to maintain
the injunctions and the Second Circuit to reverse the vacatur order.  *See, e.g.*, CX 255.

109.    My emails reflect that I had been in quite extensive contact with Mr.
Brand leading up to this period, as set forth above.  In particular, I recall a very enjoyable
dinner he invited me to in New York when he was visiting with his family in August
2015.  CX 150.  That was around the time we extended the Equal Treatment motions
beyond the test cases, and we thought the injunctions would be granted, so we were
happy that the situation seemed to be improving, although the Kirchner administration
was still inflexible.  After dinner, I brought up the overall situation and the fact that the
political context in Argentina might be in flux due to the upcoming national elections
there.  I asked Mr. Brand about his attitude about settlement -- with some hesitation,
because I knew he had generally rejected any talk of compromise.  I reminded him that
the NML hedge fund group had not obtained any real success with attachments even
though they were very focused and very well-funded in these efforts.  I told him it was
widely reported that no other holdouts had succeeded with judgment enforcement efforts
either.  I recommended that he be flexible in undertaking negotiations as future events
unfolded, and I told him I thought Argentina was highly unlikely to settle claims at

100%.  Mr. Brand said he was not interested in being flexible.  Of course, Mauricio Macri won the election and came into office in December, leading to the prospect of settlement negotiations early in 2016.

110.    On February 3, 2016, I emailed my two close contacts at NML (Jay Newman and Lee Grinberg): "FYI, I just had a half hour conversation with Milberg's largest client, a German who represents multiple retirement funds, with claims totaling $ several hundred million.  He is adamant at sticking to 100 cents on the dollar, but will consider taking securities as well as cash.  Just thought I'd pass along this local color."  CX 168.  I copied Patricia with the email afterwards and added: "My email to Jay said it all about Willi's attitude.  As you know, Willi is adamant about getting a full recovery."  CX 169 at MILBERG-0004219.  Patricia and I had email exchanges with Mr. Brand over the following weeks about the details of his claims, post-judgment interest, and other administrative matters (*see* CX 175; CX 177 – CX 180; CX 182 – CX 183) -- essentially, preparing for negotiations.  Mr. Brand did not express any interest in the pending Propuesta 72.5% offer.

111.    As noted above, I did urge our clients (including Mr. Brand) not to accept the 72.5% offer, and also not to accept the 70% offer prior to the Second Circuit decision on April 13, 2016.  I thought, and still believe, that it was sound and appropriate advice under the circumstances.  I did research on the requirements for vacating injunctions and saw that the caselaw established a very stringent standard: the "purposes" of the injunctive decree must have been "fully achieved," according to the seminal case, *Sierra Club v. U.S. Army Corps of Engineers*, 732 F.2d 253 (2d Cir. 1984).  Moreover, the Equal Treatment orders and decisions by Judge Griesa and the Second Circuit had

established that the purpose of the Equal Treatment injunctions was to "hold Argentina to

its contractual obligation of equal treatment." *NML Capital, Ltd. v. The Republic of

Argentina*, 727 F.3d 230, 241(2d Cir. 2013). I did not think that the expressed

willingness of the Macri administration to negotiate settlements satisfied the standards for

vacatur. When I discussed this with lawyers in the NML group and some other

bondholders' counsel, our consensus view was that the 72.5% Injunction offer was a

rather clumsy attempt by Argentina to pressure early settlements by offering a "teaser

rate," while in reality the government still faced a big risk that the injunctions would

continue in effect and not be vacated, preserving holdouts' leverage to negotiate better

settlement terms. My legal analysis of the vacatur was stated in the briefs I filed on

behalf of our clients in opposing Argentina's vacatur motions. Argentina had not yet

meaningfully negotiated to settle their cases, and in fact the Propuesta was still essentially

a unilateral offer by Argentina -- just as the Second Circuit had criticized the earlier

exchange offers for their unilateral, non-negotiable character. My arguments that the

Injunctions should not be vacated appear at CX 201 (SDNY brief), CX 202 at

MILBERG-0002074-78, MILBERG-0002101 (SDNY argument transcript), CX 227

(Second Circuit opening brief, no transcript) and CX 255 (Second Circuit reply brief, no

transcript). Those arguments unfortunately did not prevail. The injunction vacaturs

removed the remaining bondholders' main leverage to negotiate a better settlement.

