**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
                                                                        :
MILBERG LLP,                                                            :
                                                                        :
                                   Petitioner,                          :
                        v.                                              :       Case No.:  19-cv-4058
                                                                        :
HWB ALEXANDRA STRATEGIES PORTFOLIO;                                    :
HWB DACHFONDS – VENIVIDIVICI;                                          :
HWB GOLD & SILBER PLUS;                                                :
HWB PORTFOLIO PLUS;                                                    :
HWB RENTEN PORTFOLIO PLUS;                                             :
HWB VICTORIA STRATEGIES PORTFOLIO;                                    :
DRAWRAH LIMITED;                                                       :
NW GLOBAL STRATEGY;                                                   :
U.V.A. VADUZ;                                                          :
VICTORIA STRATEGIES PORTFOLIO LTD.,                                   :
KLAUS BOHRER; and                                                     :
UTE KANTNER;                                                          :
                                                                        :
                                   Respondents.                        :
                                                                        :
-----------------------------------------------------------------------X


### MEMORANDUM OF LAW IN SUPPORT
### OF PETITION AND MOTION TO VACATE ARBITRATION AWARD


WOLLMUTH MAHER & DEUTSCH LLP

William F. Dahill
Mara R. Lieber
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050

*Attorneys for Petitioner*

## TABLE OF CONTENTS

**Page**

FACTUAL SUMMARY ...................................................................................................1

  The Bond Litigations ...............................................................................................1

  Propuesta Settlement Offers; Respondents Discharge Petitioner; Settlements .........................3

  The Arbitration.......................................................................................................4

  The Award ............................................................................................................6

SUMMARY OF ARGUMENT ....................................................................................8

ARGUMENT ............................................................................................................9

I.     THE MANIFEST DISREGARD OF THE LAW STANDARD ......................................9

II.    THE ARBITRATORS' ASSIGNMENT OF ZERO VALUE
FOR THE ACKNOWLEDGED ENTIRETY OF PETITIONER'S SERVICES
RENDERED AFTER THE FIXED-FEE MILESTONE TASKS HAD BEEN
ACHIEVED WAS IN MANIFEST DISREGARD OF THE LAW ................................12

III.   THE ARBITRATORS MANIFESTLY DISREGARDED THE LAW OF
QUANTUM MERUIT BY FAILING TO CONSIDER THE RESULTS
OBTAINED BY PETITIONER, THE CONTINGENCY NATURE OF THE
ENGAGEMENT AGREEMENTS, AND THE TOTAL AMOUNT OF
DAMAGES AND FEES AT ISSUE ..............................................................16

    1.  Amount at issue and results obtained...................................................17

    2.  The contingency nature of the engagement ...........................................17

    3.  Equitable factors ...........................................................................18

CONCLUSION.......................................................................................................20

## TABLE OF AUTHORITIES

**Case**                                                                   **Page**

Biagioni v. Narrows MRI & Diagnostic Radiology, P.C.,
    127 A.D.3d 800 (2d Dep't 2015) ................................................................. 18

Bradkin v. Leverton,
    26 N.Y.2d 192 (1970) .............................................................................. 12

Decolator, Cohen & DiPrisco, LLP v. Lysaght, Lysaght & Kramer, P.C.,
    304 A.D.2d 86 (1st Dep't 2003) .............................................................. 18

Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,
    333 F.3d 383 (2d Cir. 2003) .................................................................... 10

Fulbright & Jaworski, LLP v. Carucci,
    63 A.D.3d 487 (1st Dep't 2009) .............................................................. 13

Halligan v. Piper Jaffray, Inc.,
    148 F.3d 197 (2d Cir. 1998) .................................................................... 10

Leeward Const. Co., Ltd. v. Am. Univ. of Antigua-College of Med.,
    826 F.3d 634 (2d Cir. 2016) .................................................................... 16

Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.,
    487 F.2d 161 (3d Cir. 1973) .................................................................... 17

Padilla v. Sansivieri,
    31 A.D.3d 64 (2d Dep't 2006) ................................................................. 18

Paolillo v. Am. Exp. Isbrandtsen Lines, Inc.,
    305 F. Supp. 250 (S.D.N.Y. 1969) .......................................................... 12

Porzig v. Dresdner Kleinwort Benson N. Am. LLC,
    497 F.3d 133 (2d Cir. 2007) ......................................................... 10, 11, 16

Rule v. Brine,
    85 F.3d 1002 (2d Cir. 1996) ............................................................. 12, 18

Schwartz v. Merrill Lynch & Co.,
    665 F.3d 444 (2d Cir. 2011) .................................................................... 10

Smarter Tools Inc. v. Chongquing SENCI Import & Export Trade Co., Ltd.,
    2019 WL 1349527 (S.D.N.Y. Mar. 26, 2019) ................................... 15, 16

*Smith v. Boscov's Dep't Store*,
    192 A.D.2d 949 (3d Dep't 1993) ........................................................................ 12, 18

*Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*,
    559 U.S. 662 (2010) .............................................................................................. 10

*Westerbeke Corp. Daihatsu Motor Co., Ltd.*,
    304 F.3d 200 (2d Cir. 2002) ............................................................................ 10, 11

## **Statutes**

9 U.S.C. § 10 ................................................................................................................ 9

Milberg LLP ("Milberg" or "Petitioner") respectfully submits this memorandum of law in support of its Motion and Petition to Vacate Arbitration Award.