Immediately when the vacatur was affirmed on April 13, 2015, I advised our clients to

settle on Propuesta terms, unless they wanted to pursue attachment remedies, as noted

above. CX 292A.

112.    I believe our advice was reasonable and appropriate throughout this period.  Mr. Brand gave no indication that he would accept, or even seriously consider, any advice from Ms. Rosito Vago or me to settle at a 72.5% level during the period February 5-19, 2016 (or indeed at any time before or long after that period).  He adamantly rejected any such possibility and insisted on a 100% settlement.

113.    Mr. Brand confirmed his insistence on seeking full recoveries, rather than settling on Propuesta terms, in the following months.  My negotiations with government representatives advanced in early March 2016. *See* CX 199; CX 205.  Special Master Pollack was interested in helping Argentina achieve settlements wherever possible, and he and I shared public (court-filed) information about the claims of many of our clients, including Respondents.  Mr. Pollack believed the government could not and would not consider settlements for amounts over the Propuesta limits.  Mr. Pollack asked about Mr. Brand's position on settlement and said Secretary Caputo was interested in having a call; I spoke to Mr. Brand and emailed Mr. Pollack that Brand was "not interested in much of a haircut if any" (*i.e.*, settlement at any percentage less than 100%); Mr. Pollack replied: "so I take it from your note that [Brand] is not interested in a call to discuss settlement at this time;" I replied "not if the financial parameters are as you describe."  CX 211 at MILBERG-002746-47.  I spoke to Mr. Brand about these circumstances and recall that his response was that he would speak "only to President Macri" -- which I interpreted as his way of declining to negotiate, since under the circumstances it was obvious that a call with Macri was not going to occur.

114.    In mid-March 2016, I was asked by a Bloomberg reporter if I knew of bondholders who would submit to interviews about their situations, and Mr. Brand said

he wanted to do so, stating "The sooner, the better!"  CX 245 at MILBERG-003800.  I

put them in touch, Mr. Brand was interviewed, and the reporter sent some quotes for Mr.

Brand's review.  CX 247.  I provided some suggested edits, and Mr. Brand then approved

and sent his quotes to the reporter.  His bottom line was: "The public offer of 70 cents on

the dollar is unacceptable to me.  We have judgments that are worth a lot more than that."

CX 250 at MILBERG-0003809.

115.     In late April, Mr. Brand reiterated to me that he did not intend to settle but

would rather pursue judgment enforcements.  On April 28, he emailed me:

> Mike: You should know, that I am in negotiations with Mr.
> Pollack now!  In addition to this, LRI is actually exploiting
> [sic] 3 options for the hwb funds: 1. Selling the entire claim
> values to entities like RD Legal Funding LLC; 2. Selling
> the bonds to Argentina; 3. Enforcing the entire claim value
> with enforcing specialists.  I will persuade LRI that they
> have to go for option 3, because it will be in the best
> interest of our clients: You should then not worry to[o]
> much about performance fees.  After all th[ese] years I
> promise to you, that I will include something reasonable for
> you in my final negotiations, when settling with the
> Gauchos, in the very near future. (Remember: They paid
> 4% Lawyers Fee for NML as well!) Best Willi.

CX 312.

### E.     Milberg did not pay "referral fees" to Mr. Brand
###         or any other non-lawyer

116.     Respondents have alleged that Milberg paid non-lawyers to solicit clients

in these cases in violation of New York ethical rules.  No such payments were ever made.

Milberg did not, directly or indirectly, make any payments to Mr. Brand (or any non-

lawyer) in connection with these cases or retainers.