## FACTUAL SUMMARY[1]

The Petition concerns an award of *quantum meruit* fees by an arbitration panel (the "panel" or "arbitrators"). The fee issues arose with respect to the engagement of Petitioner to prosecute claims for recovery on defaulted Argentine bonds for Respondents, which are ten Luxembourg and German retirement funds and two German individuals. During the period of 2007-2012, Respondents acquired over $90 million in face value of the defaulted bonds, and they became plaintiffs in seven SDNY actions seeking money judgments and, eventually, entry of *pari passu* injunctions to aid in obtaining recoveries.

The Bond Litigations

Milberg was counsel for Respondents in their actions, and in the fee arbitration, it also represents the interests of its Buenos Aires co-counsel, Rosito Vago, and the trustee of Dreier LLP, which was counsel for many of the Respondent funds until it ceased practice and was replaced by Milberg in 2009. Milberg, Rosito Vago, and Dreier represented the largest assembly of non-hedge fund bondholders in the litigation, and Respondents were their largest client group.[2]

The bond default occurred at the end of 2001. Cases were started by Dreier for other clients as early as 2002, but Respondents had extensive discussions with Rosito Vago before deciding to start litigating in 2007. The early cases established the parameters for litigants to follow, and eventually money judgments were entered against Argentina, including in Respondents' cases brought by Dreier and then Milberg. However, Argentina refused to pay the

---

[1] The facts set forth in this section are taken from the Petition to Vacate the Arbitration Award (the "Petition"). Capitalized terms not defined herein have the meaning ascribed in the Petition.
[2] Petition ¶ 1.

money judgments, and asserted sovereign immunity and shielded its assets from attachments in order to prevent any recoveries by bondholder plaintiffs. No bondholder plaintiffs were achieving recoveries.[3]

In 2010, the four largest hedge fund plaintiffs decided to seek *pari passu* injunctions to break the stalemate. They asked Milberg to join to provide the perspective of some of its small Argentine bondholder clients. Over the next five years, the hedge funds' counsel and Milberg brought test cases and won *pari passu* injunctions from the district court (Griesa, J.), which were affirmed by the Second Circuit, and certiorari was denied by the Supreme Court in June 2014. Milberg (and most other bondholders' counsel) then used the test case results to expand the injunctions to all qualifying bondholder plaintiffs in October 2015, including Respondents. After the new Macri administration took office, the injunctions persuaded Argentina to offer "Propuesta" settlements on the bonds in February 2016. Milberg tried for two months to get better terms for its clients, including Respondents, who were insistent in that regard; but in mid-April 2016 the Second Circuit affirmed Judge Griesa's vacatur of the injunctions (based on Argentina's new settlement posture), and bondholders' real bargaining leverage was lost. At that point, Milberg recommended that its clients accept the Propuesta settlements. Most clients, including Respondents, qualified for the richer "Injunction" settlement terms in the Propuesta, based on the *pari passu* injunctions obtained for the clients by Milberg. The Propuesta settlement consideration would be over $162.5 million if Respondents accepted.[4]

To understand the next phases of this story, it is necessary to go back to the engagement agreements entered into between counsel and Respondents. They provide for "hybrid" fees. <u>First</u> there were fixed "flat" fee amounts (sometimes referred to as start-up or retainer fees) to be paid

---

[3] Petition ¶¶ 6, 8-10, 16.
[4] Petition ¶¶ 16-20; Claim ¶ 20.

by the clients upon the achievement of defined tasks or results obtained ("milestones")—usually retention, complaint filing, money judgment obtained. The amounts ranged from a few hundred dollars per client to a high of $84,000 for the largest plaintiff. Overall, these fees calculated to a bit over one-half-percent of the face value of the bonds. Second, there were percentage contingency fees on amounts, if any, recovered on the bonds—generally 8% or 12% on recoveries in excess of floor amounts of the first 20 or 35 cents per dollar of face value per bond.[5]

Propuesta Settlement Offers; Respondents Discharge Petitioner; Settlements

After the Propuesta offer was made and Milberg recommended acceptance by its clients in mid-April 2016, Respondents asked to know what amount of fees would be owed under their engagement agreements if they accepted the settlement. Milberg explained how fees were calculated. The total was just under $12 million (on a $162.5 million settlement recovery).[6]

In late April and early May 2016, Respondents abruptly sent letters to Milberg discharging the firm. Communications essentially ceased, although Respondents' main manager told Milberg's lead lawyer that he "should not worry much about performance fees. After all these years I promise to you, that I will include something reasonable for you in my final negotiations when settling with the Gauchos, in the very near future."[7] No other law firm appeared for Respondents in their seven actions.[8]

In November 2016, Respondents' manager (H. Willi Brand, the genesis of the arbitrators' reference to Respondents as "HWB") told Milberg he had retained new counsel, but that he was coming to New York and wanted to "include" Milberg in their negotiations with Argentina.