70

_Michael C. Spencer_

Michael C. Spencer

Affirmed to before me this $\underline{20}$ day of $\underline{July}$, 2018

MICHELE JILLIAN KLINGER
NOTARY PUBLIC-STATE OF NEW YORK
No. 01KL6363035
Qualified in Queens County
My Commission Expires 08-14-2021

# EXHIBIT A

# MILBERG TADLER PHILLIPS GROSSMAN LLP

## Bio



### Michael Spencer

**Of Counsel**

**Practice Areas:**
Appellate Advocacy
Securities Litigation

**Contact Information:**
Phone: 212-946-9450
mspencer@milberg.com

**Education:**
B.A., magna cum laude, Yale University, 1973
J.D., cum laude, Harvard University, 1976

**Bar Admissions:**
New York, 1978, California, 1978, Ontario, 2011

Mr. Spencer has prosecuted a broad range of cases at Milberg LLP, with an emphasis on representing plaintiffs in class and other representative actions involving complex financial issues.

He was one of the principal trial counsel for plaintiffs in *In re Vivendi Universal, S.A. Securities Litigation* (S.D.N.Y.), one of the very few securities fraud class actions to go to trial and verdict. The jury returned a large verdict for plaintiffs in January 2010, which was upheld on appeal and has now resulted in distributions to class members.

Mr. Spencer has represented hundreds of holders of defaulted Argentine bonds in enforcement actions in New York federal court, including working with sovereign debt hedge funds in obtaining pari passu injunctions and preserving them on appeal, which helped settle the long-standing disputes in early 2016.

Mr. Spencer has handled many other securities cases at the Firm, including those against defendants in the fields of technology, real estate, finance, leasing, manufacturing, and pharmaceuticals. His first exposure to this type of case was in the precedent-setting "WPPSS" litigation in the late 1980s, which involved bond defaults on nuclear power plants in the Pacific northwest and established the blueprint for prosecuting many complex securities class actions that followed.

Mr. Spencer has also led the Firm's prosecution of other cases in diverse fields. He was one of two principal trial counsel representing the FDIC in its year-long trial against a major accounting firm involving failed-bank audits, which led to a global settlement covering all government claims just before closing arguments to the jury. He has prosecuted consumer and securities claims against companies that sold deferred annuities unsuitable for retirement plan investors. He has taken appraisal and breach of fiduciary duty cases to trial in Delaware and Pennsylvania. He had extensive involvement in representing a coalition of union health care funds seeking to recover costs for treating smoking-related illnesses from the tobacco industry, pursuing the cases through several appeals. He has also represented plaintiffs in cases involving accounting malpractice, limited partnership investments, real estate closing fees and mortgage insurance, contract disputes, defamation, unlawful lotteries, and consumer deception.

**Home**

**Cases & Investigations**
  Case Notices

**Results**
  Outstanding Recoveries
  Precedent Setting Decisions

**Our Firm**
  About Us
  Attorneys
  Other Professionals
  Pro Bono and Community Involvement
  Contact Us

**Practice Areas**
  Antitrust Litigation
  Appellate Advocacy
  Consumer Litigation
  Data Breach Litigation
  Derivative Litigation
  E-Discovery
  False Claims Act Litigation
  Securities Arbitration
  Securities Litigation

**News**
  News
  Publications

**Attorney Referrals**

Mr. Spencer began his legal career as a law clerk to U.S. District Judge Wm. Matthew Byrne Jr. in Los Angeles (1976-77). He then returned to New York and joined Cravath, Swaine & Moore as an associate, where he worked until 1986, when he joined Milberg as an associate and became a partner later that year.



Privacy | Legal Notice

© 2018 Milberg Tadler Phillips Gros

ATTORNEY ADVERTISING. PRIOR RESULTS DO NOT GUARANTEE A SIMILAR OUTCOME.

Results and press releases prior to January 1, 2018 were accomplished by Milberg LLP and its attorneys.

Many, but not all, of the attorneys responsible for these accomplishments are now affiliated with MTPG.