---

[5] Petition ¶¶ 12-14.
[6] Petition ¶ 6.
[7] Dahill Declaration, Ex. 15.
[8] Petition ¶¶ 6, 20, 23.

3

Shortly thereafter, the manager directed that all communications be held through the new law firm, and Milberg was informed that Respondents would not pay any fees.[9]

On May 31, 2017, Special Master Pollack announced that Respondents had reached a settlement with Argentina for $162.75 million. Documents later produced by Respondents in the fee arbitration disclosed that the settlement amount was recalculated downward in October 2017 to $162.3 million, an amount less than was available to Respondents the year before while represented by Milberg. Respondents accepted and Argentina ultimately paid that amount. Milberg, based on its experience with hundreds of other Propuesta settlements, knew that the correct settlement value on Respondents' bonds as of April 2016 was over $162.5 million, which would have yielded a contingency fee under the engagement agreements of a bit over $11.9 million. The fee amount was escrowed pending final resolution of the present fee dispute.[10]

The Arbitration

In August 2017, Petitioner commenced an AAA/ICDR arbitration, as provided in the engagement agreements, to recover fees. The arbitration claims included a request for *quantum meruit* in the $11.9 million amount. Three arbitrators were selected. Respondents requested a reasoned decision and the panel agreed to provide one.

Respondents sought to defeat any fee recovery based on certain provisions in the engagement letters and by alleging ethical violations (these defenses were all rejected by the arbitrators[11] and are not further discussed herein).

The arbitrators allowed the parties to request documents from the other side, and Respondents requested "Time records of the Law Firms relating to services performed solely on

---

[9] Petition ¶ 23.
[10] Petition ¶ 24.
[11] Award ¶¶ 68-71.

behalf of Respondents (as distinct from services performed by the Law Firms on behalf of their other clients)." Milberg performed word searches on its time records for Respondents' names and produced records showing 172 attorney hours and 90 paralegal hours, which the arbitrators valued at $142,900. Award ¶ 77. Rosito Vago did not have time records because Argentine law firms do not keep them for contingency cases; Dreier time records were no longer available.[12]

Two months after Milberg produced those time records, one of Respondents' counsel wrote to inquire whether they were "the only time records you have produced and plan to produce." Discussions among counsel indicated that Respondents were seeking all of Milberg's time records for the bond cases, and Milberg decided to produce them (300 ledger entry pages reflecting 7,719 hours) so as to avoid any withholding issues. Respondents protested to the panel that they previously had asked for "[t]ime records of the law firms"—leaving off the "related to services performed solely on behalf of Respondents" qualifier. Despite the fact that six weeks remained before the arbitration hearing, the panel excluded the time records, finding that the documents were not timely produced because they were (inexplicably) deemed responsive to Respondents' earlier, limited ("performed solely") request.[13]

Respondents also requested documents supporting Claimant's position in its arbitration statement of claim "that quantum meruit value of services is equal to '30% contingency fee plus expense reimbursement.'" Milberg produced Judge Griesa's order approving an award of a 30% contingency fee plus reimbursement of substantial litigation expenses to class counsel in certain bondholder class cases.[14]

The arbitration was heard over a week in August 2018.

---

[12] Petition ¶ 26.
[13] Petition ¶¶ 26-27.
[14] Dahill Declaration, Ex. 16.

The Award

On February 4, 2019, the arbitrators issued their Award. It rejected the defenses asserted by Respondents against any fee liability. It then turned to *quantum meruit* consideration of the reasonable value of legal services provided by Petitioner as of the time Respondents terminated the attorney-client relationship, based on the basic standards set forth in the caselaw: "taking into consideration the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended in rendering the services, the quality of performance of counsel, counsel's qualifications, the amount at issue, and the results obtained."[15]

With respect to the difficulty, nature and extent of the legal work, the panel found:

The difficulty of the representation was considerable, as reflected in the fact that litigation arising from the sovereign bond defaults in question began in 2002, involved legions of plaintiffs and many plaintiffs' lawyers, and did not result in the *Propuesta* until 2016. The representation of individual clients required strategic coordination with larger groups of plaintiffs and their counsel and, at the same time, specific attention to the facts, circumstances and priorities of each client or set of clients. Moreover, Milberg made a valuable contribution to the coordinated bondholder efforts (Cohen ¶¶ 8-11) and, at the same time, paid close attention to the priorities and instructions of HWB [Respondents].

The nature and extent of the services rendered to [Respondents] over an extended period of time included rendering sophisticated legal advice; engaging in strategic coordination with other plaintiffs' counsel; preparing and filing pleadings; engaging in *pari passu* motions practice; obtaining judgments against Argentina; actively participating in appellate practice in the Second Circuit; providing input in settlement discussions; and reporting to the client on a timely basis as to all material developments in the case and related settlement negotiations.[16]

In determining the amount of time reasonably expended in rendering services, the arbitrators noted that time records for Rosito Vago and Dreier were not available, and that Milberg's time records showed 172 attorney hours and 90 paralegal hours in the representation of Respondents, yielding a lodestar of $142,900. The panel continued:

---

[15] Petition ¶¶ 30, 32.
[16] Award ¶¶ 75-76.

[A] comparison of the time records maintained by Milberg specifically for [Respondents], on the one hand, with the description of services provided in the Spencer and Vago witness statements and the legal filings and docket entries included in the record of this hearing, establishes that Milberg did expend more time on the representation of [Respondents] than is reflected in its [Respondent]-specific time records. The 70-page Spencer witness statement, in particular, provides a comprehensive overview of the effort undertaken and in effect, serves as the equivalent of an affidavit of services in New York State practice. The Vago witness statement also reflects time-intensive, though not particularly substantive legal work done for [Respondents]. The Spencer and Vago witness statements, combined with the docket sheets, clearly establish that much more legal effort was expended on behalf of [Respondents] than is reflected in Milberg's time records . . .

Milberg's argument that its activities for other clients should be considered in *quantum meruit* nonetheless has merit, however, in the sense that Milberg's closely related and coordinate work for other clients affects at least two qualitative criteria in *quantum meruit* analysis: the quality of performance of counsel and counsel's qualifications.[17]

On the final factors in assessing *quantum meruit*—the amount at issue and result

obtained—the panel observed:

The final factors in *quantum meruit* analysis, namely the amount at issue and the result obtained, tend to justify a substantial fee recovery in this case. Milberg represented HWB in connection with Argentina's default in payment of HWB-held bonds and Milberg's efforts contributed to obtaining the *Propuesta*, a settlement worth in excess of $16 million to HWB. Milberg prosecuted HWB's claims in the context of complex and wide-ranging litigation against a sovereign that had defaulted on bonds with a face value in excess of $20 billion.[18]

Despite those conclusions, the panel decided that no fee should be awarded:

Under the facts of this case, qualitative factors properly considered in *quantum meruit* analysis justify fees to Milberg in excess of the amount that simple lodestar arithmetic might otherwise indicate on this record. See Balestriere at 3 (lodestar approach may be useful but must be modified to a substantial degree in unusual circumstances; under New York law, *quantum meruit* is left to the sound discretion of the trial court). Milberg's deep involvement in the prosecution of bondholder claims, and in the bondholder counsel group efforts including the successful pursuit of a *pari passu* injunction in the Varela case, materially enhanced the value of the time Milberg dedicated to representing HWB, and renders the $86,700 in milestone

---

[17] Award at ¶¶ 78, 80.

[18] The dollar figures in ¶ 81 are mistaken. The value of the *Propuesta* settlement to Respondents was undisputedly over $162 million, not over $16 million. The sovereign debt default involved over $90 billion in face value of bonds, not over $20 billion.

7

payments made to Milberg clearly reasonable compensation for Milberg's services. The evidence presented also establishes that the $513,245 in aggregate HWB milestone payments represent a reasonable total fee recovery.

Qualitative considerations have their limitations; they do not justify an award of fees beyond the aggregate fees already paid to Milberg, RV and Dreier.[19]

Thus, the panel declined to award any *quantum meruit* fees, finding that the $513,245 total flat fees paid by Respondents early in the lawsuits "represented a reasonable total fee recovery." Since the flat fees were agreed by the parties as compensation for the milestone work, long completed before much of Milberg's work that the panel acknowledged in the Award quoted above, the panel's approach meant that zero fees were awarded for Petitioner's later crucial work on the *pari passu* injunctions and in answering Respondents' frequent and urgent requests for individualized advice in the litigation endgame.

## SUMMARY OF ARGUMENT

1.  In this circuit, arbitration awards are subject to judicial review on a "manifest disregard of the law" standard.

2.  The arbitrators manifestly disregarded the clear law that the "reasonable value of services" to be considered in awarding *quantum meruit* fees includes all services performed by the discharged attorney. The arbitrators limited their calculation of *quantum meruit* fees to the amount of the flat fees paid by Respondents for the milestones achieved in the cases' early phases ($513,245). The milestone services had been completed in all cases by 2012 (and in the three cases started by Dreier in 2007, several years before then). By limiting their *quantum meruit* fee award to the milestone fee amounts, the arbitrators completely excluded the reasonable value of the services Petitioner performed for Respondents after the milestones were achieved. Those services included obtaining *pari passu* injunctions for Respondents—the most important

---

[19] Award at 82-83.

achievement in the entire litigation—and giving Respondents individual advice throughout the crucial February-April 2016 time period. The arbitrators' decision to provide zero fee for that work was in manifest disregard of the standards governing *quantum meruit*.

3.      The arbitrators' decision to exclude Milberg's time records showing the firm had a total multi-million dollar lodestar for the Argentina bond cases was in manifest disregard of the law of *quantum meruit*, particularly in light of the arbitrators' recognition that virtually all of Milberg's work prosecuting the cases, inherently benefited clients generally, and was not allocable and could not be recorded on a client-by-client basis.

4.      The common law of *quantum meruit* incorporates principles of equity and consideration of the risk assumed by counsel when taking on a contingency fee engagement. In awarding a zero fee, the arbitrators manifestly disregarded those equitable principles (notably that Respondents discharged Petitioner to evade paying contingency fees) and contingency risk (including that the contingency was essentially satisfied when Respondents discharged Petitioner).

5.      When arbitrators agree to provide a reasoned decision, their failure to provide some rationale for their conclusion—in this case, for limiting the reasonable value of services to the milestone fixed fees—supports a conclusion that the arbitrators manifestly disregarded the law, warranting vacatur.

## ARGUMENT

## I.    THE MANIFEST DISREGARD OF THE LAW STANDARD

This petition is brought pursuant to Federal Arbitration Act § 10(a)(4)[20], which allows a court to vacate an arbitration award where the arbitrators exceeded their powers, which in this

---

[20] 9 U.S.C. § 10.

circuit includes the situation where arbitrators render an award "in manifest disregard of the law." *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451 (2d Cir. 2011) (internal quotation marks and citation omitted). The manifest disregard standard is well-settled. *Porzig v. Dresdner Kleinwort Benson N. Am. LLC*, 497 F.3d 133, 138-39 (2d Cir. 2007); *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388-89 (2d Cir. 2003). An arbitration panel acts in manifest disregard of the law if the governing law alleged to have been disregarded "was well defined, explicit, and clearly applicable" and the arbitrator was informed about the existence of the governing law "but decided to ignore it or pay no attention to it." *Schwartz*, 665 F.3d at 452 (internal quotation marks and citation omitted).

The Award shows that the panel was made aware of the law of *quantum meruit,* including specifics governing the application of the law. Award ¶¶ 62-81.

Although manifest disregard of the law is an exacting standard, there is ample precedent where courts have found that arbitrators acted in manifest disregard of the law. *See, e.g.*, *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 559 U.S. 662, 671 (2010) (arbitrators' application of arbitration agreement to allow class arbitration was in manifest disregard of law; when an arbitrator "strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice…his decision may be unenforceable") (alterations omitted); *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 203-04 (2d Cir. 1998) (reversing district court's confirmation of arbitration award denying age discrimination claim; arbitrators acted in manifest disregard of law because they failed to explain their award; arbitrators' denial was contradicted by "overwhelming evidence"; and arbitrators' reasoning, if given, would have strained credulity). If the arbitrators' decision "strains credulity" or "does not rise to the standard of the barely colorable," a court may conclude that the arbitrators "willfully flouted the governing law by

refusing to apply it." *Westerbeke Corp. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 217-18 (2d Cir. 2002) (internal quotation marks, alterations, and citation omitted).

Arbitrators' attorney fee awards are subject to judicial review under the "manifest disregard" standard. In *Porzig*, the Second Circuit reversed the district court's confirmation of an arbitration panel's award of attorneys' fees owed to the claimant under a statutory fee-shifting statute. 497 F.3d 133, 138-39 (2d Cir. 2007). Originally the arbitrators held that the statutory attorneys' fees had to be limited to the amount of contingency fees specified in plaintiff's engagement agreement, but that award was vacated as being in manifest disregard of the law (statutory fees were not subject to that cap). *Id.* On remand, the arbitration panel awarded a fee that "was virtually identical to the contingent fee" amount and "did not explain how it came up" with that amount. *Id.* The district court declined to upset that award because of the limited review permitted for arbitration awards. *Id.* On appeal in the Second Circuit, Judge Hall recognized the "extremely deferential standard of review" of arbitration decisions mandated by Second Circuit law, but concluded:

> A decision of an arbitrator, however, is not totally impervious to judicial review. … [I]n our review of this case we find several issues that cause us great concern [describing four circumstances]. … Taken individually, in all likelihood, such circumstances would not have overcome the deference owed to the Panel's award. Taken together, however, these circumstances create, if not the perfect storm, then a disturbance ample enough to give us pause. Upon careful reflection, and mindful of the importance that the arbitration process plays in dispute resolution today and the narrow lens through which we examine such awards, we conclude the award here was issued partially in violation of the enabling statute and partially in manifest disregard of law and must be vacated.

*Id.* at 140.

The circumstances of the present case justify a similar approach by this Court.

11

II.   **THE ARBITRATORS' ASSIGNMENT OF ZERO VALUE
FOR THE ACKNOWLEDGED ENTIRETY OF PETITIONER'S SERVICES
RENDERED AFTER THE FIXED-FEE MILESTONE TASKS HAD BEEN
ACHIEVED WAS IN MANIFEST DISREGARD OF THE LAW**

An attorney whose engagement is interrupted by the client's discharge before services are

completed is unequivocally entitled to be paid under *quantum meruit* unless the attorney has been

discharged for cause. *See, e.g.*, *Smith v. Boscov's Dep't Store*, 192 A.D.2d 949, 949-50 (3d Dep't

1993). The right to recover in *quantum meruit* is provided to assure an equitable result where the

client "received a benefit from the [lawyer's] services under circumstances which, in justice,

preclude him from denying an obligation to pay for them." *Rule v. Brine*, 85 F.3d 1002, 1011 (2d

Cir. 1996) (quoting *Bradkin v. Leverton*, 26 N.Y.2d 192, 196 (1970)). Even if the "vigorous"

prosecution of the client's case was done by another firm (which certainly was not the situation

here), the discharged attorney's work establishing liability is deemed to benefit the client,

mandating a *quantum meruit* award. *Paolillo v. Am. Exp. Isbrandtsen Lines, Inc.*, 305 F. Supp.

250, 253 (S.D.N.Y. 1969).

Here, Milberg was not discharged for cause (Respondents never claimed otherwise), and

Milberg's work extended to the point of producing a settlement offer that should have completed

the engagement, and exceeded the amount ultimately accepted by Respondents. Instead,

Respondents refused to settle, terminated the engagement agreements, and invoked the

engagements' early termination provisions (which the arbitrators later found to be inapplicable) to

refuse to pay any fees—thus bringing this case into q*uantum meruit* to determine Petitioner's fees.

There is no dispute about the fundamental components of *quantum meruit* law, which the

arbitrators described in the Award. *Quantum meruit* is established when the discharged attorney

shows: "(1) the performance of services in good faith, (2) the acceptance of the services by the

person to whom they were rendered, (3) an expectation of compensation…, and (4) the reasonable

value of the services performed." *Fulbright & Jaworski, LLP v. Carucci*, 63 A.D.3d 487, 488-89 (1st Dep't 2009) (citation omitted). Here, the first three factors were not disputed and were obviously satisfied, so the focus correctly was on "the reasonable value of the services performed." This law was presented to and accepted by the arbitrators. Award ¶ 73.

As noted above, the arbitrators further described the lodestar method, and decided that the factors of difficulty of the matter and the nature and extent of the services rendered were positive in the determination of *quantum meruit* for Petitioner. Award ¶¶ 74-75.

The arbitrators acknowledged that, under the circumstances here, a lodestar approach based on the time records they permitted to be introduced would shortchange Petitioner in the *quantum meruit* analysis:

> [A] comparison of the time records maintained by Milberg specifically for HWB, on the one hand, with the description of services provided in the Spencer and Vago witness statements and the legal filings and docket entries included in the record of this hearing, establishes that Milberg did expend more time on the representation of HWB than is reflected in its HWB-specific time records. The 70-page Spencer witness statement, in particular, provides a comprehensive overview of the effort undertaken and, in effect, serves as the equivalent of an affidavit of services in New York State practice. The Vago witness statement also reflects time-intensive, though not particularly substantive work done for HWB. The Spencer and Vago witness statements, combined with the docket sheets, clearly establish that much more legal effort was expended on behalf of HWB than is reflected in Milberg's time records.
> . . .
>
> Milberg's argument that its activities for other clients should be considered in *quantum meruit* nonetheless has merit, however, in the sense that Milberg's closely related and coordinated work for other clients affects at least two qualitative criteria in *quantum meruit* analysis: the quality of performance of counsel and counsel's qualifications.

Award ¶¶ 78, 80. The arbitrators went on to discuss the remaining factors:

> The final factors in *quantum meruit* analysis, namely the amount at issue and the result obtained, tend to justify a substantial fee recovery in this case. Milberg represented HWB in connection with Argentina's default in payment of HWB-held bonds and Milberg's efforts contributed to obtaining the *Propuesta,* a settlement

offer worth in excess of $16 million to HWB.[21] Milberg prosecuted HWB's claims in the context of complex and wide-ranging litigation against a sovereign that had defaulted on bonds with a face value in excess of $20 billion.[22] Spencer Test. ¶¶ 5-10.

Award ¶ 81. The arbitrators' final conclusion on the amount to award was the following:

> Under the facts of this case, qualitative factors properly considered in *quantum meruit* analysis justify fees to Milberg in excess of the amount that simple lodestar arithmetic might otherwise indicate on this record. See Balestriere at 3 (lodestar approach may be useful but must be modified to a substantial degree in unusual circumstances; under New York law, *quantum meruit* is left to the sound discretion of the trial court). Milberg's deep involvement in the prosecution of bondholder claims, and in the bondholder counsel group efforts including the successful pursuit of a *pari passu* injunction in the Varela case, materially enhanced the value of the time Milberg dedicated to representing HWB, and renders the $86,700 in milestone payments made to Milberg clearly reasonable compensation for Milberg's services. The evidence presented also establishes that the $513,245 in aggregate HWB milestone payments represent a reasonable total fee recovery.

> Qualitative considerations have their limitations; they do not justify an award of fees beyond the aggregate fees already paid to Milberg, RV and Dreier.

Award ¶¶ 82-83.

A fair summary of the arbitrators' decision is that they set forth the elements of New York law on *quantum meruit*; accepted that much more legal effort was expended on behalf of Respondents that was reflected in Milberg's time records showing lodestar specifically naming Respondents; and recognized that all other factors tended to justify a substantial fee recovery, in excess of lodestar. Then, out of nowhere, the arbitrators decided at the conclusion of ¶ 82 and in ¶ 83 that the evidence established that the total milestone payments of $513,245 represents a reasonable total fee recovery, and the other "qualitative" factors "have their limitations" and do not justify a higher award.

---

[21] As noted earlier, the correct amount was in excess of $162 million.
[22] The correct amount is in excess of $90 billion.

The arbitrators quoted the law of *quantum meruit* extensively. But their adoption of the total milestone payments, which were explicitly for defined tasks completed in 2007-2012, as representing reasonable value for all services provided by Milberg, Rosito Vago, and Dreier was unexplained, and manifestly disregarded the very law the arbitrators quoted. The panel awarded a "zero" fee for all of the acknowledged post-milestone work performed by Milberg.

As described above, the milestone fees were defined in the engagement agreements as fixed-fee compensation for achievement of defined litigation tasks and goals earlier in the cases. The arbitrators acknowledged them as "clearly explained fees payable upon the achievement of milestones." Award ¶ 71. Those fees had already been earned by Petitioner and paid by Respondents years earlier in the cases—the most recent such fee being keyed to NW Global Strategy's retention of Milberg in 2012 (for a case filed the next year). There is no evidence that the parties intended those milestone fees to cover services beyond those provided to attain the milestone events, let alone cover the entire litigation; obviously the contrary was the case because the main consideration in the engagement agreements was the contingency fee.

 The arbitrators did not state any basis for deciding that the milestone fees constituted reasonable (or any) compensation to Petitioner for its work that was performed after the fees were earned and paid. There was no valid basis or rationale for such a decision, and it manifestly disregarded the law on *quantum meruit*.

An agreement by arbitrators to provide a "reasoned" award, as was present here, makes courts more willing to consider the merits of vacatur petitions claiming manifest disregard. In *Smarter Tools Inc. v. Chongquing SENCI Import & Export Trade Co., Ltd.*, Judge Nathan remanded an arbitration award, holding that when parties request a reasoned award, "something more than a line or two of unexplained conclusions" is required even if it is "less than full

findings of fact and conclusion of law on each issue." 2019 WL 1349527, at *3 (S.D.N.Y. Mar. 26, 2019), *appeal docketed*, No. 19-1155 (2d Cir. Apr. 25, 2019) (*citing Leeward Const. Co., Ltd. v. Am. Univ. of Antigua-College of Med.*, 826 F.3d 634, 640 (2d Cir. 2016)). An arbitrator in this situation "must at least provide some rationale" for her rejection of a party's central argument. *Id.* If those standards are not met, remand is appropriate. *Smarter Tools Inc.*, 2019 WL 1349527, at *3.

That was the situation in *Porzig*: the district court had confirmed an arbitration award of statutory attorneys' fees, but the Second Circuit reversed, noting that the arbitration panel "did not explain how it came up" with the amount awarded. 497 F.3d 133, 140 (2d Cir. 2007). There, the award amount was suspicious because it was very close to the contingency fee amount, which the court had previously admonished was not the statutory cap. *Id.* Here, as well, the award amount (zero) is suspicious because the panel got that outcome from the amount of prior milestone payments, but did not explain why (and it is difficult to conceive how) the result could rationally be explained under the facts and clear law of *quantum meruit*. The arbitrators' lack of explanation here confirms that the award should be vacated.

The arbitrators' decision necessarily means that they assigned a zero value to such crucial services by Petitioner (*see* Award ¶ 76) as obtaining the *pari passu* injunctions and negotiating with the government leading up to the *Propuesta* settlement offer. The award of zero was in manifest disregard of the clear and established *quantum meruit* law directing how the reasonable value of services should be ascertained.

III.   **THE ARBITRATORS MANIFESTLY DISREGARDED THE LAW OF *QUANTUM MERUIT* BY FAILING TO CONSIDER THE RESULTS OBTAINED BY PETITIONER, THE CONTINGENCY NATURE OF THE ENGAGEMENT AGREEMENTS, AND THE TOTAL AMOUNT OF DAMAGES AND FEES AT ISSUE**

Even apart from the arbitrators' unexplained and insupportable zero award based on the prior milestone payments, the Award manifests the arbitrators' complete disregard of important factors plainly laid out in the law of *quantum meruit*. The arbitrators actually recited those factors at some length in the Award, but it was only lip service. The arbitrators did not explain or use these factors when describing how they made their award.

In particular, three components of *quantum meruit* law were manifestly disregarded by the panel:

### 1.     Amount at issue and results obtained

As noted above, one of the standard factors relevant to assessing the reasonable value of services is the "amount at issue and the result obtained." Award ¶¶ 74, 81. The Award mentions in passing that Respondents' claims involved over $90 million face amount of bonds (Award ¶ 35) and states that Milberg obtained a result of "a settlement offer worth in excess of $16 million to HWB." Award ¶ 81. Apart from the error in amount (it was $162.5 million), the only mention of the effect of these factors on the arbitrators' decision is the statement that qualitative factors justify fees "in excess of the amount that simple lodestar arithmetic might otherwise indicate on this record," which is then followed by adoption of the total milestone amount as the total fee, without further explanation. There is no indication that Petitioner's success at obtaining a settlement offer of $162.5 million for Respondents was considered, other than as a vaguely positive factor.

### 2.     The contingency nature of the engagement

In its pre-hearing briefing to the panel, Petitioner demonstrated that in cases involving discharge of an attorney whose engagement was based on contingency fees, *quantum meruit* may include consideration of the contingency. *See* Dahill Declaration, Ex. 17, pp. 13, 18 (citing *Lindy*

*Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 168 (3d Cir. 1973) ("The first of these [*quantum meruit* factors] is the contingent nature of success; this factor is of special significance where, as here, the attorney has no private agreement that guarantees payment even if no recovery is obtained."); *Biagioni v. Narrows MRI & Diagnostic Radiology, P.C.*, 127 A.D.3d 800, 801 (2d Dep't 2015) (citing *Padilla v. Sansivieri*, 31 A.D.3d 64 (2d Dep't 2006)); *Decolator, Cohen & DiPrisco, LLP v. Lysaght, Lysaght & Kramer, P.C.*, 304 A.D.2d 86, 92 (1st Dep't 2003)). Indeed, in *Padilla*, the court recognized that in *quantum meruit* "[a]lthough [a contingency] agreement is not binding on the court . . . it is some evidence of, inter alia, the parties' own assessment of their respective contributions." 31 A.D.3d at 67; *see also Smith*, 192 A.D.2d at 950 ("the terms of the percentage agreement is one factor that may be taken into account in determining the value of the services rendered").

While a contingency fee provision in an engagement agreement is not enforceable post-discharge in *quantum meruit*, the case law plainly accepts the lawyer's contingency risk as a factor—but there is no evidence that the arbitrators here took that factor into account at all. Even if the arbitrators thought the fixed milestone fees mitigated Petitioner's contingency risk, there is no authority that contingency factors should be properly excluded in hybrid-fee cases, particularly where the contingency was essentially satisfied prior to discharge.

### 3.    Equitable factors

"If the plaintiff fails to prove a valid contract, the court may nonetheless allow recovery in quantum meruit to assure a just and equitable result, where the defendant received a benefit from the plaintiff's services under circumstances which, in justice, preclude him from denying an obligation to pay for them." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (internal quotation marks and citation omitted). In its arbitration pre-hearing brief, Petitioner cited and

quoted this case, and described the right to recover in *quantum meruit* as being designed "to assure an equitable result,"[23] so this aspect of the law of *quantum meruit* was squarely in front of the arbitrators.

The arbitrators manifestly disregarded this law. It would be grossly inequitable for Respondents to succeed in paying zero fees under the circumstances here.

As described above, Petitioner obtained the *Propuesta* offer for its clients, including Respondents, whose bonds qualified for enhanced Injunction settlement amounts based on the *pari passu* injunctions Milberg obtained for Respondents in October 2015. The settlement amount for Respondents was $162.5 million, which Respondents knew when they discharged Petitioner in late April and early May 2016. Without the injunctions, a Standard settlement on Respondents' bonds would have been $24.37 million less.[24]

Two of Respondents' managers inquired of Milberg about the terms of their contingency fee obligation two weeks before Respondents discharged Milberg. The amount worked out to $11.9 million. Respondents did not give any reason for the discharge, other than the view (which was mistaken, as determined by the arbitrators, Award ¶¶ 68-70) that they were entitled to exercise contractual early termination rights. The discharge was not for cause. Petitioner argued in the arbitration that Respondents' termination was motivated, at least in part, specifically to avoid paying the $11.9 million in contingency fees.[25] The arbitrators did not mention these considerations.

A year later, Respondents accepted the Propuesta terms (albeit for less money than available with Petitioner). That places this case as close to fulfillment of the contingency defined

---

[23] Dahill Declaration, Ex. 17, p. 11.
[24] Spencer Test. ¶ 90.
[25] Dahill Declaration, Ex. 17, pp. 21-23 ("The Facts Demonstrate That Respondents Invoked the Early Termination Provisions to Avoid Paying Legal Fees to Claimant").

in the engagement agreements as it is possible to get. Although the arbitrators recognized this was the outcome, they did not mention it in their Award.

## **CONCLUSION**

Anyone with passing familiarity with complex litigation prosecuted on a contingency fee basis (but not, here, a class action) would be shocked to learn that a hard-fought case lasting well over a decade, which resulted in a settlement recovery by plaintiffs of $162 million, could end with an award of fees to plaintiffs' counsel of zero. The shock would not be mitigated by the fact that plaintiffs had paid their counsel some flat milestone fees (around $0.5 million) for work in the early stage of the cases. The shock would be amplified because the plaintiffs avoided paying the contingency fees specified in their engagement letters ($11.9 million) by discharging their counsel after the defendant agreed to the $162 million settlement, then accepting the same settlement a year later using new counsel.

The Award should be vacated and remanded to the arbitration panel with instructions for them to compute a fee consistent with the principles of *quantum meruit* and for such other and further relief as this Court deems just and proper.

Dated: New York, New York
        May 6, 2019

Respectfully submitted,

WOLLMUTH MAHER & DEUTSCH LLP

By:     /s/William F. Dahill
       William F. Dahill
       Mara R. Lieber

500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300

*Attorneys for Petitioner*

20